## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | |
|---|---|
| JUANA VILLEGAS, )<br><br>Plaintiff, )<br><br>v. )<br><br>METROPOLITAN )<br>GOVERNMENT OF DAVIDSON )<br>COUNTY/NASHVILLE -- DAVIDSON )<br>COUNTY SHERIFF'S OFFICE, )<br>JANET NAPOLITANO, in her official )<br>capacity as SECRETARY OF )<br>DEPARTMENT OF HOMELAND )<br>SECURITY, JOHN DOE 1, )<br>JOHN DOE 2, JOHN DOE 3, AND )<br>JOHN DOE 4, )<br><br>Defendants. ) | Case No. _____<br>Jury Demand |

## COMPLAINT

Plaintiff Juana Villegas, by and through her undersigned counsel, respectfully files this complaint.

### JURISDICTION AND VENUE

1.     This Court has jurisdiction of the action under 28 U.S.C. §§ 1331, 1343, and/or 1367. This action arises under the Constitutions of the United States and Tennessee, under federal and state law, and under 42 U.S.C. §§ 1981 and 1983. Ms. Villegas seeks declaratory and/or injunctive relief, compensatory and punitive damages, attorneys fees, expenses and costs, and such other relief that may be available to her.

2.     Venue in this Court is proper under 28 U.S.C. § 1391, and this Court has personal jurisdiction over the defendants in this matter because the events giving rise to this claim occurred in this district and one or more defendant resides here.

**PARTIES**

3.     Plaintiff Juana Villegas is, and at all times relevant to this litigation was, a citizen of Mexico residing in Davidson County, Tennessee.

4.     The Davidson County Sheriff's Office is a department of the Metropolitan Government of Nashville and Davidson County, which entities are collectively referred to herein as the "DCSO." Pursuant to the Charter of the Metropolitan Government of Nashville and Davidson County, the DCSO's primary duties are to house inmates and serve civil warrants.

5.     Janet Napolitano is the Secretary of the Department of Homeland Security, of which the United States Immigration and Customs Enforcement ("ICE") is an agency. Secretary Napolitano is responsible for the conduct of ICE, which is imputed to Secretary Napolitano.

6.     John Doe 1, John Doe 2, John Doe 3 and John Doe 4 are DCSO officers. They are sued in their official capacity to the extent their actions were within the scope of their employment and in their individual capacity to the extent some or all of their conduct described herein fell outside the scope of DCSO policy.

**STATEMENT OF FACTS**

**The Stop.**

7.     On July 3, 2008, Ms. Villegas was driving north on Bransford Avenue in the City of Berry Hill. Her 11-year-old child was in the passenger seat and her 14-year-old son and 2-year-old daughter were in the back seat. Ms. Villegas was nine months pregnant at the time and was on her way home from a doctor's appointment.

8.      After Ms. Villegas passed through the intersection of Bransford Avenue and Iris Drive, Berry Hill Police Officer Tim Coleman ("Coleman"), who was traveling south on Bransford Avenue, saw Ms. Villegas approaching and motioned for her to pull over.

9.      Coleman also stopped another vehicle driven by, upon information and belief, a Caucasian male.  Coleman spent a few minutes talking with the driver of that vehicle before permitting him to drive away.

10.     Coleman then approached Ms. Villegas's vehicle and, upon information and belief, ascertained that in addition to appearing Hispanic, Ms. Villegas could speak little English.

11.     With Ms. Villegas's fourteen-year-old son interpreting for his mother in Spanish, Coleman asked for her license and registration.  He never told Ms. Villegas why she was stopped; nor did he ask if she knew why she was stopped.

12.     Ms. Villegas could not provide a driver's license issued by a state of the United States; Coleman did not ask Ms. Villegas for another source of identification or evidence of a permanent address, even though she did, in fact, have such evidence with her.  Ms. Villegas nonetheless provided her consulate ID and vehicle registration.

