# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| JUANA VILLEGAS, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | No. 3:09-0219 |
| | ) | |
| THE METROPOLITAN GOVERNMENT | ) | **Judge Haynes** |
| OF DAVIDSON COUNTY/NASHVILLE -- | ) | |
| DAVIDSON COUNTY SHERIFF'S | ) | |
| OFFICE, et al. | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Pursuant to Local Rule 7.01(a), Plaintiff Juana Villegas submits this memorandum of law in support of her Motion for Summary Judgment that Defendant The Metropolitan Government of Davidson County/Nashville – Davidson County Sheriff's Office ("Metro" or "DCSO") violated her constitutional rights and is liable to Ms. Villegas. Ms. Villegas is moving for summary judgment as to liability only and reserves for trial or a future hearing her damages resulting from Metro's illegal actions.

It is undisputed that Metro's policies in effect in July 2008 required that Ms. Villegas be restrained and shackled while pregnant, while in labor, while in transportation to the hospital for delivery, while in her hospital bed in active labor, during post-partum recovery in her bed, and when out of her bed in the hospital, including while using the restroom and shower after giving birth to her child. It is undisputed that Metro's policies and practice resulted in the DCSO officers ignoring a "no restraints" order signed by Ms. Villegas' physician at Metro General Hospital as well as requests from other medical personnel to remove the shackles and restraints

both before and after Ms. Villegas gave birth to her child. Further, it is undisputed that Metro's policies did not allow Ms. Villegas to exercise her muscles and walk around the hospital after giving birth to her child, except within her own room and with shackles and restraints applied, and did not allow her to take a breast pump and other medical devices and products back to the detention center with her. It is also undisputed that Metro's policies did not allow Ms. Villegas to contact or see her husband, nor control the possession and care of her newborn child only two days after he was born. Finally, it is undisputed that the DCSO officers in charge of guarding Ms. Villegas followed these policies in their interaction with Ms. Villegas (with the exception of Cpl. Peralta, who violated the policies by removing the restraints just before Ms. Villegas gave birth).

As a matter of law, it was established legal precedent well prior to 2008 that (a) the use of shackles and restraints on pregnant women, women in labor, and women in post-partum recovery was unconstitutional; (b) indifference to the medical needs of detainees was unconstitutional; and, (c) indifference to a detainee's right to familial association was unconstitutional. Metro either knew or should have known of these established legal principles and ignored them with deliberate indifference and in a manner that shocks the conscience. Accordingly, based on the undisputed facts, Ms. Villegas is entitled to partial summary judgment as to the liability of Metro for violating her constitutional rights.

## BACKGROUND AND UNDISPUTED MATERIAL FACTS[1]

Ms. Villegas was stopped in her car by Berry Hill Police Officer Tim Coleman on July 3, 2008, and charged with driving without a license.  (SUMF at ¶ 5.)  At the time she was nine (9) months pregnant.  (SUMF at ¶ 6.)  Ms. Villegas was transferred by Officer Coleman to the Davidson County Detention Center (the "Detention Center") on July 3, 2008.  (SUMF at ¶ 5.)

On July 5, 2008, after being held at the Detention Center for two days, Ms. Villegas' water broke and she went into active labor.  (*Id.* at ¶ 7; Deposition of Corporal Matthew Barshaw Depo. ("Barshaw Depo.," part of Collective Exhibit A to SUMF) at 18-19.)  Ms. Villegas was shackled and handcuffed, with her wrists restrained to each other and her ankles restrained to each other, as she was placed on a stretcher while in labor.  (SUMF at ¶ 8; Barshaw Depo. at 22.)  This treatment of Ms. Villegas was in compliance with the DCSO policy on restraining pregnant inmates in effect at the time.  (SUMF at ¶ 9; Deposition of Ruby Joyner ("Joyner Depo.," part of Collective Exhibit A to SUMF) at 11; Rule 30(b)(6) Deposition of Metro ("Dep. of DCSO," part of Collective Exhibit B to SUMF) by Sheriff Daron Hall[2] at 23.)  Ms. Villegas remained shackled and handcuffed as she was brought to an ambulance, transported in the ambulance to Metro General Hospital, and brought to a hospital bed.  (SUMF at ¶ 10; Barshaw Depo. at 21-22.)

With respect to the transportation from the Detention Center to the hospital, Officer Barshaw testified in his deposition that he had no experience in transporting a woman in labor and had not been trained for such a situation.  (Barshaw Depo. at 20-21, 35, 52-53, 56, 80-83,

---

[1]  A Statement of Undisputed Material Facts ("SUMF") is filed separately in support of this motion.  The Statement of Undisputed Material Facts contains citations to Metro's responses to requests for admission and other documents supporting each statement.  All of those citations are not restated in this motion, although citations to deposition transcripts have been noted herein.  In addition to the material facts, additional facts (with additional citations) are contained in this section in order to give the Court background and context.
[2]  Metro presented two representatives in response to Ms. Villegas' Rule 30(b)(6) deposition notice: Kimberly Peery (Director of Standards for the Davidson County Sheriff's Office) and Sheriff Daron Hall.  Copies of the two deposition transcripts for Metro's Rule 30(b)(6) deposition are attached as Collective Exhibit B to SUMF.

510583.12   08294-001

92-93, 95-96.) Officer Barshaw thought it was strange that two male officers were put in charge of a woman in labor for obvious privacy reasons. (Barshaw Depo. at 20.) He also testified that he was concerned about the use of restraints because of the possibility that the baby might arrive in the ambulance on the way to the hospital and it would take time to remove the restraints, but that his supervisor Lt. Quintal instructed him to keep them in place. (SUMF at ¶ 11; Barshaw Depo. at 23.)

