IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| JUANA VILLEGAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:09-0219 |
| | ) | |
| THE METROPOLITAN GOVERNMENT | ) | Judge Haynes |
| OF DAVIDSON COUNTY/NASHVILLE -- | ) | |
| DAVIDSON COUNTY SHERIFF'S | ) | JURY DEMAND |
| OFFICE, et al. | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF'S RESPONSE TO
## DEFENDANT'S MOTION TO STRIKE

Plaintiff Juana Villegas respectfully files this response to the motion to strike filed by the Metropolitan Government of Davidson County/Nashville – Davidson County Sheriff's Office ("Metro" or "DCSO"). In its motion, Metro seeks to strike various medical articles and periodicals along with other learned treatises that were filed in response to Metro's motion for summary judgment. Metro also moves to strike the filing of two declarations of fact witnesses. According to Metro, these materials should be stricken because they are the product of a "discovery violation." Metro is mistaken.

As a threshold matter, Case Management Order No. 1 in this matter explains: "No motions related to discovery or for a protective order shall be filed until a discovery/protective order dispute conference has taken place and the attorneys of record shall attend and meet, face-to-face, in an effort to resolve the dispute and a jointly-signed discovery/protective order dispute statement is submitted setting forth precisely the remaining issues in dispute and the reasons why those issues remain unresolved." Case Management Order No. 1 (DE 18) at 7-8. Metro never

requested or even raised the issue of a discovery dispute conference prior to filing its motion, and it did not file any joint statement.

One of the purposes for the discovery dispute conference is to avoid the needless expenditure of judicial and litigant resources. That purpose is readily apparent in this case because, had Metro contacted the undersigned counsel, its professed concerns would have been allayed and it would have discovered that its motion had no basis.

Take, for example, the declarations of Dr. Donald Bruce and Malika Saada Saar. Had Metro's counsel called the undersigned counsel, they would have learned that the undersigned counsel first spoke with Dr. Bruce on November 9, 2010, while seeking information to respond to arguments raised by Metro in its motion for summary judgment. Counsel then first met with Dr. Bruce in person on November 17, 2010, when he executed the declaration offered in this case. Dr. Bruce's declaration was in response to new arguments raised by Metro in its summary judgment filings that were not articulated in its theory of the case (DE 10), its answer (DE 11) or its initial disclosures. Dr. Bruce is not offered as an expert witness but rather as a fact witness regarding his actual experience in treating approximately 95 percent of all pregnant inmates held by the Tennessee Department of Correction. Ms. Villegas timely supplemented her disclosure to identify Dr. Bruce as a potential fact witness on November 23, 2010.[1]

Turning to Malika Saada Saar, she is the executive director of the Rebecca Project for Human Rights. Again, had Metro contacted the undersigned counsel, they would have learned that the undersigned counsel learned of that organization from an article appearing on the front page of the Local & Business section of the Tennessean on October 25, 2010. (An article that presumably Metro also saw.) The article, entitled "Pregnant inmate care grade upsets TN,"

---

[1] Metro itself acknowledged in its own disclosures that persons associated with Metro General Hospital may have discoverable information and someone within Metro presumably knew of Dr. Bruce's role in treating women prisoners of the Tennessee Department of Correction before Ms. Villegas' counsel did.

517274.3 08294-001

detailed "[a] nationwide study on the treatment of pregnant state prison inmates." The article, in addition to reporting on the *Nelson* case, quoted Malika Saada Saar, whose organization published the report dated October 2010. After reading this article, counsel for Ms. Villegas researched on the internet and obtained a copy of the publicly-available report from the Rebecca Project website. He then spoke with counsel for the Rebecca Project on November 9, 2010, who then coordinated obtaining a declaration from Ms. Saar for the purpose of authenticating the report and letters received from the American Congress of Obstetricians and Gynecologists ("ACOG"), which are also available on the internet. This declaration was obtained on November 19, 2010 and Ms. Villegas timely supplemented her Rule 26 disclosures to identify Ms. Saar on November 23, 2010.

Rule 26(e) governs supplementing disclosures and provides that they be done in a "timely manner." Fed. R. Civ. P. 26(e)(1). There can be no dispute that Ms. Villegas supplemented her Rule 26 disclosure in a very timely manner and more than three months before trial. Moreover, Ms. Villegas' initial disclosures specifically informed Metro that she may rely on "witnesses that may be required to address, rebut, or impeach any claims raised by Defendants," which is exactly what Dr. Bruce and Ms. Saar have done in response to the arguments made by Metro in its motion for summary judgment. Interestingly, when Metro was asked in discovery to identify "all persons who you may rely upon for testimony or factual information as well as all persons having knowledge or discoverable information related to this matter," Metro took the position in part that such a request was "overbroad and unduly burdensome" and that it "seeks the mental impressions of the Metropolitan Government's counsel which are protected by the work-product doctrine." (Metro Response to Interrogatory No. 5.)