13.     Coleman instructed Ms. Villegas to call someone who had a U.S. driver's license to retrieve her vehicle.  However, he did not inform Ms. Villegas that she would be arrested even though, upon information and belief, Coleman had already decided to arrest her and was in fact detaining Ms. Villegas as they waited for the arrival of Ms. Villegas' brother-in-law.

14.     Upon information and belief, Coleman had no reasonable suspicion that Ms. Villegas was engaged in any other illegal activity with the exception of questioning her legal status in the United States.

15.     Although Coleman was aware that Ms. Villegas was nine months pregnant and that she had three children with her, and even though it was 89 degrees on that hot Summer day, Coleman disregarded their health and safety by forcing them to wait in a hot car for over an hour until Ms. Villegas's brother-in-law arrived to retrieve the car.

**The Decision to Detain.**

16.     While Ms. Villegas and her children waited, a second officer, Corporal Ronnie Hill, arrived on the scene.  Coleman and Hill required Ms. Villegas to sign two documents: an arrest report and a citation.  These documents were neither explained to nor translated for Ms. Villegas.

17.     Upon information and belief, Coleman did not inform Ms. Villegas at any time prior to the arrival of her brother-in-law that she was under arrest or would be placed under arrest.  When she signed the arrest report, Ms. Villegas was unaware that she was being arrested.

18.     Although Coleman was aware, upon information and belief, that Ms. Villegas was nine months pregnant, he acted in disregard of her medical condition and arrested her, allegedly for a misdemeanor traffic violation: driving without a license.

19.     Tennessee law and the Berry Hill Police Department's own policies provide that Ms. Villegas should have been issued a citation for driving without a license – obviating the need to have her taken into custody.

20.     For example, Berry Hill promulgated SOP – 65: "Use of Citations in Lieu of Continued Custody of an Arrested Person."  The policy was in effect at the time of Ms. Villegas' arrest and provides:

> All Berry Hill Police Department personnel shall adhere to the provisions herein with respect to issuing state misdemeanor citations.  Officers **shall** issue citations in cases where:

A. The public will not be endangered by the continued freedom of the suspected misdemeanant; and
B. The officer has reasonable proof of the identity of the suspected misdemeanant; and
C. There is no reason to believe the suspected misdemeanant will not appear as required by law; and
D. Issuance of such citation is not specifically prohibited by statute and/or standard operating procedure.

21. Instead of respecting Berry Hill policy and Tennessee statutory authority, Coleman—based on his suspicion, upon information and belief, of her legal status and in furtherance of the 287(g) program discussed below—chose to arrest Ms. Villegas in front of her three children.

22. The Illegal Immigration Reform and Immigrant Responsibility Act (IIRAIRA), effective September 30, 1996, added section 287(g), performance of immigration officer functions by state officers and employees, to the Immigration and Nationality Act (INA). This authorizes the Secretary of the U.S. Department of Homeland Security (DHS) to enter into agreements with state and local law enforcement agencies, permitting designated officers to perform immigration law enforcement functions, pursuant to a Memorandum of Agreement.

23. According to ICE, the program has led to the identification and detention of more than 70,000 individuals (since January 2006), mostly in jails, based solely on suspicion of their legal status.

24. Coleman, upon information and belief seeking to further the 287(g) program, arrested Ms. Villegas, separated her from her three children, and ordered her to get into his patrol car under the threat of cuffing her, telling her she had 20 seconds to kiss her kids goodbye as she would not be seeing them again. As her children cried, Ms. Villegas was transported to the Metro-Davidson County Detention Facility ("detention center") in Nashville, Tennessee for processing under the 287(g) program. Upon information and belief, absent the 287(g) program,

Ms. Villegas would not have been arrested, detained and remained in DCSO custody for as long as she did.

25.     Upon information and belief, ICE placed or authorized and permitted to be placed a federal detainer against Ms. Villegas.