Once at the hospital, Officers Barshaw and Farragher remained in the room while Ms. Villegas undressed and put on a hospital gown. (SUMF at ¶ 12; Barshaw Depo. at 29-30.) DCSO does not train its officers with respect to privacy concerns in such situations. (SUMF at ¶ 13.) The medical staff requested that the handcuffs be removed from Ms. Villegas for her medical examination, but Officer Farragher only agreed to remove them for a few seconds while the hospital gown could be put on Ms. Villegas. (SUMF at ¶ 14; Barshaw Depo. at 31-33.) Ms. Villegas was not allowed to contact her husband or other family, even by telephone, at any time. (SUMF at ¶ 15; Barshaw Depo. at 40; Deposition of Corporal David Peralta ("Peralta Depo.," part of Collective Exhibit A to SUMF) at 35-36.) As a result, Ms. Villegas's husband and children were not present during Ms. Villegas's labor and delivery. (SUMF at ¶ 16.) Throughout this process, Officer Barshaw described the medical staff at Metro General Hospital as "annoyed" at his refusal to remove the restraints. (*Id.* at ¶ 17; Barshaw Depo. at 317.) Officer Barshaw testified that his actions in restraining Ms. Villegas were based on DCSO policies, which did not distinguish between an inmate convicted of a crime versus an inmate that was merely awaiting bail. (SUMF at ¶ 18; Barshaw Depo. at 45, 57, 77-78.)

At 11:20 p.m. on July 5, 2008, Dr. Robertson signed a physician's order stating: "Please remove shackles" (hereinafter, the "No Restraint Order," a copy of which is attached as Exhibit

Case 3:09-cv-00219   Document 85   Filed 10/22/10   Page 4 of 26 PageID #: 762

E to SUMF). The No Restraint Order was made part of Ms. Villegas' medical file at Metro General Hospital. (Deposition of Michelle Ray ("Ray Depo.," part of Collective Exhibit A to SUMF) at 25-26.) There is no other order in the record at any time in which a physician orders that the shackles or other restraints be reapplied or alters in any way the No Restraint Order. (SUMF at ¶ 20.)

While in written discovery responses Metro attempts to dispute that the order was ever "issued" or given to Metro, the depositions of the actual DCSO officers involved in guarding Ms. Villegas tell a different story. Cpl. Moore (who guarded Ms. Villegas both before and after she gave birth on separate shifts), testified that she was informed by medical personnel that a no restraint order was coming before it was actually signed, and that she told the officers relieving her to expect a no restraint order to be issued. (SUMF at ¶ 22; Deposition of Corporal Brandi Moore ("Moore Depo.," part of Collective Exhibit A to SUMF) at 32-33, 83-85; Peralta Depo. at 10; Ray Depo. at 36.) Cpl. Flatt was also informed by a nurse that there was a No Restraint Order in place after Ms. Villegas gave birth, but his supervisor, Sgt. Danny Dorsey, ordered that restraints remain in place. (SUMF at ¶ 23; Moore Depo. at 64.)[3] Cpl. Flatt was not ordered to request a copy of the No Restraint Order, was not ordered to seek out the physician to ask for an explanation, and was not ordered to make any notation in the log kept by DCSO officers regarding the No Restraint Order. At the end of his shift, Cpl. Flatt informed the next DCSO officer, Cpl. Moore, of the existence of the No Restraint Order. (*Id.* at ¶ 24; Moore Depo. at 63, 84, 87-88.)

---

[3] At his deposition, Sgt. Dorsey had no recollection one way or the other of these events. (Deposition of Sergeant Danny Dorsey ("Dorsey Depo.," part of Collective Exhibit A to SUMF) at 25-26.) He did testify generally that he would order corporals reporting to him not to follow a physician's order to "remove shackles" unless the corporal first asked the doctor for a more detailed explanation. (*Id.* at 45-46.) No corporal deposed recalled being asked to make further inquiries of the physician.

Just like Cpl. Flatt, Cpl. Moore contacted her supervisor about the No Restraint Order and was told to "put restraints on." (SUMF at ¶ 26; Moore Depo. at 64-65.) As was previously noted, Cpl. Moore was not surprised by the existence of the No Restraint Order because she had been told by a nurse in her previous shift that such an order would be signed. Nevertheless, just like Cpl. Flatt, Cpl. Moore was ordered to keep the restraints on Ms. Villegas and ignore the No Restraint Order. (SUMF at ¶ 26; Moore Depo. at 64.) Cpl. Moore testified that she followed DCSO policies by using leg irons on Ms. Villegas, including when she used the restroom or shower after giving birth to her son. (SUMF at ¶ 27; Moore Depo. at 47, 56.) Another nurse confirmed to Cpl. Moore that there was a No Restraint Order in place, but that did not make any difference to Cpl. Moore or her supervisor. (SUMF at ¶ 25; Moore Depo. at 60-61, 71.) Cpl. Moore testified that the medical staff at Metro General Hospital commented about the continued use of restraints on Ms. Villegas, stated that the DCSO officers "shouldn't put leg irons on her," and was "rude about it." (SUMF at ¶ 28; Moore Depo. at 59-60.) Cpl. Moore responded that "it was policy to put leg irons on her." (SUMF at ¶ 29; Moore Depo. at 59-60; Dep. of DCSO (Hall) at 23.) After Ms. Villegas again requested that her husband be allowed to visit her and their newborn son, Cpl. Moore denied the request based on DCSO's written policies. (SUMF at ¶ 30; Moore Depo. at 61.)

During the time after which Ms. Villegas' water broke on July 5th, when she gave birth on July 6th, and until she returned to the Detention Center on July 8th she was guarded by the following DCSO employees (in temporal order of their first appearance): Matthew Barshaw, Thomas Farragher, Brandi Moore, David Peralta, Tony Flatt, David Humphries, David Hodge, Scott Carpenter, Eric Robinson, Thomas Franklin III, and David McCollum. (SUMF at ¶ 31.)

Of the DCSO officers guarding Ms. Villegas, only one removed the shackles and handcuffs[4] and stood outside the hospital room to provide Ms. Villegas some level of privacy. (*Id.* at ¶ 34.)