Turning to the affidavit of Dr. Cynthia Frazier that was filed in the *Nelson* case on January 4, 2007, Metro is mistaken about the purpose of this document. The affidavit was obtained off PACER and is a publicly-available document. It would be remarkable if Metro did not previously review the affidavit given the central role that *Nelson* plays in this matter. Moreover, Ms. Villegas is not offering Dr. Frazier as an expert witness; instead, the affidavit was used as a cite in Ms. Villegas' response to the motion for summary judgment (on page 4) for the proposition that the conclusions reached by Dr. Torrente and others regarding the dangers of shackling "were well-established in the public record well prior to Ms. Villegas' ordeal." Accordingly, the publicly-available affidavit detailing the dangers and risks of shackling a pregnant woman reflects that Metro was or should have been aware of this issue prior to shackling Ms. Villegas. Moreover, Metro was fully aware of Dr. Frazier's affidavit, <u>as it was disclosed and discussed in Dr. Torrente's expert report provided to Metro on August 9, 2010</u>. (Torrente Rep. at ¶ 50.)

Finally, with respect to the declaration of Dr. Thomas Easterling, it is not even cited in Ms. Villegas' response to Metro's motion for summary judgment. However, that declaration is also part of the public record and, as explained in the Notice of Filing, was obtained off PACER along with the motion for summary judgment filed in the *Brawley* case. Dr. Easterling is not offered as an expert witness by Ms. Villegas but rather as additional evidence from other cases where both the experts and the Court concluded that shackling was unconstitutional.

Moreover, Metro has argued that the courts in *Nelson* and *Brawley* were concerned only with the exact facts presented and the precise timing of when the shackles were removed. Metro spends considerable time in its summary judgment papers seeking to distinguish facts of *Nelson*

and *Brawley*. Yet, it never addresses the underlying record evidence before those courts. For example, the Easterling declaration before the Court in *Brawley* explained that:

> Women in labor must have freedom of movement to appropriately position themselves so as to avoid venocaval occlusion, hypotension and fetal compromise. A restrained woman cannot move spontaneously in response to symptoms of hypotension. She cannot move efficiently from side to side as needed in labor. When a woman is physically restrained she cannot be moved efficiently in case of an emergency.
>
> After delivery, early and frequent ambulation is the cornerstone of prevention of deep venous thrombosis and pulmonary embolus. Walking also hastens the return of normal bowel function. In addition, postpartum women require careful and personal care to their perineum. These aspects of routine care are limited or prevented when a woman is restrained.
>
> Likewise, prior to labor and delivery, restraining pregnant women late in pregnancy, or during a high risk pregnancy, can increase the likelihood of the pregnant woman falling down. Falls and other trauma increase the risk of placental abruption and preterm labor.
>
> In addition, restraints impair appropriate interactions between mothers and newborns. A new mother who is restrained cannot be responsive to the needs of a newborn. She cannot readily come to the baby's care and comfort. She cannot efficiently and effectively breast feed without the use of both arms. A new mother is not merely prevented from experiencing the joys of motherhood. In stark contrast, the critical frame work of mother-baby relationship that will serve as the foundation for a life of parenting is placed at risk.
>
> As I stated above, I insist on the removal of handcuffs and any other form of shackles from a pregnant and laboring patient. This is because handcuffs and shackles interfere with the patient-physician relationship. The presence of restraints labels the woman as undeserving of respect and compassion. And I certainly do not find restraints necessary for my physical safety as a treating physician. The presence of shackles cannot be justified for a pregnant woman experiencing the pain and discomfort of labor; for a pregnant woman with an epidural who, as a result, does not have the strength in her legs to walk; for a postpartum woman still recovering from caesarian surgery who also has very limited ability to move and cannot move quickly; for a postpartum woman with a baby in arms. And in my experience, the absurdity of restraining incarcerated pregnant women is heightened because there is invariably a trained corrections officer guarding the single door to the woman's room.

While Metro seeks to create factual dissimilarities from *Nelson* and *Brawley*, Metro never addresses the underlying record upon which those courts based their decisions (nor their holdings which make none of the distinctions Metro now asserts).