26.     ICE did not have authority to place or authorize the placement of a federal detainer against Ms. Villegas. Section 236 of the INA (8 U.S.C. § 1226) pertains to the authority of DHS to arrest and detain aliens for whom the Attorney General or the Secretary for Homeland Security has issued a warrant. This section says nothing about the issuance of detainers under DHS authority to agents of state or local law enforcement. Section 287 of the INA (8 U.S.C. § 1357) pertains to the powers of DHS officers and governs actions taken without warrants. Its only reference to detainers occurs at §287(d), which limits the issuance of a detainer for an alien who is arrested by a law enforcement agency for violation of any law relating to controlled substances, and it says nothing about the issuance of any detainer for any other aliens. Thus, detainers authorized pursuant to this statutory authority should be issued only for aliens arrested for controlled substance violations.

27.     Ms. Villegas was neither arrested for nor convicted of a controlled substance violation. Therefore, the ICE detainer against Ms. Villegas, which was enforced by the DCSO, was not authorized by statute or regulation, and had no legal authority, but was nonetheless carried out under color of law.

28.     The federal detainer rendered it practically impossible for Ms. Villegas to obtain the services of a bond agency to post her $4,000 criminal bond and thus arrange her release from the detention center. Upon information and belief, ICE and DCSO were aware of this consequence of the detainer.

29.     As a recent GAO report found, ICE has failed to provide its state and local partners with clearly defined objectives for the 287(g) program or to create a consistent system for supervising them.

**The Detention.**

30.     When Ms. Villegas was booked at the detention center, she received "pregnancy papers," designed to verify her pregnancy and prevent guards at the facility from shackling her feet.

31.     According to Article 36 of the Vienna Convention on Consular Relations and Optional Protocols, adopted by the United States, when a foreign national is arrested or detained, authorities of the receiving state must notify her "without delay" of her right to have her country's local consular officer contacted.  Ms. Villegas, a Mexican citizen, is a foreign national and according to the arrest report Ms. Villegas "provided a Mexican I.D."

32.     At no time during Ms. Villegas's arrest or detention was Ms. Villegas informed of her right to contact the Mexican consular officer.  The Mexican Consulate in Atlanta, Georgia was never contacted regarding Ms. Villegas's detention.

33.     Ms. Villegas was detained at the detention center for several days by DCSO under the auspices of a Memorandum of Agreement and/or an Inter-Governmental Service Agreement ("the Agreement") between ICE and Davidson County, Nashville, Tennessee for the detention and care of foreign nationals.  A copy of the Memorandum of Agreement signed by DCSO and ICE on and around January 31, 2007, and the Inter-Governmental Service Agreement signed on or around August 4, 2007, are attached as **Collective Exhibit 1.**

34.     The Agreement sets forth certain standards that are to be followed by DCSO. These standards include ICE policies, which, for example, in various contexts require officers to

identify at the earliest opportunity people arrested on noncriminal immigration violations who may be sole caregivers or who have other humanitarian concerns. Those who are to be evaluated for immediate humanitarian release include pregnant women and nursing mothers. These evaluations are to be made the day of an arrest.

35.    Upon information and belief, ICE has not enforced the terms of the Agreement and/or failed to require DCSO's performance of its contractual obligations.

36.    Disregarding the ICE policies and, upon information and belief, following its own policies and procedures, DCSO continued to detain Ms. Villegas despite the fact that she was nine months pregnant and the caregiver for three children.

37.    Pursuant to DCSO policy, Ms. Villegas was classified as a medium security risk for no reason other than her immigration status. Upon information and belief, ICE was aware that the federal detainer and/or Ms. Villegas' immigration status would result in her classification as a medium security risk.

38.    No rational person could consider her a security risk: she had no outstanding criminal charges, arrests or warrants; she was not violent or uncooperative; and, particularly due to her advanced stage of pregnancy and her three children at home, she did not reasonably present a flight risk.

39.    Upon information and belief, DCSO officers never made an individualized determination that Ms. Villegas presented a substantial flight risk or some other extraordinary security threat to the safety and security of DCSO staff, other detainees, or the public.