When Cpl. Peralta's shift guarding Ms. Villegas began at 11:00 pm on July 5, 2008, she was handcuffed and shackled. (SUMF at ¶ 35; Security Log (a copy of which can be found at Exhibit E to the Barshaw Depo.); Metro's Responses to Second Requests for Admission at No. 24; Peralta Depo. at 12-13.) Cpl. Moore informed Cpl. Peralta that "there was going to be a no restraint order." (SUMF at ¶ 36; Peralta Depo. at 10.) Cpl. Peralta removed the shackles and handcuffs from Ms. Villegas shortly after his shift began at 11:00 pm on July 5, 2008. (Peralta Depo. at 12-13.) Cpl. Peralta testified that he removed the shackles and handcuffs from Ms. Villegas because she was "going to give birth," and that he did so in <u>violation</u> of Metro's policies and practice. (Peralta Depo. at 13-15.) Cpl. Peralta knew that he was not following DCSO policies and practices in removing the restraints, but just thought it was the right thing to do because Ms. Villegas was going to give birth. (Peralta Depo. at 31, 47.) Specifically, Cpl. Peralta testified as follows:

> Q. Is it fair to say that you made the decision to unrestrain Ms. Villegas?
> A. Yes.
>
> Q. Is it fair to say that you knew that that was not necessarily the policy at the time, but it was your decision, nonetheless?
> A. Correct.

(Peralta Depo. at 14-15.) Of course, given that she was in active labor, Ms. Villegas did not try to escape or cause any trouble while unrestrained. (SUMF at ¶ 40; Peralta Depo. at 32-33.) Cpl. Peralta also did not allow Ms. Villegas to contact her husband because DCSO policies prohibited him from doing so. (SUMF at ¶ 41; Peralta Depo. at 35-36.)

---

[4] Other DCSO officers unfastened the leg irons from the hospital bed when Ms. Villegas used the restroom, but her legs were then shackled together for the restroom visit. (SUMF at ¶ 33.)

Ms. Villegas gave birth to her son at approximately 1:03 am on July 6, 2010. (SUMF at ¶ 42; Deposition of Juana Villegas ("Villegas Depo.," Ex. C to SUMF) at 132.) At approximately 6:52 am on July 6, 2010, the restraints were placed back on Ms. Villegas by Cpl. Peralta. (SUMF at ¶ 43; Peralta Depo. at 21-22.) Cpl. Peralta testified that he put the restraints back on Ms. Villegas as his shift ended because under DCSO policies she was supposed to be restrained at that time, and in fact should have been restrained right after she gave birth. (Peralta Depo. at 22; Metro's Responses to Second Requests for Admission at No. 10.) Other than unshackling Ms. Villegas from the hospital bed but keeping her legs shackled together when she needed to use the restroom, Ms. Villegas remained handcuffed and shackled until she was returned to the Detention Center on July 8, 2008. (SUMF at ¶ 32; Deposition of Corporal Daniel McCollom ("McCollom Depo.," part of Collective Exhibit A to SUMF) at 33-34.) Ms. Villegas was not allowed to walk around the hallway, loosen her muscles, ensure against blood clots, or take care of necessary post-childbirth hygiene without shackles. (SUMF at ¶¶ 45-46; Deposition of Corporal David Humphries ("Humphries Depo.," part of Collective Exhibit A to SUMF) at 21-22, 26, 29-30.)

It is undisputed that nurses at Metro General Hospital on July 5th and 6th requested on several occasions that DCSO officers remove the restraints from Ms. Villegas, but to no avail. (SUMF at ¶ 47.) The nurses also explained to the officers the high risk of blood clots after giving birth, but this medical risk did not convince the officers to remove the shackles. (SUMF at ¶ 48; Ray Depo. at 53-55.) As Cpl. Humphries summarized DCSO policy regarding whether to follow a no restraint order from a physician: "Q: So a supervisor can verbally negate a no restraint order. A: Yes." (Humphries Depo. at 50-51; see Ray Depo. at 27.)

When she was returned to the Detention Center two days after giving birth, despite requests from medical personnel, Ms. Villegas was not allowed to bring a breast pump to relieve the engorgement of her breasts, nor moisturizers or any other medical supplies back to the Detention Center. (SUMF at ¶ 50; Humphries Depo. at 40-45; Ray Depo. at 41.) DCSO policy at the time was that inmates could not take "anything" back to the Detention Center from the hospital no matter the circumstances and no matter what the physician ordered. (SUMF at ¶ 51; Dorsey Depo. at 42-43.) Even though it was only two days after she had given birth, Ms. Villegas was not allowed to take her newborn son with her, was not allowed to direct and control his care, and was not informed when she might see him again. (SUMF at ¶ 52.)

According to Metro's deponents, there are three (3) DCSO policies that controlled with respect to the detention and transportation of Ms. Villegas and that were followed by the DCSO officers. These policies collectively required that Ms. Villegas be restrained for the entirety of her labor, birth and post-partum recovery. (SUMF at ¶ 55; Dorsey Depo. at 59-60; McCollom Depo. at 31.) Further, these policies prohibited Ms. Villegas from contacting or seeing her husband in any way. (SUMF at ¶ 56; McCollom Depo. at 40-41.) Copies of these policies are attached as Exhibit F to the Statement of Undisputed Material Facts:

> Policy Number 1-3.130: Inmate Transportation: This policy provides for restraining inmates during transportation, including to a hospital (pages 1 and 3-4). It also provides that "[t]he inmate's cuffs are not to be removed when the inmate uses the restroom" (page 2).

> Policy Number 1-3.135: Use of Restraints. This policy provides that "[t]he use of restraint devices constitutes a use of force" (page 2).