Turning to Metro's motion to strike various "books, articles, and other publications," it is difficult to understand Metro's position. In responding to Metro's motion for summary judgment, the undersigned counsel researched case law and secondary sources. This type of research is classic attorney work-product. These sources were then cited in response to Metro's motion for summary judgment and, consistent with local rules, copies of all unpublished cases and secondary sources were filed with the Court. Metro evidently takes no issue with the cases cited by Ms. Villegas but seeks to strike the secondary sources on the basis that Ms. Villegas did not previously disclose to Metro what secondary sources it may cite in responding to a yet-to-filed motion for summary judgment by Metro. Respectfully, this position simply makes no sense.

Each of the books, articles and publications Metro seeks to strike are publicly-available. Ms. Villegas specifically explained in her responses to Metro's document requests that she understood Metro's requests for documents in this case *not* to seek "materials that are available to the public or Metro or its counsel." (Plaintiff's Response to Metro's Discovery Requests at p. 2.) Metro never took issue with this position. In any event, none of the materials were obtained and purposefully withheld from Metro prior to the motion for summary judgment filed by Metro.

Again, had Metro simply met and conferred with the undersigned counsel, any concerns could have been alleviated. The treatise STANDARDS FOR HEALTH SERVICES IN JAILS published by the National Commission on Correctional Health Care (the "NCCHC") was not obtained until November 2010. Same for the book HEALTH ISSUES AMONG INCARCERATED WOMEN (2006),

517274.3  08294-001

6
Case 3:09-cv-00219   Document 107   Filed 12/07/10   Page 6 of 10 PageID #: 2506

available from NCCHC's website. Both of these were ordered on November 10, 2010. Similarly, the press release and resolution found on the American Medical Association ("AMA") website was not located until November 2010, as a result of attorney-work product.

As for the "Standard Minimum Rules for the Treatment of Prisoners" that was obtained from the website of the Office of the United Nations High Commissioner for Human Rights, this was actually an exhibit to the deposition of Cpl. David Humphries, which occurred <u>a year ago</u> on December 17, 2009. (Humphries Dep. at Ex. 6.) Similarly surprising, Metro seeks to strike a report from the United Nations on civil and political rights that is again publicly-available and an official report from the United Nations that the undersigned counsel found while doing legal research in response to Metro's motion for summary judgment.

Metro also seeks to strike an unpublished law article entitled *Mothers in Chains: How national and state legislation have been enacted to stop the practice of shackling incarcerated pregnant women* (May 4, 2010) that counsel found while working on a response to Metro's motion for summary judgment. Again, Metro's position that it should be stricken makes no sense, and carried to its logical conclusion would require a litigant to disclose all cases and secondary legal sources that one may rely upon—including in response to a future unknown motion filed by an adversary—at the outset of a case. Metro certainly did not do that in this litigation.[2]

---

[2] In fact, in Metro's own initial disclosure it identified only the following documents: Internal Affairs investigation file, CD-R with interviews and logs from IA investigation, Jail File, Incident Report, Jail Medical File, and General Hospital Medical Records. Yet, in moving for summary judgment, Metro relied on numerous additional documents, including the Berry Hill and Tennessee Charter, Nashville-Sheriff website, Nashville government website, American Correctional Association's "Public Correctional Policy on Use of Force," ACA's Standards for "Adult Local Detention Facilities," Metro General Hospital Policies, various books cited by Donald Leach, among others. Plus, Metro did not produce many documents in this case until after the deadline for the close of fact discovery, when it produced on August 19, 2010, in excess of fifteen hundred (1,500) pages of responsive hard-copy documents. Then, on August 25, 2010, Metro produced a cd-rom containing the Outlook data files for ten DCSO employees. Ms. Villegas served her original requests for production and interrogatories on April 8<u>, 2009.</u> Moreover, Metro produced over 100 additional pages on September 24, 2010, along with additional disclosures of

Finally, Metro seeks to strike three secondary sources that were filed in the *Brawley* case, No. 3:09-cv-05382-RJB (W.D. Wash.).[3] Again, these materials were all publicly available and part of the record in a case cited by both parties. In any event, these materials were discovered while researching in support of the response to Metro's motion for summary judgment. There is no basis to strike them. Each has been properly authenticated and each constitute an exception to the hearsay rule as they are medical publications detailing the risks and dangers of shackling pregnant and post-partum women. Moreover, they were part of the record in the *Brawley* case, which Metro has sought to distinguish on the facts.