40.    International standards stipulate that jails and prisons should use restraints only when restraints are required as a precaution against escape or to prevent an inmate from injuring

him or herself or other people or damaging property. In every case, due regard must be given to an inmate's individual history.

41. International standards provide that the routine use of restraints on pregnant women is cruel, inhumane and degrading treatment, and given medical and other factors impeding pregnant or birthing women from attempting escape or becoming violent, the presumption must be that no restraints should be applied. A woman's privacy and dignity must be respected during labor and birth.

42. International standards provide that:

- Leg irons, shackles, belly chains or handcuffs behind the body may not be used at any time during pregnancy.

- For pregnant women in the third trimester no restraints may be applied, including during transportation.

- Under no circumstances may restraints of any kind may be used on a woman in labor or while she is giving birth.

- A female correctional officer should accompany the woman during transport to the hospital for prenatal checkups as well as for the delivery itself, and should remain immediately outside the room during checkups, and a woman's labor and delivery, unless the woman wishes otherwise. The officer should be trained to be sensitive to the medical and emotional issues of pregnancy and childbirth.

- No restraints should be applied while a woman remains in the hospital during recovery, and all efforts should be made to afford the mother reasonable access to the baby without having impeding her movements by restraints.

- Restraints should not be applied during transportation back to the detention facility.

**Ms. Villegas' Labor.**

43. After being detained for two days, on the evening of July 5, 2008, Ms. Villegas went into labor while in her cell at the detention center. She was taken to the nurse's station, where her feet and hands were shackled awaiting transportation to the hospital.

44.     Ms. Villegas was taken to Nashville General Hospital in Nashville, Tennessee, placed on a gurney, and moved into a hospital room. Her hands and feet remained shackled.

45.     When she arrived at Nashville General to deliver her son, two male DCSO officers, John Does 1 and 2, were waiting in her hospital room. The nurses asked the officers to step out of the room so that Ms. Villegas could have some privacy as she changed into a hospital gown; the officers refused and instead subjected Ms. Villegas to personal embarrassment and further emotional distress by forcing her to change in their presence.

46.     DCSO officers John Doe 1 and 2 unplugged the telephone in Ms. Villegas' hospital room and thereby prevented Ms. Villegas from notifying her husband of the impending birth of their child. According to the DCSO, its officers followed DCSO policy in this regard.

47.     Although Ms. Villegas was in labor, John Doe 1 shackled Ms. Villegas's left foot and right hand to the hospital bed as soon as Ms. Villegas laid down so that she could only move her left ankle and right wrist six inches from the metal bed while she was in labor.

48.     The hospital staff complained to John Doe 1 that the shackling of Ms. Villegas was "barbaric" and in violation of medical standards. Despite their pleas, John Doe 1 refused to unshackle Ms. Villegas.

49.     The attending physician went so far as to order that the shackles be removed for the safety of the mother and the child.

50.     When John Doe 1 completed his shift, he was replaced by another DCSO officer who removed the shackles and told Ms. Villegas that he would not shackle her again. This officer stood outside Ms. Villegas's door during the rest of her labor and while she was delivering her baby. No claim is brought against this officer.

**The Birth of Ms. Villegas' Son.**

51.     Ms. Villegas gave birth at approximately 1:00 a.m. on Sunday, July 6, 2008.

52.     After Ms. Villegas gave birth, and notwithstanding the physician's order that Ms. Villegas not be shackled, another DCSO officer, John Doe 3, again shackled Ms. Villegas to the hospital bed notwithstanding the serious risk of injury to her.

53.     Nurses instructed Ms. Villegas to walk around as much as possible after her baby was born to loosen the muscles in her lower body.   In spite of these instructions, the officers "guarding" Ms. Villegas would not let her walk around the room for more than ten minutes at a time before forcing her to get back in bed where she was shackled to the bed.

54.     Even when Ms. Villegas was permitted to walk around the room or go to the bathroom, Officer John Doe 3 required—despite pleas from the nursing staff to the contrary— that Ms. Villegas' feet be shackled.   This prevented Ms. Villegas from properly exercising her sore muscles and caused her significant and ongoing pain and stiffness.