> Policy Number 1-4.551: Hospital Inmate Security. This policy requires "all" inmates to be restrained at all times unless otherwise directed by the attending physician (page 1). The policy also "strictly prohibits" the visitation of inmates in the hospital "except

with the authorization of the chief deputy/designee" and does not allow the use of the telephone "unless authorized by the chief deputy/designee" (page 4). Finally, the policy states: "Hospital personnel do not have authority over the assigned officers in performing their duties or maintaining the security of the inmates. This is the responsibility of the D.C.S.O. and the facility/division to which the officers are assigned." (page 4).

The memorandum created by Metro's own investigation of this incident concludes: "The early portions of the incident that are in contention appear to be the result of having officers on site who are unfamiliar with hospital security protocols. . . . It seems plausible that, based on a lack of knowledge about hospital security, the facility officers may have been hypersensitive to the possibility of escape and thus less willing to completely compromise their idea of securing the inmate." (SUMF at ¶ 57 and Ex. G thereto.) Despite this conclusion, all of the DCSO officers testified that all of their actions (with the exception of Cpl. Peralta removing the restraints) were consistent with Metro's policies and procedures. Further, Metro relied solely on these written policies in guarding inmates, including pregnant inmates or those in labor.

Metro admits that restraints should only be used when they are required as a precaution against escape or to prevent an inmate from injuring him or herself or other people or damaging property. (SUMF at ¶ 59.) According to Cpl. Humphries, in Ms. Villegas' case the restraints were used – on a woman in active labor and then post-partum recovery – to prevent escape. (SUMF at ¶ 60; Humphries Depo. at 69-70.)

## ARGUMENT

Section 1983 provides for liability in "an action at law, suit in equity, or other proper proceeding" when a "person" "subjects, or causes to be subjected, any … other person within the jurisdiction [of the United States] to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Each of these elements is met in this

case. There is no dispute that Ms. Villegas was a "person within the jurisdiction" of the United States. There is no dispute that Metro "subject[ed]" Ms. Villegas (or "cause[d] [her] to be subjected") to actions in conformity with its policies and practices concerning (i) medical treatment provided to pregnant detainees, (ii) the manner in which pregnant detainees were transported to and from the hospital, (iii) the manner in which pregnant detainees were secured and restrained during and after the delivery of their child, and (iv) respect for the rights of familial association. Metro's shackling and restraint of Ms. Villegas and disregard for her medical needs and right to familial association, all in accordance with Metro's policies and procedures, violated well-established rights provided under the U.S. and Tennessee Constitutions as a matter of law. Ms. Villegas is entitled to summary judgment that Metro is liable for its actions.

## I. Legal Standard.

"Rule 56(c) of the Federal Rules of Civil Procedure provides in part that summary judgment 'shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Jennings v. ProLabor Servs.*, 2010 U.S. Dist. LEXIS 86333, at *6-7 (M.D. Tenn. Aug. 19, 2010) (quoting Fed. R. Civ. P. 56(c)). Indeed, the "[t]he very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Id.* at *7.

"Mere allegations of a factual dispute between the parties are not sufficient to defeat a properly supported summary judgment motion; there must be a genuine issue of material fact," which is a fact that if proven at trial "would result in a reasonable jury finding favor of the non-

moving party." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). "The substantive law involved in the case will underscore which facts are material and only disputes over outcome determinative facts will bar a grant of summary judgment." *Id.*

"While the moving party bears the initial burden of proof for its motion, the party that opposes the motion has the burden to come forth with sufficient proof to support its claim, particularly when that party has had an opportunity to conduct discovery." *Id.* at *7-8 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The non-movant, therefore, may not "rely solely on conclusory allegations, but rather must come forward with affirmative evidence which establishes its claims and raises an issue of genuine material fact." *Id.* at *8 (citing *Celotex*, 477 U.S. at 324)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at *8 (citing *Celotex*, 477 U.S. at 249-50).

## II.     Metro Violated Ms. Villegas' Constitutional Rights While She Was in Metro's Custody and Control.

Based on established law and undisputed facts, the Court should find that Metro violated Ms. Villegas' constitutional rights in at least four independent ways: (1) Metro violated the due process rights embodied in the Fourteenth Amendment to the U.S. Constitution, the prohibition again cruel and unusual punishment of the Eighth Amendment to the U.S. Constitution, and Article I, Sections 8, 13, 16 and 32 of the Tennessee Constitution by shackling and restraining Ms. Villegas during her pregnancy and while in labor and recovery; (2) Metro violated the prohibition on use of excessive force in the Fourth, Eighth and Fourteenth Amendments to the U.S. Constitution and Article I, Sections 8, 13 and 32 of the Tennessee Constitution by its actions; (3) Metro violated the due process rights embodied in Fourteenth Amendment of the U.S. Constitution and Article I, Section 8 of the Tennessee Constitution by failing to provide for Ms. Villegas' basic medical needs during her pregnancy and while in labor and recovery; and (4)

Metro violated the Fourteenth Amendment of the U.S. Constitution and Article I, Sections 7 and 8 of the Tennessee Constitution by violating Ms. Villegas' rights to familial association by refusing to allow Ms. Villegas to contact her husband or family for the birth of her child and refusing to allow Ms. Villegas to control the possession and care of her newborn child.

It is undisputed that Ms. Villegas was restrained and shackled while she was in labor  in transport to the hospital in an ambulance, at the hospital while in labor, and at the hospital during post-partum recovery.  Further, it is undisputed that the DCSO officers followed Metro's policies and procedures and the directions of superiors in refusing to comply with the No Restraint Order and pleas from medical personnel to unrestrain Ms. Villegas.  As a matter of law, the U.S. and Tennessee Constitutions provided Ms. Villegas with a clearly established protection from being restrained and shackled during labor and otherwise undergoing her ordeal.  The Court, therefore, should grant summary judgment with respect to Ms. Villegas' claims for violations of her constitutional rights.