Accordingly, Metro's motion is without merit. Presumably, had Metro followed the Court's order by having a discovery dispute conference or even calling the undersigned counsel, it would have reached the same conclusion. Instead, Metro decided to file the present motion at midnight on December 2, 2010, without any advance notice or discussion. As it is plain that Metro's motion has no merit and was filed without any discovery conference—the second time Metro has done that in this litigation[4]—Ms. Villegas respectfully requests that the Court deny the

---

documents and individuals, including two persons with Nashville General Hospital, one of whom Metro had actually met with in August 2008.

[3] These include (i) an article in ACOG Today (Nov./Dec. 2008) as it appears on PACER and which counsel obtained from PACER in the *Brawley* case, No. 3:09-cv-05382-RJB, W.D. Wash. (DE 30-4, Ex. 22), (ii) a true and correct copy of AMERICAN PUBLIC HEALTH ASSOCIATION, STANDARDS FOR HEALTH SERVICES IN CORRECTIONAL INSTITUTIONS 108 (2003) as it appears on PACER and which counsel obtained from PACER in the *Brawley* case, No. 3:09-cv-05382-RJB, W.D. Wash. (DE 30-4, Ex. 21), and (iii) a true and correct copy of Barbara A. Hotelling, Perinatal Needs of Pregnant Incarcerated Women, Journal of Perinatal Education, Vol. 17, No. 2, 37-44 (Spring 2008) as it appears on PACER and which counsel obtained from PACER in the *Brawley* case, No. 3:09-cv-05382-RJB, W.D. Wash. (DE 30-4, Ex. 23).

[4] *See* Metro's Reply in Support of Motion for Leave to Depose Rule 26(a)(2) Witness [Doc. No. 74] ("Having now re-read the initial case management order, <u>it appears that a joint discovery statement may be required for any discovery motion, dispute or otherwise</u>. To the extent that is the Court's intent, the Metropolitan Government apologizes for not having fulfilled this requirement. To address this oversight, contemporaneously with the filing of this reply, Defendant will work with Plaintiff to meet this requirement. . . ." (emphasis added)).

motion and award such relief as may be appropriate to Ms. Villegas and her counsel for having to respond to the motion.[5]

                                                      Respectfully Submitted,

                                        */s/ Phillip F. Cramer*
                                        William L. Harbison (No. 7012)
                                        Phillip F. Cramer (No. 20697)
                                        John L. Farringer IV (No. 22783)
                                        SHERRARD & ROE, PLC
                                        424 Church Street, Suite 2000
                                        Nashville, TN 37219
                                        (615) 742-4200
                                        bharbison@sherrardroe.com
                                        pcramer@sherrardroe.com
                                        jfarringer@sherrardroe.com

                                        Elliott Ozment (No. 4331)
                                        IMMIGRATION LAW OFFICES OF
                                        ELLIOT OZMENT
                                        1214 Murfreesboro Pike
                                        Nashville, TN 37217
                                        (615) 321-8888
                                        elliott@ozmentlaw.com

                                        *Attorneys for Juana Villegas*

---

[5] It is also curious that Metro would file such an aggressive motion regarding discovery given its record in this matter. For example, Metro failed to produce any video-tapes of Ms. Villegas at the detention center and denied their existence. When counsel for Ms. Villegas continued to press the issue, Metro retracted its earlier position and explained that in the interim it had destroyed the videotape showing Ms. Villegas at the detention center. This would have been admissible evidence to show a jury Ms. Villegas' pregnant state and her demeanor when incarcerated at the jail. Similarly, Metro consistently and persistently failed to timely produce documents as explained *supra* in note 2. Moreover, Metro's 30(b)(6) designees had to be changed on numerous occasions, sometimes the day before a deposition was to occur and sometimes mid-deposition when it became apparent that Metro had failed to designate an appropriate representative. Yet, Ms. Villegas and her counsel have sought to work through these issues with Metro and have given Metro the benefit of the doubt.

517274.3   08294-001

## **CERTIFICATE OF SERVICE**

    Service of the foregoing was accomplished through the Court's Electronic Filing System on this 7th day of December, 2010, upon the following:

    Kevin Klein
    Allison Bussell
    Metropolitan Department of Law
    108 Metropolitan Courthouse
    P.O. Box 196300
    Nashville, TN  37219
    Kevin.Klein@nashville.gov
    Allison.Bussell@nashville.gov

                */s/ Phillip F. Cramer*