55.     Ms. Villegas was also shackled when she took a shower.   When a nurse explained that the shackles must be removed so Ms. Villegas could adequately and safely take care of necessary post-childbirth hygiene, Officer John Doe 4 refused to remove the shackles consistent with these medical requests.

56.     As a result of the shackling during labor and post-partum recovery, Ms. Villegas not only incurred severe pain, suffering and emotional distress, but she continued to suffer pain, especially to her leg, for considerable time afterwards.

57.     After giving birth, DCSO officers prevented Ms. Villegas from contacting anyone, including her husband, to notify them that she was at the hospital or that she had given birth.

58.     As a result of the DCSO's actions, Ms. Villegas and her husband were denied the opportunity to share in the birth of their child. Similarly, Ms. Villegas' other children were denied the opportunity to share in the birth of their sibling.

59.     Ms. Villegas' newborn baby was also taken from Ms. Villegas and she was not told and did not know when she would see her son again.

60.     Upon information and belief, it is customary practice at Nashville General for a Polaroid photograph of a newborn baby to be given to the mother. The DCSO officer prohibited the Nashville General nurses from giving Ms. Villegas a photograph of her son.

61.     Ms. Villegas remained admitted at Nashville General Hospital from Saturday, July 5, 2008, until Tuesday, July 8, 2008.

**Discharge from the Hospital.**

62.     Before Ms. Villegas left Nashville General Hospital, a nurse provided her with a breast pump and moisturizers to enable her to express her break milk safely, hygienically, and to reduce pain, while she was separated from her newborn and unable to nurse. The nurse communicated the medical purpose of the breast pump and moisturizers to the DCSO officer, but the officer refused to allow Ms. Villegas to take the breast pump and moisturizers with her.

63.     Upon information and belief, DCSO's official position is that John Doe 1, 2, 3, and 4's treatment of Ms. Villegas, including the use of shackles on Ms. Villegas during labor and post-partum recovery, refusing to allow Ms. Villegas to notify her husband of her impending delivery or the birth of their newborn, and refusing to accept medically recommended supplies for Ms. Villegas, were all consistent with established DCSO policy and custom.

64.     Upon information and belief, DCSO and Officers John Does 1, 2, 3, and 4, were, at all relevant times, aware that the use of mechanical restraints during labor and post-partum

recovery is unsafe, unsanitary, dangerous, poses a substantial risk of harm to the mother's and baby's health and safety, and is contrary to the community standard of medical care.

65. Upon information and belief, DCSO and Officers John Does 1, 2, 3, and 4, were, at all relevant times, aware that denying a post-partum woman access to a breast pump to express milk while separated from her newborn posed a substantial risk of pain and infection and is contrary to the community standard of medical care.

66. Because Ms. Villegas was not allowed to take the breast pump with her to the detention center, her breasts became swollen and Ms. Villegas experienced such tremendous pain that she could not move or sleep. Eventually, Ms. Villegas developed mastitis, an infection of the breast tissue caused by an inability to express her breastmilk by breastfeeding her newborn or otherwise expressing the milk.

67. Because Ms. Villegas was not allowed to properly exercise the muscles in her lower body while she was at Nashville General Hospital, Ms. Villegas experienced cramping, stiffness, and pain for weeks and was unable to fully straighten her left leg, which had been shackled to the hospital bed.

68. Upon her departure from the hospital, Ms. Villegas was separated from her child and would remain separated until her release from the detention center, causing severe emotional distress and damage to Ms. Villegas.

69. After being released from the hospital, Ms. Villegas pled guilty to driving without a license. Up until this point, Ms. Villegas was a pretrial detainee. Ms. Villegas pled guilty based on her understanding doing so would permit her to be released from DCSO custody and transferred to the direct custody of ICE.