    A.    <u>Constitutional Basis for Claims</u>.

"The Eighth Amendment 'prohibits the infliction of cruel and unusual punishments on those convicted of crimes.'"  *Nelson v. Corr. Med. Servs.*, 583 F.3d 522, 528 (8th Cir. 2009) (quoting *Wilson v. Seiter*, 501 U.S. 294, 296-97 (1991)); U.S. CONST. amend. VIII.

With respect to the prohibition on use of excessive force, a pretrial detainee's claim "lies in the murky area between the Fourth and Eighth Amendments."  *See Lanman v. Hinson*, 529 F.3d 673, 680 (6th Cir. 2008) (quoting *Phelps v. Coy*, 286 F.3d 300 (6th Cir. 2002).  At the very least, the due process clause of the Fourteenth Amendment protects a pretrial detainee from the use of excessive force that amounts to punishment.  *Id.*; *see Youngberg v. Romeo*, 457 U.S. 307, 324 (1982) (holding that the Fourteenth Amendment provides involuntarily committed

individuals with the right to be free from undue bodily restraint in the course of their treatment by the State).

Further, police have a constitutional duty to care for the basic needs of their detainees. "[I]n the custodial situation of a prison, forethought about an inmate's welfare is not only feasible but obligatory under a regime that incapacitates a prisoner to exercise ordinary responsibility for his own welfare." *Sacramento v. Lewis*, 523 U.S. 833, 851 (1998). Indeed, "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney v. Winnebago County Dept. of Soc. Servs.*, 489 U.S. 189, 199-200 (1989). Generally, no countervailing interests excuse the officials. In fact, "the State's responsibility to attend to the medical needs of prisoners does not ordinarily clash with other equally important governmental responsibilities." *Whitley v. Albers*, 475 U.S. 312, 320 (1986).

Though Ms. Villegas might properly be labeled a "pretrial detainee" and not a "convicted prisoner" while in the custody of Metro, this classification difference does not alleviate or otherwise modify the legal responsibility Metro owed her regarding medical treatment. *See Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983) ("[T]he due process rights of a [pretrial detainee] are at least as great as the Eighth Amendment protections available to a convicted prisoner."). In fact, the Supreme Court has stated: "Since it may suffice for Eighth Amendment liability that prison officials were deliberately indifferent to the medical needs of their prisoners, it follows that such deliberately indifferent conduct must also be enough to satisfy the fault requirement for due process claims based on the medical needs of someone jailed while awaiting trial." *Sacramento*, 523 U.S. at 850 (internal citations omitted).

The actions of Metro with respect to Ms. Villegas "shocked the conscience." *See Sacramento*, 523 U.S. at 846 (citing *Collins v. Harker Heights*, 503 U.S. 115, 129 (1992)); *see also Rochin v. California*, 342 U.S. 165, 172-73 (1952) (finding that the forced pumping of a suspect's stomach offended due process because the conduct shocked the conscience). Further, Metro's actions exhibited deliberate indifference to Ms. Villegas' medical needs in violation of her due process rights. "A prison official is deliberately indifferent if she 'knows of and disregards' a serious medical need or a substantial risk to an inmate's health or safety." *Nelson*, 583 F.3d at 528 (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). "A claim of deliberate indifference has both an objective and a subjective component"; thus, the relevant questions are: (1) whether plaintiff had a serious medical need or whether a substantial risk to her health or safety existed, and (2) whether the prison official had knowledge of such serious medical need or substantial risk to plaintiff's health or safety but nevertheless disregarded it. *See id.* at 529 (citing *Farmer*, 511 U.S. at 842). Notice of constitutionally impermissible conduct may be provided by the Constitution itself or the decisions of the United States Supreme Court and the lower federal courts. *See Hope v. Pelzer*, 536 U.S. 730, 741-42 (2002). The regulations governing the conduct of correctional officers are also relevant in determining whether an inmate's right was clearly established. *Treats v. Morgan*, 308 F.3d 868, 875 (8th Cir. 2002).

Finally, it is a parent's fundamental right under the Fourteenth Amendment to make decisions concerning the care, custody and control of their children. *Troxel v. Granville*, 530 U.S. 57, 66 (2000). The Sixth Circuit has held that, any time a child is removed from the parent's care and custody, the parent's liberty interest in familial association is implicated. *Kottmyer v. Maas*, 436 F.3d 684, 690 (6th Circuit 2006). Therefore, the state agent removing the child from the parent's custody must first provide sufficient due process. *Id.*; *see Brown v.*

*Montana*, 442 F. Supp. 2d 982, 992 (D. Mont. 2006); *Wallis v. Spencer*, 202 F.3d 1126, 1138 (9th Cir. 2000).

Metro's individual and collective actions as set forth in the undisputed facts establish that Metro violated each of Ms. Villegas' constitutional rights set forth above. Further, Metro does not dispute that all of the officers' actions with respect to Ms. Villegas were consistent with and in furtherance of Metro's policies and practice. Metro itself, therefore, caused the constitutional violations. *See Canton v. Harris*, 489 U.S. 378, 385 (1989); *Bd. of County Comm'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 403-04 (1997). Further, it is undisputed that the unconstitutional actions – in particular, the decision to ignore the No Restraint Order and pleas of the medical personnel – were the result of a decision made by superior officers with final decision-making authority. *See St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988); *Pembaur v. Cincinnati*, 475 U.S. 469, 481-82 (1986).

    B.    <u>Precedent Directly On Point and Clearly Establishing Ms. Villegas' Constitutional Rights</u>.

Any question as to the clearly-established rights of a pregnant detainee not to be shackled during labor was put to rest by the recent decision of the Eighth Circuit (sitting *en banc*) in *Nelson v. Corr. Med. Servs.*, 583 F.3d 522 (8th Cir. 2009) (*en banc*). Shawanna Nelson brought a § 1983 case because she was shackled to her hospital bed during the final stages of labor (up until roughly three (3) hours before she gave birth) – just like Ms. Villegas (who was shackled until two (2) hours before she gave birth). *Nelson,* 583 F.3d at 524-25. No medical personnel ever requested that Ms. Nelson be shackled; to the contrary, they repeatedly requested that the shackles be removed – like in Ms. Villegas' case. *Id*. at 530. Ms. Nelson argued that the Arkansas Department of Correction failed to ensure appropriate policies for the treatment of pregnant inmates (like in this case) and that individual officers ignored the expressed wishes of

medical personnel (like in this case) to balance security concerns of a woman in labor fleeing against obvious medical needs and remove the shackles. *Id.* at 524-25. Like Ms. Villegas, Ms. Nelson was a nonviolent offender at the time of her arrest.