70.     Upon transfer to the custody of ICE, she was granted release by Special Agent Butcher on humanitarian grounds.

71.     Upon information and belief, ICE was or should have been aware (i) of the state of Ms. Villegas' pregnancy at or around the time of her initial booking, (ii) that humanitarian grounds justified her immediate release, (iii) that despite her pregnancy, DCSO would classify her as a medium security risk, and (iv) that Ms. Villegas would be subject to DCSO's policies that caused the harm described herein.

72.     Nonetheless, and upon information and belief, ICE took no action to protect Ms. Villegas' physical and medical safety from the time of her booking until her release.

73.     Subsequent to her release, Ms. Villegas went to Berry Hill municipal court to challenge the basis for the stop in her criminal case.  Ultimately, the charge upon which she was stopped was dismissed.

## CAUSES OF ACTION

### DCSO's and ICE's Violation of the 14th Amendment of the U.S. Constitution and Article 1, Section 8 of the Tennessee Constitution
### Substantive Due Process
### (Deliberate Indifference to a Serious Medical Need)

74.     All allegations set forth in this Complaint are hereby incorporated by reference.

75.     As applied to Ms. Villegas, DCSO's practice and policy of requiring mechanical wrist and ankle restraints on pregnant women during transport to the hospital and while in labor and on new mothers during post-partum recovery, in the absence of a specific and individualized assessment that a laboring or post-partum woman presents a substantial flight risk or extraordinary threat to the safety of staff or other detainees, constituted a policy of deliberate indifference to Ms. Villegas' serious medical needs.

76.     As applied to Ms. Villegas, DCSO's practice and policy of prohibiting post-partum mothers from using a medically recommended and provided breast pump and related supplies constituted a policy of deliberate indifference to Ms. Villegas' serious medical needs.

77.     ICE failed to train and/or require the training of DCSO officers, failed to review DCSO policy when it entered into the Agreement with DCSO or thereafter, failed to enforce the terms of the Agreement or take such other actions that could have avoided the injuries caused to Ms. Villegas, facilitated and enabled a program that led to Ms. Villegas' detention, and therefore facilitated, enabled, ratified and/or sanctioned DCSO in carrying out the policies that resulted in the conduct complained of herein.

78.     As a proximate result of ICE's and DCSO's unconstitutional policies, practices, acts and omissions, Ms. Villegas suffered immediate and irreparable injury, including physical, psychological and emotional injury and risk of death.

### Officers John Does' Violations of the 14th Amendment of the U.S. Constitution and Article 1, Section 8 of the Tennessee Constitution Substantive Due Process (Deliberate Indifference to a Serious Medical Need)

79.     All allegations set forth in this Complaint are hereby incorporated by reference.

80.     Officers John Does 1, 2, 3 and 4, were aware that Ms. Villegas had a serious medical need and knew that placing shackles on Ms. Villegas during transport to the hospital, while in labor and during post-partum recovery posed a substantial risk of serious harm to her safety and health.  Officers John Does 1, 2, 3, and 4 evinced deliberate indifference to Ms. Villegas' serious medical needs when they placed her in restraints during labor and recovery despite medical orders to remove the restraints.

81.     Officer John Doe 4 was aware that Ms. Villegas had a serious medical need and that denying her access to a breast pump and related medical supplies posed a substantial risk of

serious harm to her safety and health. Officer John Doe 4 evinced deliberate indifference to her serious medical needs when he denied these medically provided supplies for Ms. Villegas.

82.     To the extent the actions alleged above were not customary or in compliance with DSCO practice and policy, then John Does 1-4 are liable in their individual capacities because a reasonable officer in their positions would have known that shackling a laboring and post-partum woman and denying her medical supplies, all contrary to medical orders and/or standards, constitute deliberate indifference to serious medical needs.