The defendants moved for summary judgment based on qualified immunity, arguing that their actions did not violate any of Ms. Nelson's clearly established constitutional rights. *Id.* at 525. The district court denied the motion, finding that a reasonable official "would have known that shackling [Nelson's] legs to a bed post while she was in labor, without regard to whether she posed a security or flight risk, violated her Eighth Amendment rights." *Id.* at 527.

The Eighth Circuit affirmed: "The Eighth Amendment standard for conditions of confinement and medical care such as those raised here is different, and the constitutional question in this case is whether [the prison official] acted with 'deliberate indifference.' " *Nelson*, 583 F.3d at 528 (citing *Wilson v. Seiter*, 501 U.S. 294, 303 (6th Cir. 1991). The Eighth Circuit found that a reasonable factfinder could determine that the officers had a general, common sense awareness of the risk of harm from shackling a woman in labor, and that the statements of medical personal also put the officers on notice of the medical needs of the patient. *Nelson*, 583 F.3d at 529. Like in Ms. Villegas' case, no medical personnel expressed any fear of danger or ever suggested restraints were needed. *Id.* at 530. To the contrary, there were requests for the shackles to be removed.[5] *Id.*

The *Nelson* court held that a factfinder could find that the officer "recognized that the shackles interfered with [the detainee's] medical care, could be an obstacle in the event of a

---

[5]     As noted, in Ms. Villegas' case, there is an actual doctor's order to remove the shackles that was ignored post-labor. The DCSO officers also admitted in depositions that the medical staff repeatedly asked them to remove the shackles and discussed the No Restraint Order and risk of blood clots, but to no avail. According to one officer, it is quite common for the officers to fight with medical personnel about the use of restraints. (Moore Depo. at 60.) There is no indication from the *Nelson* opinion that such a doctor's order existed in that case, making Ms. Villegas' case even stronger than that of Ms. Nelson.

medical emergency, and ***caused unnecessary suffering at a time when Nelson would have likely been physically unable to flee*** because of the pain she was undergoing and the powerful contractions she was experiencing as her body worked to give birth." *Id.* at 530 (emphasis added). The Court found that the risks involved in labor and childbirth were "obvious" and "have entered the collective consciousness" so that the officer must have been aware of the medical risks. *Id.* at 530 n.5. Further, "there does not even appear to have been a competing penological interest in shackling her." *Id.* at 530. "A reasonable factfinder could determine from the record in this case that Officer Turensky . . . was not facing an emergency situation but nevertheless 'subjected [Nelson] to a substantial risk of physical harm, to the unnecessary pain caused by the [shackles] and the restricted position of confinement . . . [and] created a risk of particular discomfort and humiliation.' " *Id.* at 532 (citing *Hope v. Pelzer*, 536 U.S. 730, 738 (2002).

Most importantly, the Eighth Circuit also held that the constitutional right of the inmate not to be shackled while in labor was <u>clearly</u> <u>established</u> because its contours were sufficiently clear that a reasonable official would understand that what he or she is doing violated the right. *Id.* at 531. In 2002, the Supreme Court had provided guidance to officials on the constitutional limits in restraining inmates in *Hope v. Pelzer*, 536 U.S. 730 (2002). In that case, the Court held that a prison official had acted with deliberate indifference to the inmate's health and safety in violation of the Eighth Amendment by handcuffing him to a prison hitching post without any clear emergency situation and in a manner "that created a risk of particular discomfort and humiliation." *Nelson*, 583 F.3d at 532 (quoting *Hope*, 536 U.S. at 737-38).

Similarly, with respect to the general responsibilities of officers with regard to an inmate's medical needs, the Supreme Court clearly established such rights in 1976 in *Estelle v.*

*Gamble*, 429 U.S. 97 (1976). In *Estelle*, the Court concluded that "either interference with care or infliction of 'unnecessary suffering' establishes deliberate indifference to medical care." *Nelson*, 583 F.3d at 532 (quoting *Estelle*, 429 U.S. at 103-05 and citing *Farmer v. Brennan*, 511 U.S. 825, 842, (1994) (holding that an official violates the Eighth Amendment in confinement cases where he "act[s] or fail[s] to act despite his knowledge of a substantial risk of serious harm"); *Tlamka v. Serrell*, 244 F.3d 628, 633 (8th Cir. 2001) (holding that the Eighth Amendment was violated in medical care case where the official disregards an "obvious" risk to an inmate); and *Coleman v. Rahija*, 114 F.3d 778, 786 (8th Cir. 1997) (holding that an official violates a pregnant inmate's Eighth Amendment rights when she fails to act in the face of an "obvious[]" risk of harm)).

The *Nelson* court then held that "the precise issue under consideration here was decided years ago by a federal district court in the District of Columbia" in *Women Prisoners of D.C. Dep't of Corr. v. District of Columbia*, 877 F. Supp. 634 (D.D.C. 1994), *modified in part on other grounds*, 899 F. Supp. 659 (D.D.C. 1995). *Nelson*, 583 F.3d at 532. In *Women Prisoners*, the court held prison officials liable for shackling a woman in labor because the officials acted with "deliberate indifference" because "the risk of injury to women prisoners is obvious." *Id.* at 532-33 (quoting *Women Prisoners*, 877 F. Supp. at 669). The *Women Prisoners* court reasoned:

> Plaintiffs have demonstrated that the manner in which the Defendants shackle pregnant women prisoners in the third trimester of pregnancy and immediately after delivery poses a risk so serious that it violates contemporary standards of decency. The Court understands that the Defendants may need to shackle a woman prisoner who has a history of assaultive behavior or escapes. <u>In general, however, the physical limitations of a woman in the third trimester of pregnancy and the pain involved in delivery make complete shackling redundant and unacceptable in light of the risk of injury to a woman and baby.</u> The Court believes that leg shackles adequately secure women prisoners without creating an inhumane condition of confinement during the third

> trimester.  <u>While a woman is in labor and shortly thereafter,</u>
> <u>however, the Court holds that shackling is inhumane</u>.