83.     As a proximate result of John Does 1-4's unconstitutional policies, practices, acts and omissions, Ms. Villegas suffered immediate and irreparable injury, including physical, psychological and emotional injury and risk of death

**All Defendants' Violation of the 14th Amendment of the U.S. Constitution**
**and Article 1, Section 32 of the Tennessee Constitution**
**Substantive Due Process**
**(Shackling a Pregnant or Post-Partum Detainee is Cruel and Unusual Punishment)**

84.     All allegations set forth in this Complaint are hereby incorporated by reference.

85.     Ms. Villegas was a pretrial detainee who was being held on a charge of driving without a license.

86.     Under Tennessee law, the charge of driving without a license is a class B misdemeanor, most commonly punished by a fine of not more than $500.

87.     During all times relevant to this Complaint, Ms. Villegas did not pose a threat to herself or others, nor was she a security risk of any kind.

88.     DCSO's policy and practice that resulted in the shackling of Ms. Villegas' hands and feet during transport to the hospital to deliver her baby, while she was in labor, and during post-partum recovery, in the absence of any indication that she posed a security risk, was not rationally related to a legitimate, non-punitive government purpose, as such it was arbitrary and

without purpose, and therefore constitutes punishment in violation of the Due Process Clause of the Fourteenth Amendment.

89.     DCSO's policy and practice that resulted in the shackling of Ms. Villegas' hands and feet during transport to the hospital to deliver her baby, while she was in labor, and during post-partum recovery, in the absence of any indication that she posed a security risk, was a grossly excessive response to any stated purpose evinced by Defendants, and therefore constitutes punishment in violation of the Due Process Clause of the Fourteenth Amendment.

90.     As a proximate cause of the policy and practice that resulted in the shackling of Ms. Villegas' hands and feet during transport to the hospital to deliver her baby, during labor and during post-partum recovery, Ms. Villegas experienced unnecessary physical injury, pain and suffering.

91.     ICE failed to train and/or require the training of DCSO officers, failed to review DCSO policy when it entered into the Agreement with DCSO or thereafter, failed to enforce the terms of the Agreement or take such other actions that could have avoided the injuries caused to Ms. Villegas, facilitated and enabled a program that led to Ms. Villegas' detention and security classification, and therefore facilitated, enabled, ratified and/or sanctioned DCSO in carrying out the policies that resulted in the conduct complained of herein.

92.     To the extent the DCSO officers' conduct described in this complaint was not customary or in compliance with DSCO policy, then John Does 1-4 are liable in their individual capacities.

### All Defendants' Violation of Right of Familial Association and Right to Privacy under the U.S. and Tennessee Constitutions

93.     All allegations set forth in this Complaint are hereby incorporated by reference.

94. The officers of the DCSO who were assigned to guard Ms. Villegas while she was in Nashville General Hospital prevented Ms. Villegas from seeing or nursing her baby, or communicating with her husband and family, without any form of hearing.

95. In doing so, the officers, in accordance with the common practice and custom of the DCSO, denied Ms. Villegas her fundamental right to family integrity without first conducting a hearing, even though the officers were acting in a non-emergency situation. This violated Ms. Villegas' rights under the U.S. and Tennessee Constitutions.

96. The officers violated Ms. Villegas's clear and well-established Constitutional right to due process of the law.

97. The DCSO failed to adequately train the officers guarding Ms. Villegas on the fundamental right to family integrity, which reflects a deliberate indifference to the rights of pregnant detainees.

98. ICE failed to train and/or require the training of DCSO officers, failed to review DCSO policy when it entered into the Agreement with DCSO or thereafter, failed to enforce the terms of the Agreement or take such other actions that could have avoided the injuries caused to Ms. Villegas, facilitated and enabled a program that led to Ms. Villegas' detention, and therefore facilitated, enabled, ratified and/or sanctioned DCSO in carrying out the policies that resulted in the conduct complained of herein.

99. To the extent the actions described above were not customary or in compliance with DSCO policy, then John Does 1-4 are liable in their individual capacities.

**DCSO's Breach of Contract**

100. All allegations set forth in this Complaint are hereby incorporated by reference.

101. The Agreement between ICE and DCSO sets forth certain contractual obligations and rights with respect to the detention and care of persons detained under the authority of the INA.