*Women Prisoners*, 877 F. Supp at 668.  The *Nelson* court noted that the *Women Prisoners*

precedent was valuable because the government decided not to contest the holding to the D.C.

Circuit.  *Nelson*, 583 F.3d at 533.

Based on this precedent, the *Nelson* court held:

> ***Nelson's protections from being shackled during labor had thus***
> ***been clearly established by decisions of the Supreme Court and***
> ***the lower federal court before September 2003***.
>
>        \*       \*       \*
>
> Existing constitutional protections, as developed by the Supreme
> Court and the lower federal courts and evidenced in [state]
> regulations, would have made it sufficiently clear to a reasonable
> officer in September 2003 that an inmate in the final stages of
> labor cannot be shackled absent clear evidence that she is a
> security or flight risk. . . .  ***"[Nelson] was treated in a way***
> ***antithetical to human dignity . . . and under circumstances that***
> ***were both degrading and dangerous."***

*Id.* at 533-34 (emphasis added) (quoting *Hope*, 536 U.S. at 745).  The Nelson decision has since

been followed by at least one district court outside of the Eighth Circuit.[6]  *See Brawley v.*

*Washington*, 2010 U.S. Dist. LEXIS 42880 (W.D. Wash. May 3, 2010).

It was, therefore, clearly established well before July 2008 that it violated the U.S.

Constitution to shackle and restrain Ms. Villegas while she was in labor and in post-partum

recovery.  As a matter of law, Ms. Villegas did not pose a threat or flight risk in her medical

---

[6]        It is interesting that the *Nelson* decision came on the heels of the enactment of written policies limiting the practice of shackling pregnant prisoners by the Federal Bureau of Prisons, the United States Marshalls Service, the District of Columbia, and the passage of legislation regulating the practice in at least seven states, including Illinois, New York, California, New Mexico, Texas, Vermont, and Washington.  *See* Elizabeth Alexander, *The Ben J. Altheimer Symposium: Prisoners' Rights: The Rights of the Convicted and Forgotten: Article: Unshackling Shawanna: The Battle Over Chaining Women Prisoners During Labor and Delivery*, 32 U. ARK. LITTLE ROCK L. REV. 435 (2010) (a copy of this article is included along with the unpublished cases in the Appendix hereto).  Based on the testimony of DCSO's Rule 30(b)(6) deponents, Metro was or should have been aware of these changes.

condition (and there is no evidence that anyone believed she did). As a matter of law, Ms. Villegas' medical needs and the risks of shackling were obvious to the DCSO officers. Metro violated these clearly-established rights of Ms. Villegas and did so pursuant to its written policies.

Further, Metro was aware or should have been aware of the *Women's Prisoners* case and other precedent that the *Nelson* court relied upon to find that the right not to be shackled in labor and recovery violated the Constitution. Ms. Peery, as one of Metro's Rule 30(b)(6) witnesses, explained that Metro constantly reviews the policies of other jurisdictions and were or should have been aware of changes in such policies and whether Metro's policies should be amended. (Dep. of DCSO (Peery) at 27-28, 73, 96-97.) Similarly, Sheriff Hall, also in the role of Metro's Rule 30(b)(6) witness, testified as follows:

- DCSO looks "at policies of other Sheriff's Departments around the country" and "look[s] to see if there are standards nationally that pertain to what we're talking about" with the goal of finding "what's the best way to do it or a new way of doing it."

- DCSO has "a lot of access to the National Institute of Corrections in Colorado which is the largest jail network and then the American Correctional Association, the American Jail Association" and employs "auditors in all of those associations, traveling, doing audits in other institution" who "bring back ideas."

- DCSO professes "to do what we believe is on the cutting edge of best practice" and to "exceed the standard" with respect to treating pregnant women appropriately.

- In determining what is the "best practices" it is appropriate for DCSO to look at the policies of other cities and counties around the country.

- New York City had a policy effective since 2002 not to shackle pregnant inmates during transportation and delivery, and Metro had access to this policy.

- DCSO claims that "people who are in the world of corrections nationally look at us" as "exceed[ing] what the national expectation is in many, many ways."

(Dep. of DCSO (Hall) at 12-13, 18-19, 21-22, 50-52, 55-56.)  When asked specifically about the changes to the DCSO policies following Ms. Villegas' ordeal (which amendments eliminated shackling of pregnant inmates), Sheriff Hall testified that the "knowledge and information" that DCSO used to create the changes regarding shackling pregnant inmates "wasn't new" in 2008 and was known by DCSO before that.  (*Id.* at 24; *see id.* at 62.)  Finally, Sheriff Hall admitted that the policies in effect in July 2008 did not, to his satisfaction, take into account the practicality of the circumstance of the pregnant inmate.  (*Id.* at 58.).