102. Among other things, the contract specifies the standard of care with which DCSO officers must treat detainees under the Agreement. The purpose of specifying the standard of care is to benefit detainees and confer a right of performance on the detainees.

103. Since 2007, ICE has required its officers making arrests to identify at the earliest opportunity people arrested on noncriminal immigration violations who may be sole caregivers or who have other humanitarian concerns.

104. Those who are to be evaluated for immediate humanitarian release include pregnant women and nursing mothers. These evaluations are to be made the day of an arrest.

105. Hours after she was sentenced to time served on her traffic violation and turned over to ICE agents to deal with her immigration status, she was released. This release was based on humanitarian grounds.

106. Upon information and belief, DCSO breached the Agreement with ICE when participating DCSO personnel:

   (a) failed to provide Ms. Villegas with an interpreter or an opportunity to request an interpreter;

   (b) failed to abide by all federal civil rights statutes and regulations when guarding Ms. Villegas at Nashville General Hospital, as described in the allegations above;

   (c) failed to give timely notice to the ICE supervisory officer within 24 hours of issuing a detainer against Ms. Villegas;

   (d) failed to exercise the ICE Use of Force Policy against Ms. Villegas; and

(e) violated the Vienna Convention.

107. Upon information and belief, DCSO also breached the Agreement with ICE by permitting Coleman, who was and is not a participating personnel member under the Agreement, to conduct immigration officer functions listed in the Agreement, including:

(a) interrogating Ms. Villegas, who he believed to be an alien, as to her right to be or remain in the United States; and

(b) detaining and transporting Ms. Villegas, who he arrested, upon information and belief, for being an alien.

108. Upon information and belief, Ms. Villegas is a third-party beneficiary to the Agreement between ICE and DCSO.

109. DCSO and ICE specifically intended to benefit and protect the interest of third parties such as Ms. Villegas through the Agreement. The parties agreed, for instance, that:

(a) participating DCSO personnel must provide an opportunity for subjects with limited English language proficiency to request an interpreter;

(b) participating DSCO personnel shall give timely notice to the ICE supervisory officer within 24 hours of any detainer issued under the authorities set forth in the Agreement; and

(c) the policies and procedures utilized by the participating DCSO personnel shall be DHS and ICE policies and procedures, including the ICE Use of Force Policy.

These provisions indicate that ICE and DCSO intended to protect the interests of individuals, including Ms. Villegas, who are detained pursuant to the Agreement.

110.     As a third-party beneficiary of the Agreement between ICE and DCSO who was injured because DCSO breached the Agreement, Ms. Villegas is entitled to recover damages for breach of contract.

## PRAYER FOR RELIEF

**WHEREFORE, PREMISES CONSIDERED**, Ms. Villegas respectfully requests and prays:

1.     The proper process issue and be served on ICE and DCSO, with the latter being required to identify John Does 1 – 4 so that process may be issued upon them;

2.     That Ms. Villegas receive a jury trial on all the issues so triable;

3.     That Ms. Villegas be awarded compensatory damages in an amount to be determined at trial;

4.     That Ms. Villegas be awarded punitive damages to the extent applicable in an amount to be determined at trial;

5.     That the Court award any declaratory and/or injunctive relief that may be available;

6.     That the Court award attorneys' fees, expenses and costs in this action to the full extent permissible, including pursuant to 42 U.S.C. § 1988; and

7.     That Ms. Villegas be awarded such other, further, and general relief which the Court deems proper or appropriate.

Respectfully Submitted,

SHERRARD & ROE, PLC

_____
William L. Harbison (No. 7012)
Phillip F. Cramer (No. 20697)
John L. Farringer IV (No. 22783)
424 Church Street, Suite 2000
Nashville, TN 37219
(615) 742-4200


IMMIGRATION LAW OFFICES OF
ELLIOT OZMENT
Elliot Ozment (No. 4331)
1214 Murfreesboro Pike
Nashville, TN 37217
(615) 321-8888


Attorneys for Juana Villegas