Metro's policies also prevented Ms. Villegas from contacting, seeing or even talking on the phone with her husband and family and, therefore, violated her constitutional rights to familial association without due process of the law.  Further, Ms. Villegas was returned to the Detention Center two days after she gave birth not only without her newborn child but without any information regarding whether she would ever see her child again.  Although the right to family integrity is neither absolute nor unqualified, Metro has not put forth any concern for the protection of Ms. Villegas' son from Ms. Villegas or any other justification for forcibly segregating Ms. Villegas from her child.  *See Martinez v. Mafchir*, 35 F.3d 1486, 1490 (10th Cir. 1994); *Myers v. Morris*, 810 F.2d 1437, 1462 (8th Cir. 1987).  Metro's policies effectively eliminated Ms. Villegas's ability and opportunity to make decisions concerning the care, custody, and control of her newborn child, which rights are fundamental to her under the Fourteenth Amendment.  *See Troxel v. Granville*, 530 U.S. 57, 66 (2000).

Metro either knew or should have known of the clearly-established constitutional rights of pregnant inmates and inmates in labor and ignored those rights in its treatment of Ms. Villegas.  Accordingly, Ms. Villegas should be granted summary judgment against Metro.

C.    <u>Metro Also Violated Tennessee's Constitution Through Its Treatment of Ms. Villegas</u>.

While there do not appear to be any cases directly on point with respect to Ms. Villegas' claims under the Tennessee Constitution, the law is clear that the Tennessee Constitution affords individuals rights and protections identical to or broader than those provided by the U.S. Constitution. The Tennessee Constitution's "law of the land" provision under. Art. I, Section 8 has been held to provide at least the same level of protection as the due process clause in the U.S. Constitution. *See Bryant v. Tenet, Inc.*, 969 S.W.2d 923, 925 (Tenn. Ct. App. 1997) (holding that the "law of the land" provision in the Tennessee Constitution is the counterpart to the U.S. Constitution's Due Process Clause); *Martin v. Sizemore*, 78 S.W.3d 249, 262 (Tenn. Ct. App. 2001) (holding that the Tennessee and U.S. Constitutions provide similar procedural protections and guarantees); *State v. Hale*, 840 S.W.2d 307, 312 (Tenn. 1992) (holding that the "law of the land" and "due process of law" provisions are synonymous); *Nichols v. Tullahoma Open Door, Inc.*, 640 S.W.2d 13, 16 (Tenn. Ct. App. 1982) (same); *Martin v. Beer Bd. for City of Dickson*, 908 S.W.2d 941, 954-55 (Tenn. Ct. App. 1995) (finding that the Fourteenth Amendment's protections related to due process establish a minimum level of constitutional protection and leaving room for Tennessee to interpret similar provisions more broadly to provide greater protections).

Similarly, the Tennessee Constitution's provision prohibiting cruel and unusual punishment (Article I, Section 16) and provision requiring safe and comfortable prisons, inspection of prisons and human treatment of prisoners (Article I, Section 32) have been found to provide at least the same level of protections as the U.S. Constitution's prohibition on cruel and unusual punishment in the Eighth Amendment. *See Grubbs v. Bradley*, 552 F. Supp. 1052, 1125 (M.D. Tenn. 1982) (same level of protection); *State v. Black*, 815 S.W.2d 166, 188 (Tenn. 1991)

(finding that the textual parallelism between the state and federal prohibitions against cruel and unusual punishment does not foreclose a more expansive interpretation of the state constitutional provision).

Finally, the Tennessee Constitution's right to privacy (evidenced in Article 1, Sections 3, 7, 8, 19 and 27) has been held to be broader than that found in the U.S. Constitution. *See Cutshall v. Sundquist*, 980 F. Supp. 928, 932-33 (M.D. Tenn. 1997); *Campbell v. Sundquist*, 926 S.W.2d 250, 261 (Tenn. Ct. App. 1996); *see also Davis v. Davis*, 842 S.W.2d 588, 600 (Tenn. 1992) (the right to procreational autonomy)

It is undisputed that Ms. Villegas was shackled as a pre-trial detainee while she was in the custody of Metro, that Ms. Villegas was shackled during her transport to the hospital, that Ms. Villegas was shackled during labor, and that she was shackled shortly after giving birth during her post-partum recovery period. It is undisputed that the shackles were not removed and were reapplied even after Ms. Villegas' physician signed a No Restraint Order, after the nurses pleaded on numerous occasions for the restraints to be removed for medical reasons, and after Ms. Villegas' obvious medical needs related to giving birth and avoiding blood clots arose. It is undisputed that, during the seminal event of the birth of her child, Ms. Villegas was not allowed to see her husband or family and was not allowed to care for her newborn child only two days after his birth. Finally, it is undisputed that all of these actions by Metro DCSO Officers were consistent with Metro's policies at the time and in accordance with the directions of the officers' superiors. Ms. Villegas submits that, as a matter of law, Metro is therefore liable to Ms. Villegas for violating her clearly established rights under the Tennessee Constitution.

## CONCLUSION

For the reasons set forth above, Ms. Villegas moves the Court to grant partial summary judgment that Metro has violated Ms. Villegas' constitutional rights as set forth in the U.S. Constitution and the Tennessee Constitution.

Respectfully Submitted,

SHERRARD & ROE, PLC

*/s/ John L. Farringer IV*
William L. Harbison (No. 7012)
Phillip F. Cramer (No. 20697)
John L. Farringer IV (No. 22783)
424 Church Street, Suite 2000
Nashville, TN 37219
(615) 742-4200
bharbison@sherrardroe.com
pcramer@sherrardroe.com
jfarringer@sherrardroe.com

IMMIGRATION LAW OFFICES OF
ELLIOT OZMENT
Elliot Ozment (No. 4331)
1214 Murfreesboro Pike
Nashville, TN 37217
(615) 321-8888
elliott@ozmentlaw.com

*Attorneys for Juana Villegas*

## <u>CERTIFICATE OF SERVICE</u>

Service of the foregoing was accomplished through the Court's Electronic Filing System on this 22nd day of October, 2010, upon the following:

Kevin Klein
Allison Bussell
Metropolitan Department of Law
108 Metropolitan Courthouse
P.O. Box 196300
Nashville, TN 37219
Kevin.Klein@nashville.gov
Allison.Bussell@nashville.gov

*/s/ John L. Farringer IV*