**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| JUANA VILLEGAS,<br><br>Plaintiff,<br><br>v.<br><br>METROPOLITAN GOVERNMENT OF DAVIDSON COUNTY/NASHVILLE DAVIDSON COUNTY SHERIFF'S OFFICE, et al.<br><br>Defendants. | ) | NO. 3:09-00219<br>JUDGE HAYNES |

**MEMORANDUM**

Plaintiff, Juana Villegas, filed this action under 42 U.S.C. §§ 1981 and 1983, against the Defendants: Metropolitan Government of Nashville Davidson County, Tennessee, Nashville Davidson County Sheriff's Office[1], Janet Napolitano, in her official capacity as Secretary of Department of Homeland Security, and John Doe #1, John Doe # 2, John Doe # 3 and John Doe # 4. Plaintiff's specific claims are that the Defendants' conduct violated her rights under the Due Process Clause of the Fourteenth Amendment for their deliberate indifference to Plaintiff's serious medical needs arising from Defendants' shackling of Plaintiff during the final stages of her labor during her pregnancy and post-partum recovery. Plaintiff also asserts other federal constitutional claims that the Defendants violated her First Amendment right to familial association and her

[1] The Court deems Metro to be the real party in interest because a "Sheriff's department" is not a person under Section 1983. See Petty v. County of Franklin, 478 F.3d 341, 347 (6th Cir. 2007). Claims against the sheriff of a county in his official capacity are against the pertinent governmental entity here, Metro. Leach v. Shelby County Sheriff, 891 F.2d 1241, 1245-46 (6th Cir. 1989).

Fourth Amendment right of personal privacy. Plaintiff further asserts claims that the Davidson County Sheriff's Office ("DCSO") breached its contract with the Immigration and Customs Enforcement ("ICE") on Metro's detention of her and Defendants' conduct violated the Tennessee Constitution, Article 1, Section 8 and Section 32. In earlier proceedings, Plaintiff nonsuited her claims against the John Doe Defendants. (Docket Entry No. 53). The Court dismissed Plaintiff's claims against the Secretary. (Docket Entry Nos. 44 and 45). The remaining parties proceeded with discovery.

Before the Court are the parties' cross-motions for summary judgment, (Docket Entry Nos. 77 and 84), but Plaintiff seeks only partial summary judgment on her federal and state constitutional claims.

In their motion for summary judgment, Defendants contend, in sum: (1) that handcuffing and shackling Plaintiff during her active labor and post-partum recovery have penological justifications; (2) that Plaintiff cannot show any objective harm by reason of Defendants' acts or omissions, nor that the Defendants acted in reckless disregard of any risk to Plaintiff by their handcuffing and shackling her and; (3) that Defendants' policies restricting Plaintiff's right to personal privacy and access to her child, as well as visits or telephone contacts with family members, were also based upon penological justifications. Thus, without actionable federal claims, Defendants also seek dismissal of Plaintiff's state law claims without prejudice.

In her motion, Plaintiff asserts, in essence, that Defendants' shackling of her during her active labor, shortly before actual delivery and during her post-partum recovery as well as Defendants' agents' disregard of a physician's "no restraint" directive, violated Plaintiff's

Fourteenth Amendment right to be free from deliberate indifference to her serious medical condition. In addition, Plaintiff contends that Defendants also exhibited recklessness during her hospital stay and interfered with her rights to personal privacy and familial association.

**A. Findings of Fact**

**1. Plaintiff's Initial Confinement**

On July 3, 2008, Tim Coleman, a Berry Hill, Tennessee[2] police office arrested Plaintiff, Juana Villegas, who was nine months pregnant, for driving without a valid license. (Docket Entry No. 93, Plaintiff's Response to Defendant's Statement of Undisputed Facts at ¶ 1). After Plaintiff could not produce a driver's license, Coleman arrested Plaintiff and transported her to the DCSO jail. Id. at ¶¶ 2-3. DCSO accepts and houses individuals arrested by local law enforcement agencies without inquiry into whether the arrest was proper. Id. at ¶ 6. In Davidson County, a judicial commissioner determines if probable cause exists to justify an arrest and Plaintiff made some type of appearance before a commissioner. Id. at ¶ 7. From July 3rd until July 5th 2008, Plaintiff was held in the Davidson County jail. Id. at ¶ 13. Because July 4th was a holiday, Davidson County courts did not meet that day. Id. On the evening of July 5th, Plaintiff was confined at the Correctional Development Center, a female correctional facility on Harding Place in Nashville. Id. at ¶ 12.

While in the DCSO's custody, a DCSO employee and agent of the United States under DCSO's 287(g) program with ICE, screened Plaintiff for classification, inquired of Plaintiff's legal status and determined that Plaintiff was not lawfully in the United States. Id. at ¶ 9.

---

[2]Berry Hill is a separate city within Metropolitan Government of Nashville and Davidson County.

Plaintiff initially asserted that she was deported by voluntary agreement.[3] ICE then placed a federal detainer on Plaintiff pending resolution of her state charges. Id. at ¶ 10. The ICE detainer caused Plaintiff to be classified as a medium-security inmate. (Docket Entry No. 86-1, Barshaw Deposition at 5, 6). Although Plaintiff was able to secure bond for the traffic offense, the ICE detainer precluded Plaintiff's release from DCSO custody. (Docket Entry No. 94-21,Carachure Deposition at 37-39).

**2. Commencement of Plaintiff's Labor**

According to Defendants, at approximately 10:00 p.m. on July 5th, Plaintiff informed Richard Ramsey, a male jail guard that her "water," *i.e.*, amniotic fluid "broke" and "that she was having labor pains." (Docket Entry No. 93, Plaintiff's Response to Defendants' Statement Undisputed Facts at ¶ 14). Plaintiff told the officer who was at her cell to distribute food "my baby is coming." (Docket Entry No. 86-15, Villegas Deposition at 116). DCSO's jail incident report reflects that Plaintiff's water actually broke at 9:00 p.m. (Docket Entry No. 94-22). In any event, jail guards transported Plaintiff to the jail infirmary where a nurse confirmed that Plaintiff's water had broken and summoned an ambulance. (Docket Entry No. 93, Plaintiff's Response to Defendants' Statement of Undisputed Facts at ¶¶ 14 and 16).

---

[3] In a separate action, Plaintiff asserted that she was deported by voluntary agreement, but in Villegas v. Holder, 2010 WL 6439842, at *4-*6 (6th Cir. Nov. 8, 2010), the Sixth Circuit ruled that Plaintiff had been ordered to leave the country.

Plaintiff was placed on a stretcher and transported to Metro General Hospital ("MGH") with her wrists restrained in front of her body and her legs restrained together. Id. at ¶ 18. Lt. Kristina Quintal, a jail supervisor sent two male officers to transport Plaintiff. (Docket Entry No. 86-1, Barshaw Deposition at 17-20). In route to the hospital, Matthew Barshaw, a DCSO officer asked Lt. Quintal if Plaintiff needed to be shackled because "what's going through my head now is what if all of a sudden the baby started -- took more time to unrestrain these restraints in the back of the ambulance." Id. at 23. Plaintiff testified that she was in pain, from contractions during this time. (Docket Entry No. 86-15, Villegas Deposition at 123, 128). According to Defendants, because hospitals are "conducive to security breaches including escape," inmates at hospitals remain shackled, including Plaintiff. (Docket Entry No. 79, Stalder Declaration at 7g, i).

**3. Plaintiff's Hospitalization**

When Plaintiff arrived in her hospital room at MGH, she remained shackled until her transfer to the hospital bed from the ambulance stretcher. (Docket Entry No. 86-1, Barshaw Deposition at 28). Nurses requested a jail officer to remove Plaintiff's handcuffs to change Plaintiff into a hospital gown. Id. at 28, 29. Plaintiff was unshackled and Barshaw and Farragher, a fellow male officer, remained in Plaintiff's room, but turned their backs to Plaintiff, as the nurses and a doctor requested. Id. at 29. A doctor requested that the officers turn their backs while she examined Plaintiff's lower extremities. Id. Once in her hospital gown, officers Farragher and/or Bradshaw again restrained Plaintiff's hands and legs while she was in the hospital bed. (Docket Entry No. 93, Plaintiff's Response to Defendants' Statement of Undisputed Facts at ¶ 26).

Plaintiff asserts that she repeatedly asked the guards to remove the restraints. (Docket Entry No. 94-5, Villegas Declaration at ¶ 6).

Brandi Moore, a corporal in DCSO's transportation division, relieved Officers Faragher and Barshaw very shortly after Plaintiff's arrival at MGH. (Docket Entry No. 93, Plaintiff's Response to Defendants Statement of Undisputed Facts at ¶ 27). Farragher informed Moore that Plaintiff was a medium security inmate with a "hold," "detainer" or something to that effect. Id. at ¶¶ 28 and 29. Moore also had a "charge sheet" with Plaintiff's name, charge, and custody level. Id. at ¶ 29. Moore removed the handcuffs from Plaintiff, but restrained one of Plaintiff's legs to the hospital bed. Id. at ¶ 30. According to Moore, she overheard MGH medical staff talking to a doctor about a "No Restraint Order," but the doctor did not respond. (Docket Entry No. 86-6, Moore Deposition at 35, 50). A nurse, however, commented that the officers "shouldn't put leg irons on her" and Moore described the nurse as "rude." Id. at 59-60. A nurse described to jail officers the high risk of blood clots after giving birth, if the shackles were not removed.[4] (Docket Entry No. 86-5, Ray Deposition at 53-55). According to Plaintiff's hospital records, at 11:20 p.m. on July 5, 2008, Dr. Kesha Robertson signed a physician's order stating: "Please remove shackles" and this Order was placed in Plaintiff's hospital file. Id. at 25-26. Moore did not see a "No Restraint

---

[4]Defendants contend that the nurse's statement to Metro's investigator on this risk is inadmissible hearsay, but the declarant is a Metro nurse who is an employee of the Defendant Metro and whose statement is within the scope of her employment and adverse to Metro's position in this action. Such statements, including to the Defendants' investigator, are admissible under Fed. R. Evid. 801(d)(2)(D), on the Defendants' officers' state of mind. See Stalbosky v. Belew, 205 F.3d 890, 895 (6th Cir. 2000): Moore v. Kuka Welding Sys. & Robot Corp, 171 F.3d 1073, 1081-82 (6th Cir. 1999); Williams v. General Motors Corp.,18 Fed. Appx. 342,347-49 (6th Cir 2001).

Order," but the next day Officer Flatt told her of the "No Restraint Order." (Docket Entry No. 78-4 at 84-85).

David Peralta, another DCSO officer, relieved Moore at 11:00 p.m. on July 5th and Moore told Peralta to be prepared for a "no restraint order." (Docket Entry No. 86-6, Peralta Deposition at 9-10). Shortly after 11:00 p.m., Peralta removed Plaintiff's restraints. Id. at 12-13. Plaintiff gave birth to her child at approximately 1:00 a.m. on July 6, 2008. (Docket Entry No. 93, Plaintiff's Response to Defendants' Statement of Undisputed Facts at ¶ 35). Plaintiff remained unrestrained during Peralta's shift, but Peralta shackled Plaintiff just minutes before his shift change at 7:00 a.m., because of DCSO policy. (Docket Entry No. 86-6, Peralta Deposition at 22). Peralta restrained one of Plaintiff's ankles to the bed after Plaintiff opted for the ankle restraint in lieu of a wrist restraint. Id. at 24.

When Moore returned on July 6th, Officer Flatt informed her that a No Restraint Order was in effect (Docket Entry No. 86-6, Moore Deposition at 63), but Sergeant Harrison, her supervisor ordered Moore to "put restraints" on Plaintiff. Id. at 64. Plaintiff saw her child, but after delivery, the nurse took the baby to enable Plaintiff to rest. (Docket Entry No. 86-16, Villegas Deposition at 141-142). Defendant cites Plaintiff's statement that her child was "with [her] the whole time." Id. at 142. During her post-partum recovery, one of Plaintiff's legs was shackled to her hospital bed. (Docket Entry No. 93, Plaintiff's Response to Defendants Statement of Undisputed Facts at ¶¶ 40, 41). Yet, whenever Plaintiff went to the restroom or walked or bathed during her post-partum recovery, both of Plaintiff's legs were restrained. Id. at ¶ 42.

As to Plaintiff's other claims, DCSO policy also did not allow Plaintiff to use the telephone or to have any visitors to her hospital room. (Docket Entry No. 93, Plaintiff's Response to Defendants' Statement of Undisputed Facts at ¶¶ 45, 49). Defendants assert these limitations are for "public, institutional, inmate and officer safety" and is a common and acceptable correction practice." Id. at ¶¶ 46, 50. Defendants' expert also cites MGH's policy restricting inmate access to telephone calls. (Docket Entry No. 80 at 8-9).

At the time of Plaintiff's discharge from MGH, citing safety concerns, DCSO officials did not allow Plaintiff to be transported to the DCSO jail leave with a breast pump that the hospital staff provided. (Docket Entry No. 93, Answers to Interrogatories at ¶ 54) Defendants do not consider a breast pump to be a critical medical device under its jail policy. (Docket Entry No. 80, Leach Declaration at 10). Without the breast pump, Plaintiff described her pain from the engorgement or swelling of her breasts. (Docket Entry No. 86-15 Answers to Interrogatories at ¶ 5). Plaintiff testified that she cries repeatedly weekly from this shackling experience surrounding the birth of her child. (Docket Entry No. 86-17, Villegas Deposition at 178-79).

**4. Expert Medical Proof**

Both parties submitted expert medical proof on the risks, effects and injuries attributable to Defendants' shackling of Plaintiff in transport to the hospital, during Plaintiff's stay at the hospital and Defendants' denial of the breast pump provided by MGH staff.

Defendants' medical expert proof is that at that time of Peralta's initial release of Plaintiff from all restraints, Plaintiff's cervix was dilated only to 3 centimeters, (Docket Entry No. 81, Spetalnick Affidavit at ¶ 5(b)), and Plaintiff was also unrestrained during her entire progression

from 3 centimeters to 10 centimeters until birth of her child. Id. Dr. Bennett Spetalnick, the medical director of labor and delivery for Vanderbilt University Medical Center and an assistant professor of obstetrics and gynecology at the Vanderbilt University School of Medicine, opined that the use of restraints during Plaintiff's labor and post-partum did not enhance Plaintiff's medical risks nor did she suffer excessive pain:

> [a]lthough the risk of a DVT (deep venous thrombosis) and PE (pulmonary embolism) is increased with pregnancy and postpartum, my medical opinion, based on the literature and personal experience, is **that these risks are not enhanced by a leg restraint and/or handcuffs**. Ambulation is encouraged in the peripartum period, but the amount of ambulation recommended to prevent a DVT is not prevented by leg restraints as they were used in Ms. Villegas['s] situation. There is no significant risk to the patient with a leg restrained up to the time of delivery and immediately post-partum and none in this case with no leg restrained for 7 hrs B 2 hrs prior and for 5 hours after delivery. The facts of the case also documented by the nurses indicate "Thrombophlebitis, Both Legs, none" with multiple reports through the entire hospital stay, which in layman's terms indicate that the nursing staff repeatedly ruled out these conditions for Ms. Villegas.
>
> b. The restraining of one leg is not a danger to the patient or her unborn child. Although vaginal access to a laboring woman for examinations by caregivers is necessary and a leg restraint is a theoretical impediment in the case of an emergency, my medical opinion is that a restraint would not prevent, significantly impede, or make less accurate the vaginal exam. Furthermore, the facts of this case indicate that the patient was unrestrained from 3 to 10 cm dilation and for 5 hrs. after delivery.
>
> c. Although a leg restraint, like any other fomite, can carry bacteria, my medical opinion is that there is no evidence that the use of these restraints under the circumstances of this case created a significant infectious risk for Ms. Villegas.
>
> . . . .
>
> e. Although postpartum complaints of back pain are common, there is no evidence a handcuff or leg restraint while laboring or postpartum caused any more leg and back pain noted by Ms. Villegas in her deposition, than might theoretically effect any patient whether pregnant or not.

f. **Although labor is very painful, it is medically anticipated that the pain experienced in latent labor is less severe than that experienced in active labor.** The facts of the case indicate that Ms. Villegas was dilated to 3 cm on admission and remained at 3 cm until at least 23:30. Thus, she was in latent labor until at least 23:30. Her records indicate that all of her restraints were removed prior to active labor. At 23:45, when 4cm and starting active labor, she made her first request for pain medication and was given Stadol. **Since the patient placed her pain as a 5 on a 10 scale one hour before delivery, the facts in the NGH records do not support her claim of excessive pain while wearing restraints: "07/06 00:30 PAIN SCALE (1-10): 5 & 07/06 08:00, 12:45, 13:00, 17:15, 17:29, 20:30: 07/07 08:49, 20:30; 07/08 08:00: Denies Pain: 0=No pain."**

(Docket Entry No. 81 at 2-3) (emphasis added).

For the Plaintiff, Dr. Sandra Torrente, an assistant professor in the department of obstetrics and gynecology at Meharry Medical College and graduate of the Kansas Medical School, has spent several years on MGH's maternity ward. (Docket Entry No. 94-4 at 7). Dr. Torrent reviewed the medical effects of Plaintiff's shackling. In a more extensive analysis than Dr. Spetalnick, Dr. Torrente differs about the effects of Plaintiff's shackling and also opined on other issues that Dr. Spetalnick did not address:

37. **The shackling of a woman who is in her third trimester and whose water has broken is extremely dangerous because of, among other things, a potential for the umbilical cord prolapse.** Umbilical cord prolapse occurs when the baby's head is not engaged (not in the pelvis) and the umbilical cord moves below the baby's head. In this position, the cord can kink and cause a lack of blood to the baby. The baby because hypoxic, which can cause brain injury. In this situation, the mother needs an emergency caesarean.

38. A woman whose membranes have ruptured needs to be assessed as soon as possible for potential umbilical cord prolapse. This is performed through a cervical exam and should be performed as soon as possible. . .

39. If a woman's legs are shackled during labor, she cannot be effectively monitored for umbilical cord prolapse, and she is not able to deliver a baby. Moreover, if a woman's legs are shackled together, the ability to provide emergency medical care may be restricted and/or delayed.

40. When stress is introduced to a woman who is pregnant, this stress can induce labor. A stress-induced labor can cause potential serious complications, placing both the mother and child at risk.

41. In my medical opinion, placing shackles on Ms. Villegas after her water broke and keeping these shackles on her during ambulance transport to the hospital evidenced indifference to Ms. Villegas' medical needs.

A proper cervical exam cannot be conducted while a woman is restricted with foot-long leg shackles. It is my opinion that if Ms. Villegas had developed an umbilical cord prolapse or other complication, she was at a much higher risk of having such a life-threatening condition go unnoticed and untreated. . . .

42. [H]aving her legs shackled certainly increased the risk of injury to both Ms. Villegas and her unborn child.

* * *

**47. Medical personnel need constant unrestricted access to a woman in labor. There are a number of complications that can occur during labor which necessitate the ability of healthcare providers to provide immediate medical assistance. The process of freeing the woman from restraints can inhibit this process. For example, when a woman is in labor and the baby develops a non-reassuring fetal heart tracing, the patient needs to be able to move to her left lateral decubitus position to increase blood flow to the baby**. The uterus is displaced to the right in a woman and moving the patient to her left lateral decubitus improves the mode of resuscitating the baby through the mother by improving blood flow to the fetus; we also provide high flow oxygen by a face mask.

(Docket Entry No. 94-4, at 19-23)(emphasis added).[5]

Dr. Torrente details other significant risks in shackling of Plaintiff during her labor and post-partum recovery:

**18. Placing a pregnant woman in leg irons or shackles increases her risk of developing a potentially life-threatening blood clot. This risk is increased and present throughout a woman's entire pregnancy; however, it is at the greatest**

[5] These references to pagination are to the Court's electronic filing system's pagination.

**risk post-partum**. This is a primary risk to women post-partum and the main prevention for blood clots is to be ambulatoryCi.e., being able to freely move and walk aroundCas often as possible. Monitoring a woman whose water has broken and keeping her unrestrained are also important because of the potential occurrence of umbilical cord prolapse, which requires monitoring of a woman's cervix and an emergency caesarean if the condition is discovered.
Throughout pregnancy and labor, a woman should not be restrained because of the increased risk in falling due to a pregnant woman's impaired balance. **Women who are pregnant have three major physiologic changes that increase their fall risk. First her center of gravity changes to be above her legs, second the enlarging abdomen, and third the relaxation of the pelvic joints leads to unsteadiness in her gait. Restraints B particularly leg restraints B would increase her fall risk which can lead to injury of both the woman and the unborn child.**

**19. A woman who has given birth should not be restrained in any manner for her entire hospital stay. It is vitally important that a woman have full range of movement of her limbs and remain ambulatory to prevent blood clots and general discomfort**. A woman whose hand or hands are restrained by handcuffs also cannot safely handle a newborn child and should not be entrusted with a child when her hands or arms are restrained in any manner. . .

**21. The use of shackles on a woman during labor and post-partum is extremely unsanitary and unacceptable.**

Id. at 13-15) (emphasis added). Dr. Torrente also explained that the shackling of Plaintiff "certainly increased the risk of injury to both Ms. Villegas and her unborn child" with a stress induced labor. Id. at 21.

As to the opinions of Dr. Spetalnick on the absence of any increased risks due to Plaintiff's shackling, Dr. Torrente responds:

Ms. Villegas was shackled while she was in active labor and after her water broke. **Based on my review of Ms. Villegas' medical charts and her personal history, she could have easily progressed to the final phase of labor while she was shackled in the ambulance or in the hospital room. The fact that Ms. Villegas progressed from being dilated at 3 cm to 10 cm in only two hours proves this point and is apparently overlooked by Dr. Spetalnick. There is no indication**

> **that Metro monitored Ms. Villegas' dilation and made any purposeful decision to remove the shackles based on her level of dilation. Moreover, it is apparent that Metro subjected Ms. Villegas to unnecessary pain and suffering by shackling her after her water broke. Dr. Spetalnick's claim that Ms. Villegas was only in "latent labor" does not mean from a medical standpoint that Ms. Villegas was not in pain or that birth could not have progressed very quickly**.

Id. at 3 (emphasis added).

Dr. Jill DeBona, a graduate of the Vanderbilt Medical School, licensed psychiatrist and assistant clinical professor of the Vanderbilt Medical School interviewed and evaluated Plaintiff. (Docket Entry No. 94-3 at 3-5). Dr. DeBona describes Plaintiff's emotional distress, mental anguish and subsequent mental disorder caused by Plaintiff's shackling in the ambulance and at the hospital:

> While in the ambulance, Ms. Villegas had to face the terror that her baby might die. She did not realize that an officer was in the ambulance. She believed that there was no one to remove the shackles.
>
> Just as her labor had been short with the births of her two previous children, she believed that this labor would also be short. Yet, during this labor, she could not move or open her legs. Unable to move or open her legs, she feared that her son would not be able to be delivered. She had to sit with the terror that her baby might die inside of her body. According to Ms. Villegas, there was nothing that she could do to help him. She felt helpless.
>
> Ms. Villegas experienced a profound stressor, the threat of death to her unborn child. The threat of death to a family member, in this case Ms. Villegas's baby, is an example of the type of extreme stressor that can lead to the development of Post-Traumatic Stress Disorder. Additionally, Ms. Villegas's response of terror and helplessness is often seen in trauma victims who develop Post Traumatic Stress Disorder.

(Docket Entry No. 94-3 at 20). Dr. DeBona also explained: "While in the ambulance, Ms. Villegas had to face the terror that her baby might die." Id. at 8.

As to the effects of the entire time of Plaintiff's shackling, Dr. DeBona opined as follows:

> Ms. Villegas experienced thirty-six hours of shackling with a heavy leg iron. This shackling was degrading and humiliating. Ms. Villegas's self concept is that she is a mother, a worker, a wife, not a criminal. **This humiliation at the hands of the police has caused a break in trust, in the institutions and people that are supposed to protect her. Her core sense of self, as a human being with value, has been shaken. Her sense of security has been shattered. A traffic violation can lead to thirty six hours of shackling. And her response again was one of helplessness.**
>
> **The literature on the psychological effects of restraints primarily refers to the use of physical restraints in the hospital. Jones et al. (2007) note that the use of physical restraints in hospitalized patients resulted in a higher incidence of PTSD**. Physical restraints ranged from the use of mittens on a patient's hands to the more restrictive practice of tying the patient's limbs to the bed. According to Jones, hospitalized patients who wore mittens or who were tied to the hospital bed had higher rates of PTSD than unrestrained patients. Ms. Villegas was not only restrained but she was shackled with a leg iron.
>
> Thus, we see that Ms. Villegas experienced a number of stressors July 3-10, 2008 that met the threshold for PTSD.

Id. at 34.

As to the Defendants' agents' denial of the breast pump provided by MGH staff, Dr. Spetalnick's affidavit is silent. Dr. Torrente stated: "If a woman is unable to express her milk for several days, because she does not have access to her child or to a breast pump, the woman can develop engorged breasts and mastitis." (Docket Entry No. 94-4, Torrente Report at 33). "Mastitis is an infection of the breast tissue that results in severe breast pain, swelling, significant fever, rigors and chills." Id. "The best cure for this condition, and that which is normally prescribed, is for the mother to express her milk, utilizing a breast pump." Id. "When a woman's breasts become engorged in this way they become rock solid and the pain is just horrendous." Id. In Dr. Torrente's expert medical opinion, "the development of mastitis by Ms. Villegas was almost

certainly caused by her inability to use a breast pump in the hours and day following her release

from General Hospital." Id. at 34. According to Dr. Torrente, this denial injured Plaintiff: "It is my

opinion that the discomfort and pain that she complains of could have been prevented and/or

relieved if she had been allowed to return to the detention center with a breast pump and use the

pump regularly." Id.

Based upon her evaluation of Plaintiff, Dr. DeBona corroborates Dr. Torrent about the

significance of Defendants' denial of the breast pump:

> **It is clear that Ms. Villegas needed a breast pump to relieve the painful engorgement that she was experiencing.**
>
> Yet, it didn't occur to her that she could ask for a breast pump and that her request might be granted. She had already endured profound experiences of helplessness in the custody of the sheriff's department. Now she was back in jail and suffering from a painful medical condition. Instead of asking for the help that a breast pump might offer, she remained silent, passive. Her coping mechanisms had been taxed. She felt defeated. Helpless.
>
> After enduring so much, it seems that Ms. Villegas had given up. Instead of requesting available help from the officers, a nurse or a doctor, she remained silent and endured pain.
>
> Such surrender despite the experience of pain is reminiscent of the studies by van der Kolk. In his work, dogs in cages were exposed to electric shocks from which escape was impossible. When they were then given the shocks and also allowed a possible escape, they did not exit. They stayed in their cages and endured the pain of the shocks. They had learned that escape was impossible despite the evidence to the contrary. They simply gave up and suffered. In effect, they had learned that they were helpless to save themselves. This state is termed one of 'learned helplessness'.
>
> After enduring so much, it seems that Ms. Villegas had also given up. Instead of requesting available help from the officers, a nurse or a doctor, she remained silent and endured the pain. She, too, had developed a state of learned helplessness.
>
> According to Maier and Seligman (1984), this state of learned helplessness

resembles the symptoms of defeat, withdrawal, and lack of motivation seen in individuals with Post Traumatic Stress Disorder.

(Docket Entry No. 94-3 at 23-24).

As to denial of contact visits or telephone usage at the hospital, Plaintiff was not allowed to contact her husband or other family, by telephone or otherwise throughout her stay at the hospital. (Docket Entry No. 86-1, Barshaw Deposition at 40 and Docket Entry No. 86-6, Peralta Deposition at 35-36). Dr. DeBona also described Plaintiff's fears from this lack of visitation with her child and husband:

> Ms. Villegas's two day old nursing infant was taken from her. She didn't know his whereabouts. Ms. Villegas was told that her husband had been called to pick up the baby. However, she wasn't permitted to see or speak to her husband to confirm that he had, in fact, received the call or picked up the baby. She feared that someone had taken, possibly kidnapped, her infant son. She had to face the horror that something bad may have befallen her baby and that she might never see him again. Her response again was one of intense fear and helplessness.

(Docket Entry No. 94-3, DeBona Report at 34).

**5. Penological Justification for Plaintiff's Shackling**

Defendants submit that the shackling at issue is required as a precaution to prevent escape or to prevent an inmate from injuring herself or other persons or damaging property.

Daron Hall, Metro's Sheriff and Rule 30(b)(6) witness, explained that DCSO examines "policies of other Sheriff's Departments around the country," " to see if there are standards nationally that pertain to what we're talking about" and to find "what's the best way to do it or a new way of doing it." (Docket Entry No. 86-13, Hall Deposition at 12). DCSO has "access to the National Institute of Corrections ... which is the largest jail network and then the American Correctional Association, the American Jail Association" that employs "auditors in all of those

associations, traveling, doing audits in other institution" who "bring back ideas." Id. at 12, 13. DCSO professes to adopt "the cutting edge of best practices" and "exceed the standard" on treating pregnant women. Id. at 13, 19. In determining the "best practices," Hall asserts that "people who are in the world of corrections nationally look at [DCSO]" as "exceed[ing] what the national expectation is in many, many ways." Id. at 18-19, 21-22, 50-52, 55-56.

As to Plaintiff's shackling, Hall explained that the "knowledge and information" that DCSO used to create the changes regarding shackling pregnant inmates "wasn't new" in 2008 and was known by DCSO before that time. Id. at 24-25. Hall admitted that the policies in effect in July 2008 did not, to his satisfaction, consider the practicality of the circumstance of the pregnant inmate. Id. at 58. According to DCSO Officer Humphries, the justification for Plaintiff's restraints during active labor and her post-partum recovery was to prevent her escape. (Docket Entry No. 86-7, Humphries Deposition at 69-70).

According to Defendants' expert proof, Richard Stalder, former president of the American Correctional Association and Association of State Correctional Administrators and Defendants' expert:

> In the case of Plaintiff Villegas, the stress of pending deportation could easily promote what otherwise may be uncharacteristic unlawful behaviors, including flight from custody and subsequent illegal activity. The relationship between public safety, custody status, general security practices and restraint policy is strong and justified.
>
> * * *
>
> Plaintiff Villegas was a female offender with obvious special medical needs but had to remain subject to system priorities and classification policy (such policy incorporating her special needs requirements through the recognition of "special needs – a designation for inmates requiring . . . services (for) physical impairments or medical . . . concerns." 000177). Consistent with the operating

protocols of multiple jurisdictions, Plaintiff Villegas' medical condition was not an automatic waiver of good classification practices nor a door to amnesty for the consequences of past behaviors (including her illegal return to the United States after her past deportation). While the federal government has the ability to consider "compassionate release," the entity responsible for custody is far more limited in considering options for "compassionate reduction in security." This is particularly applicable to the external provision of medical services in the clinic/outpatient/inpatient environment ("external" in this context referring to locations outside of the secure perimeter of the facility). These environments are conducive to security breaches including escape. (For example, DCSO policy, consistent with other jurisdictions throughout the nation, states that "inmate notification of appointments to outside facilities prior to the scheduled date and time of the actual transport is strictly prohibited and may result in the rescheduling of the transport." (DCSO policy on Inmate Transportation 000141)).

(Docket Entry No. 79 at 4, 5-6, Stalder Declaration at ¶ 7(d) and (g)).

According to Donald Leach, Defendants' correctional expert about the shackling of the Plaintiff:

> . . . .The application of the handcuffs and shackles prior to transport to the hospital was a discretionary act made in "good faith" by the officers on the scene based on their understanding of the agency's policy and procedures. The staff exercised reasonable discretion and judgment in the application of the restraints and demonstrated a concern for Ms. Villegas' welfare both during the labor and after the baby's birth.
>
> d. Additionally, the Davidson County Sheriff's Office had in place appropriate policies addressing the use of restraints on pregnant female inmates. These policies are intended to reduce the risk to pregnant female inmate while protecting the public's safety the safety of the officers and staff and the inmate. The Davidson County Sheriff's Office's policies reflect acceptable and appropriate correctional practice for prisons and jails throughout the United States. The use of restraints on pregnant female inmates during transport, labor or even the birth process is a common and acceptable security practice.
>
> e. The use of restraints during transport is a security protocol intended to protect the public safety, protect the staff and protect the inmate. The type and amount of restraints used varies according to the classification of the inmate. The greater the threat the inmate presents the greater the level of restraints that will be employed. The use of restraints during transport is intended to reduce the likelihood

of violent acts, escape attempts and contraband possession. The predominant concern is the protection of the community by the retention and control of the inmate when outside of the jail's security perimeter. This is reflected in the DCSO policy "Use of Restraints," which states: "Use of restraints may be based on any of the following: the need to prevent escape of an inmate under escort; the security classification of an inmate; the physical and mental health of an inmate; the demonstrated behavior of an inmate; the need to prevent injury to self, staff, other persons, or property; medical reasons, by direction of medical staff." (000152).

f. Effective restraint policies allow for limitations on the application of restraints based upon medical issues. When presented with a valid, medical reason, the use of restraints can be curtailed. This concern for the medical well-being of the pregnant female inmate is embedded in the Davidson County Sheriff's Office policies on "Inmate Transportation" and "Hospital Inmate Security." These policies contain appropriate, reasonable statements regarding the limitation on restraint use based on medical reasons:

- "The health services administrator may recommend a reduced level of restraint based on the inmate's physical ailment or disability. This recommendation must be stated in writing, recording the inmate's physical limitations and the consequences a particular type of restraint will have on the inmate and/or his ailment if used. The recommendation must be signed by the physician or a health services staff member acting on the physician's authority." DCSO Policy, "Inmate Transportation" (000140/000141).

- "All inmates shall be restrained by mechanical restraint devices at all times unless otherwise directed by the attending physician." DCSO Policy "Hospital Inmate Security" (000195) (Bolding mine)

g. The hospital's own policy recognizes the need to work with the correctional staff to balance security with the provision of medical care. Included in this is an evaluation by trained medical professionals concerning the physical effect of having the restraints on the patient.

h. Once Ms. Villegas delivered her baby, she was no longer pregnant and could be restrained according to the DCSO and the Nashville General Hospital policies. There were no medical reasons provided to the staff to preclude the application of the restraints for the remainder of her stay in the hospital.

(Docket Entry No. 80 at 4-6) As to denial of a breast pump, Leach states that DCSO officers assumed that the Metro jail health personnel would decide the necessity of the breast pump and opines that a breast pump is not a critical medical device under correctional policy. Id. at 10.

Plaintiff's medical expert addresses the appropriateness of the shackling of Plaintiff. Dr. Torrente stated that MGH staff has previously informed Metro officers about the adverse medical effects of shackling and that Defendants' officers have access to "No Restraint Orders" in the medical files of persons in their custody.

> **It is my understanding and knowledge that it has been commonly communicated by the medical staff at Metro General to detention officers and their superiors that shackling of women in the labor and delivery wing of the hospital is against best medical practice and interferes with the medical needs of the patients.** Nonetheless, it has been my understanding that medical providers must resort, on occasion, to issuing a no restraint order. This is commonly verbally conveyed to the detention officers followed by an order being placed in the patient's file at the nurses' station. **In my experience at Metro General, there is nothing to prevent a detention officer from requesting a copy of such an order after being verbally informed of its existence. Sometimes a detention officer will request that the doctor fax a copy of the order to a supervisor at the detention facility, although this is not requested every time an order is issued.**
>
> . . . .
>
> **In my experience, Ms. Villegas' doctor and health care providers followed standard practice in Nashville when they verbally informed her detention officers of the "no restraint order" and then placed a written "no restraint order" in Ms. Villegas' medical file.**

(Docket Entry No. 94-4, Torrente Report at 36-37) (emphasis added).

As to the Defendants' cited concerns of flight and danger, Dr. Sandra Torrente opined that on the flight issue, "[a] woman who is in active labor would not, from a medical point of view, pose a physical flight risk due to her condition" because she is "focused on childbirth and she does

not have the energy or ability to flee an officer located outside her room and then flee the maternity ward." (Docket Entry No. 94-4, Torrente Report at 15, 30). Similarly, Plaintiff would not "pose a risk of flight for the first 48 hours following birth of her child due to her physical status." Id. at 15. Dr. Torrente's report also reflects that the maternity ward at Metro General Hospital is "locked down," id., and "to enter *or exit* the ward, a person would have to personally check-in with a nurse who would have to authorize the exit and unlock the doors." Id. at 30. Moreover, the record reflects that "[a] woman in her third trimester of pregnancy also poses little risk of flight from custody or aggressive behavior." Id. "For the first 48 hours after giving birth, a woman poses an incredibly small risk of flight or aggressive behavior" because "a woman is extremely exhausted postpartum and will simply not have the physical energy to flee or act aggressively." Id. at 31.

Defendants cite Plaintiff's testimony that she had no complaints about her treatment by DCSO staff or medical staff from 11:00 p.m. to 7:00 a.m. (Docket Entry No. 86-16, Villegas Deposition at 139). At the noted pages, Villegas testified:

> Q. **[F]rom the time the restraints were taken off and the guard was waiting outside until the time the restraints were put back on do you have any complaints about the way you were treated?**
>
> A. **No.**
>
> Q. The B the doctor and nurses were able to do their jobs, right?
>
> A. Yes.
>
> Q. You were able to move about as you needed, correct?
>
> A. Well, I just -- **I fell asleep and stayed asleep. I didn't move around or get out of bed or anything.**
>
> Q. And you're referring to after you gave birth?

A. Yes.

Q. And my B I guess the point of clarification was, you were able to move about as you B as you wanted to during that time?

A. Yes.

(Docket Entry No. 86-15, Villegas Deposition at 131(emphasis added). Yet, these statements refer only to the time when Plaintiff was not shackled or was asleep.

### B. Conclusions of Law

"The very reason of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Advisory Committee Notes on Rule 56, Federal Civil Judicial Procedure and Rules (West Ed. 1989). Moreover, "district courts are widely acknowledged to possess the power to enter summary judgment sua sponte, so long as the opposing party was on notice that she had to come forward with all of her evidence." Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986). Accord, Routman v. Automatic Data Processing, Inc., 873 F.2d 970, 971 (6th Cir. 1989).

In Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), the United States Supreme Court explained the nature of a motion for summary judgment:

> Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment 'shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.
>
> As to materiality, the substantive law will identify which facts are material. Only

> disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

477 U.S. at 247-48 (emphasis in the original and added in part). Earlier the Supreme Court defined a material fact for Rule 56 purposes as "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Electrical Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citations omitted).

A motion for summary judgment is to be considered after adequate time for discovery. Celotex Corp. v. Catrett, 477 U.S. 317, 326, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where there has been a reasonable opportunity for discovery, the party opposing the motion must make an affirmative showing of the need for additional discovery after the filing of a motion for summary judgment. Emmons v. McLaughlin, 874 F.2d 351, 355-57 (6th Cir. 1989). But see Routman v. Automatic Data Processing, Inc., 873 F.2d 970, 971 (6th Cir. 1989).

There is a certain framework in considering a summary judgment motion as to the required showing of the respective parties as described by the Court in Celotex:

> Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. . . . [W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim.

Celotex, 477 U.S. at 323 (emphasis deleted).

As the Court of Appeals explained, "[t]he moving party bears the burden of satisfying Rule

56(c) standards." Martin v. Kelley, 803 F.2d 236, 239, n. 4 (6th Cir. 1986). The moving party's burden is to show "clearly and convincingly" the absence of any genuine issues of material fact. Sims v. Memphis Processors, Inc., 926 F.2d 524, 526 (6th Cir. 1991)(quoting Kochins v. Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir. 1986)). "So long as the movant has met its initial burden of 'demonstrating the absence of a genuine issue of material fact,' the nonmoving party then 'must set forth specific facts showing that there is a genuine issue for trial.'" Emmons v. McLaughlin, 874 F.2d 351, 353 (6th Cir. 1989) (quoting Celotex and Rule 56(e)).

Once the moving party meets its initial burden, the Court of Appeals warned that "[t]he respondent must adduce more than a scintilla of evidence to overcome the motion [and]. . . must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989)(quoting Liberty Lobby). Moreover, the Court of Appeals explained that:

> The respondent must 'do more than simply show that there is some metaphysical doubt as to the material facts.' Further, '[w]here the record taken as a whole could not lead a rational trier of fact to find' for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is 'implausible.'

Street, 886 F.2d at 1480 (cites omitted). See also Hutt v. Gibson Fiber Glass Products, No. 89-5731 (6th Cir. filed September 19, 1990) ("A court deciding a motion for summary judgment must determine 'whether the evidence presents a sufficient disagreement to require a submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." quoting Liberty Lobby)).

If both parties make their respective showings, the Court then determines if the material

factual dispute is genuine, applying the governing law.

> More important for present purposes, summary judgment will not lie if the dispute about a material fact is 'genuine' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.
>
> * * *
>
> Progressing to the specific issue in this case, we are convinced that the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits. If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict -- 'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'

Liberty Lobby, 477 U.S. at 248, 252 (citation omitted and emphasis added).

It is likewise true that:

> [I]n ruling on a motion for summary judgment, the court must construe the evidence in its most favorable light in favor of the party opposing the motion and against the movant. Further, the papers supporting the movant are closely scrutinized, whereas the opponent's are indulgently treated. It has been stated that: 'The purpose of the hearing on the motion for such a judgment is not to resolve factual issues. It is to determine whether there is any genuine issue of material fact in dispute. . . .'

Bohn Aluminum & Brass Corp. v. Storm King Corp., 303 F.2d 425, 427 (6th Cir. 1962) (citation omitted). As the Court of Appeals stated, "[a]ll facts and inferences to be drawn therefrom must be read in a light most favorable to the party opposing the motion." Duchon v. Cajon Company, 791 F.2d. 43, 46 (6th Cir. 1986) app. 840 F.2d 16 (6th Cir. 1988) (unpublished opinion) (citation

omitted).

The Court of Appeals further explained the District Court's role in evaluating the proof on a summary judgment motion:

> A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim. Rule 56 contemplates a limited marshalling of evidence by the nonmoving party sufficient to establishing a genuine issue of material fact for trial. This marshalling of evidence, however, does not require the nonmoving party to "designate" facts by citing specific page numbers. Designate means simply "to point out the location of." Webster's Third New International Dictionary (1986).

Of course, the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the nonmoving party relies; but that need for specificity must be balanced against a party's need to be fairly apprised of how much specificity the district court requires. This notice can be adequately accomplished through a local court rule or a pretrial order.

> 1. Complex cases are not necessarily inappropriate for summary judgment.
>
> 2. Cases involving state of mind issues are not necessarily inappropriate for summary judgment.
>
> 3. The movant must meet the initial burden of showing 'the absence of a genuine issue of material fact' as to an essential element of the non-movant's case.
>
> 4. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.
>
> 5. A court should apply a federal directed verdict standard in ruling on a motion for summary judgment. The inquiry on a summary judgment motion or a directed verdict motion is the same: 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that the party must prevail as a matter of law.'

6. As on federal directed verdict motions, the 'scintilla rule' applies, i.e., the respondent must adduce more than a scintilla of evidence to overcome the motion.

7. The substantive law governing the case will determine what issues of fact are material, and any heightened burden of proof required by the substantive law for an element of the respondent's case, such as proof by clear and convincing evidence, must be satisfied by the respondent.

8. The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'

9. The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

10. The trial court has more discretion than in the 'old era' in evaluating the respondent's evidence. The respondent must 'do more than simply show that there is some metaphysical doubt as to the material facts.' Further, '[w]here the record taken as a whole could not lead a rational trier of fact to find' for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is 'implausible.

Street, 886 F.2d at 1479-80.

The Court has distilled from these collective holdings four issues that are to be addressed upon a motion for summary judgment: (1) has the moving party "clearly and convincingly" established the absence of material facts?; (2) if so, does the plaintiff present sufficient facts to establish all the elements of the asserted claim or defense?; (3) if factual support is presented by the nonmoving party, are those facts sufficiently plausible to support a jury verdict or judgment under the applicable law?; and (4) are there any genuine factual issues with respect to those material facts under the governing law?

Plaintiff's claim for denial of medical care arises from Defendants' shackling during her active pre-birth labor (when her "water broke") and during her post-partum recovery and is

predicated on the Due Process Clause of the Fourteenth Amendment because Plaintiff was a detainee, not a convicted prisoner. City of Revere v. Massachusetts Gen. Hosp., 463 U.S. 239, 244-46 (1983). Yet, the Supreme Court applies Eighth Amendment standards to such claims. Bell v.Wolfish, 441 U.S. 520, 545 (1979). To be sure, as Defendants state, under Eighth Amendment standards, the Court must be "especially deferential to prison authorities 'in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.'" Rhodes v. Chapman, 452 U.S. 337, 361-62 (1981) (citations omitted) (Brenman, J., concurring). Yet, in evaluating a due process claim for a particular practice, the Court must consider the purpose of detention, Youngberg v. Romeo, 457 U.S. 307, 320 n. 27 (1982) and here, the recognized government interest in detention of illegal aliens is regulatory, namely, "'ensuring the appearance of aliens at future immigration proceedings'" and "'preventing danger to the community.'" Zadvydas v. Davis, 533 U.S. 678, 690 (2001).[6]

Under the Eighth Amendment, the standard for deciding whether this right to adequate medical care was violated is as follows:

---

[6] Defendants argue extensively that shackling serves a penological purpose, (Docket Entry No. 82, Defendants' Memorandum at 16, 17, 19, 20, 21, 23 and 25 and Docket Entry No. 96, Defendants' Response to Plaintiff's motion for summary judgment at 9, 10, 13, 15, 16, 17 19 and 20), but "[p]enological interests . . . relate to the treatment . . . of persons convicted of crimes." Benjamin v. Frazer, 264 F.3d 175, 187 n.10 (2nd Cir. 2001). Plaintiff is not a convicted person. As the Supreme Court stated: "This Court has recognized a distinction between punitive measures that may not be constitutionally imposed prior to a determination of guilt and regulatory restraints that may". Bell, 441 U.S. at 537. In addition, Bell refers to "order", "discipline" and "institutional security," id., at 546-47, none of which is implicated, given Plaintiff's medical condition at the hospital and lack of criminal or disciplinary history.

Case 3:09-cv-00219 Document 119-1 Filed 05/27/11 Page 28 of 42 PageID #: 2618

> [D]eliberate indifference to serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain" proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983.

Estelle v. Gamble, 429 U.S. 97, 104-05 (1976) (citation and footnotes omitted).

Later, in Helling v. McKinney, 509 U.S. 25 (1993), the Supreme Court refined the distinct objective and subjective components for this Eighth Amendment claim. The objective component, i.e., a serious medical condition, does not necessarily require the person to manifest symptoms of a disease explaining that:

> Also with respect to the objective factor, determining whether McKinney's conditions of confinement violate the Eighth Amendment requires more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure to ETS. **It also requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose** *anyone* **unwilling to such a risk. In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate.**

Id. at 36 (italicize in the original with other emphasis added).

Under Helling, a serious medical complaint is one that "is sure or very likely to cause serious illness and needless suffering," 509 U.S. at 33, or a condition "that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention," Blackmore v. Kalamazoo County, 390 F.3d 890, 897 (6th Cir. 2004) (quoting Friend v. Rees, 779 F.2d 50, 1985 WL 13838 (6th Cir. Oct. 1, 1985)), or a serious medical need "'is one that has been diagnosed by a physician as mandating treatment.'" Id. (quoting Gaudreault v. Municipality of Salem, 923 F.2d

203, 208 (1st Cir. 1990) with other citations omitted)). Actual physical injury due to indifference is unnecessary as "the Eighth Amendment protects against future harm to inmates [that] is not a novel proposition." Helling, 509 U.S. at 33. Unnecessary suffering and mental anguish from delay in care is sufficient for Eighth Amendment purposes, Boretti v. Wiscomb, 930 F.2d 1150, 1154 (6th Cir. 1991) (citing Estelle, 429 U.S. at 103), as is conduct that causes "severe emotional distress." Parrish v. Johnson, 800 F.2d 600, 610-11 (6th Cir. 1986).

As to the subjective element of evidence, the Court is to consider "the prison authorities' current attitudes and conduct," Helling 509 U.S. at 36, and the "intent on the part of the prison officials." Stubbs v. Wilkinson, 52 F.3d 326, 1995 WL 234672, at *2 (6th Cir. 1995) (unpublished). Yet, "a detailed inquiry into his state of mind," is unnecessary as conscious indifference is not required. Weeks v. Chaboudy, 984 F.2d 185, 187 (6th Cir. 1993). "Knowledge of the asserted serious needs or of circumstances clearly indicating the existence of such needs, is essential to a finding of deliberate indifference." Horn v. Madison County Fiscal Court, 22 F.3d 653, 660 (6th Cir. 1994).

As examples of deliberate indifference, the Supreme Court listed " guards in intentionally denying or delaying access to medical care or **intentionally interfering with the treatment once prescribed**". Estelle, 429 U.S. at 105 (emphasis added with footnotes to citations omitted). In the Sixth Circuit, prison or jail officials' failure to provide prescribed medical treatment or comply with a medical treatment plan violates the Eight Amendment. Boretti, 930 F.2d at 1154-55; Byrd v. Wilson, 701 F.2d 592, 595 (6th Cir. 1983)(per curiam). "Complying with a doctor's prescription or treatment plan is a ministerial function, not a discretionary one." Boretti, 930 F2d at 1156.

The critical part of Plaintiff's claim is Defendants' shackling of her during her final stages of her labor after her amniotic fluid or water broke. Government officials cannot restrain residents except "when and to the extent professional judgment deems this necessary to assure such safety. . . ." Youngberg, 457 U.S. at 324 (mental patients). Later, in Hope v. Pelzer, 536 U.S. 737, 738 (2002), the Supreme Court held that a prison official who handcuffed a convicted inmate to a prison hitching post for seven hours in dire conditions and without any clear emergency situation and in a manner "that created a risk of particular discomfort and humiliation" and in doing so "acted with deliberate indifference to the inmate's health and safety" violated the inmate's Eighth Amendment to be free of cruel and unusual punishment.

As to use of restraints in shackling of a pregnant detainee in labor, in Nelson v. Correctional Medical Services, 583 F.3d 522 (8th Cir. 2009) (en banc)[7] the Eighth Circuit summarized the constitutional history of holdings that since 1994 such restraints were unconstitutional as deliberate indifference to a serious medical condition:

> **[I]n the District of Columbia ... [i]n 1994 that court held that "[w]hile a woman is in labor ... shackling is inhumane" and violates her constitutional rights.** Women Prisoners of D.C. Dep't of Corr. v. District of Columbia, 877 F.Supp. 634, 668-69 (D.D.C.1994), modified in part on other grounds, 899 F.Supp. 659 (D.D.C.1995). The court held defendant prison officials liable, explaining that a prison official who shackles a woman in labor acts with "deliberate indifference ... since the risk of injury to women prisoners is obvious." Id. at 669. **The court found it significant that one prison official had shackled a pregnant inmate even though he himself later stated "that he would not shackle a third trimester woman," from which the court concluded "that he recognize[d] the risk."** Id.

[7] Defendants argue that Nelson was a 6-5 decision and this fact devalues its holding on whether there is a clear constitutional violation here. (Docket Entry No. 96, Defendants' Memorandum at 3). First, this argument is more akin to a qualified immunity defense that is unavailable to local governmental entities. Owens v. City of Independence, 445 U.S. 622, 649-50 (1980). For Defendants, the only issue is whether the Constitution was violated, not whether the right to be free from shackling was clearly established. There is not any factual dispute that DCSO's policy was the cause of Plaintiff's shackling, as reflected by the testimony of DCSO officers and Defendants' experts.

Turensky's similar admission could also be found to show that she applied the leg restraints on Nelson despite recognizing the risks involved in shackling her during labor. These constitutional holdings in Women Prisoners were never appealed and they remained in effect at the time Nelson went into labor. See Women Prisoners of D.C. Dep't of Corr. v. District of Columbia, 93 F.3d 910 (D.C.Cir.1996).

* * *

**Existing constitutional protections, as developed by the Supreme Court and the lower federal courts and evidenced in ADC regulations, would have made it sufficiently clear to a reasonable officer in September 2003 that an inmate in the final stages of labor cannot be shackled absent clear evidence that she is a security or flight risk. Indeed, "[t]he obvious cruelty inherent in this practice should have provided [Turensky] with some notice that [her] alleged conduct violated [Nelson's] constitutional protection against cruel and unusual punishment. [Nelson] was treated in a way antithetical to human dignity ... and under circumstances that were both degrading and dangerous."**

Id. at 532-34 (quoting Hope, 536 U.S. at 745 with emphasis added). Accord Coleman v. Rahija, 114 F.3d 778 (8th Cir. 1997) and Brawley v. State of Washington, 712 F. Supp.2d 1208 (W.D. Wash. 2010).

In Nelson, the Eighth Circuit concluded that the officer " should have been aware of the risks involved with labor and childbirth because they are obvious" and that "a factfinder could infer [that the officer] 'recognized that the shackles interfered with [the detainee's] medical care, could be an obstacle in the event of a medical emergency, and **caused unnecessary suffering at a time when Nelson would have likely been physically unable to flee,'"** id. at 542, "because of the pain she was undergoing and the powerful contractions she was experiencing as her body worked to give birth." Id. at 530 (emphasis added and citations to medical publications omitted). Thus, the Eighth Circuit deemed the risks involved in shackling a woman in labor near childbirth to be "obvious" and to "have entered the collective consciousness" of society so that the officer must have been aware of the medical risks. Id. at 530 n.5.

The Eighth Circuit also found, "there does not even appear to have been a competing penological interest in shackling her," given that the inmate had not been any problem. Id. at 530. The Eighth Circuit also concluded that "[a] reasonable factfinder could determine from the record in this case that [the officer] . . . was not facing an emergency situation but nevertheless 'subjected [Nelson] to a substantial risk of physical harm, to the unnecessary pain caused by the [shackles] and the restricted position of confinement . . . [and] created a risk of particular discomfort and humiliation.'" Id. at 532 (citing Hope, 536 U.S. at 738). The Eighth Circuit deemed the right to be free of such restraints to be "clearly established" as of "September 2003".Id. at 531.

In Brawley, a pregnant inmate "was shackled to the hospital bed on April 15, 2007 and April 16, 2007" and that Court found that:

> **Common sense,** and the DOC's own policy, **tells us that it is not good practice to shackle women to a hospital bed while they are in labor.**
>
> * * *
>
> There is evidence in the record that Plaintiff endured unnecessary pain due to being chained to her bed. . . . **Dr. Easterling testified that "[t]he ability to move and change positions is integral to a woman trying to cope with pain, and so [Plaintiff's] ability to deal with pain by changing positions is severely impaired**." Dkt. 30-3, at 26.
>
> * * *
>
> Dr. Easterling testified that it is important for women who are in labor to be able to move around to avoid venocaval occlusion, hypertension, and fetal compromise. Dkt. 30-3, at 26. Defendants offer no evidence to counter this opinion.
>
> * * *
>
> **There is no evidence that she posed a flight risk. The evidence shows that on April 15, 2007, when Officers Glasco and Joy took her to the hospital, at a minimum, she was a pregnant woman at or near full term, was running a fever, was in pain, and was moving slowly**. Dkt. 23-3, at 43-45.
>
> * * *

> **. . . [S]he had a serious medical need and was exposed to an unnecessary risk of harm.**

712 F. Supp. 2d at 1219, 1220 (emphasis added).

Here, Plaintiff had no prior criminal history or prior arrest or flight risk and had not been engaged in any conduct to pose a danger to the community or to anyone. While Plaintiff was in labor or post-partum recovery, the medical testimony of Dr. Sandra Torrente and the commendable conduct of Officer Peralta clearly establish that Plaintiff was neither a risk of flight nor a danger to anyone. Although Defendants cite expert testimony of the danger of illegal immigrants fleeing and engaging in illegal activities[8] justifying these restraints, Hall, Metro's sheriff, released Plaintiff on July 9th. Villegas, 2010 WL 6439842 at *1.

The Court applies Hope, Women Prisoners at D.C., Nelson and Brawley and the undisputed facts[9] to conclude that Defendants' shackling of Plaintiff during the final stages of her

---

[8] There is not any empirical support for Defendants' experts' assertions that illegal aliens, as a group, commit crimes that endanger the public safety. A 2011 article reported that "nearly half of all people described as "illegal aliens" obtained their legal status by overstaying valid visas." Keith Cunningham-Parmeter, "Alien Language: Immigration Metaphors and the Jurisprudence of Otherness" 79 Fordham L. Rev. 1545, 1575 (2011). Another article suggests the need to distinguish between "criminal aliens" and "illegal aliens". Teresa A. Miller, "Blurring the Boundaries between Immigration and Crime Control after September 11th," 25 Boston College Third World Journal 81, 122 n.212 (2005). Federal law recognizes this distinction. See *e.g.*, 8 U.S.C. §1326 (a) and (b)(2). Another article notes that the 287(g) program was limited to aliens who "pose a threat to communities." "From 287(g) to S.B. 1010: The Decline of Federal Immigration Partnership and the Rise of State Level Immigration Enforcement", 52 Ariz. L. Rev. 1083, 1108 (2010). Assuming this limitation, with her lack of criminal history and arrest for a traffic offense, Plaintiff would not appear to meet this latter standard.

[9] Given the legal precedents on shackling women in the final stages of labor and post partum recovery, as here, the Court does not consider Dr. Spetalnik's medical opinion or the Defendants' argument about whether the MGH nurses provided DCSO's officers with a copy of the no restraint order to create a material factual dispute. Moreover, as a matter of law, actual physical injury is not required. Subjecting a person to unnecessary suffering and mental anguish under the Eighth Amendment is sufficient as the facts and Dr.DeBona's report undisputedly establish. Dr. Spetalnick's opinion does not address Villegas's mental pain and anguish.

active labor and her post-partum recovery, violated the Due Process Clause of the Fourteenth Amendment, given Plaintiff's serious medical condition and the Defendants' indifference to that condition by shackling her during these time periods. The medical proof demonstrates that such shackling was not medically necessary and caused unnecessary physical and mental suffering. In addition, under Boretti and Byrd, the Court concludes that Defendants' denial of the breast pump that the MGH provided for Plaintiff's medical care also constitutes deliberate indifference under the Eighth and Fourteenth Amendments as the denial and interference with care prescribed by a health care provider. The Court concludes that the Defendants' shackling of Plaintiff in the final stages of her pregnancy and post-partum recovery as well as the denial of the prescribed breast pump, constitute punishment under the Due Process Clause that is also prohibited under Bell. 441 U.S. at 535. ("[U]nder the Due Process Clause, a detainee may not be punished prior to an adjudication in accordance with due process law").

Defendants cited two decisions as justifying Plaintiff's shackling during her transport to the hospital and at the hospital. Hoyte v. Wagner, 2009 WL 215342 (3rd Cir. Jan. 30, 2009) and Taggart v. McDonald, 131 Fed. Appx. 544 (9th Cir. 2005). Hoyte involved a male "criminal alien" with prior convictions for drug trafficking, trespass and "menacing." 2009 WL 215342 at *1. There, the Third Circuit deemed shackling reasonable. In Taggart, a convicted state prisoner with a history of seizures was shackled to provide medical treatment and did not present any evidence of excessive use of force during the shackling. Here, Plaintiff has not been convicted of a crime or engaged in violent conduct. Plaintiff is a pregnant female in the final stages of labor in her pregnancy, has medical proof and substantial case law that her shackling was medically and physically unnecessary and resulted in the infliction of excessive pain and a mental disorder. As the Supreme Court stated: "This Court has recognized a distinction between punitive measures that

may not be constitutionally imposed prior to a determination of guilt and regulatory restraints that may". Bell, 441 U.S. at 537. Because Plaintiff is a detainee without a prior conviction or history of violent conduct, the Court deems Hoyte and Taggart to be factually inapposite.

The testimony and opinions of Defendant's correctional experts are unpersuasive for several reasons. First, Defendants' experts ignored the defined trend among states and federal agencies, to abandon shackling in this context. Plaintiff does not seek any amnesty as Leach asserts, but only the removal of shackles where she was physically unable to flee or pose any danger, as reflected by Dr. Torrent's medical expert opinion. Officer Peralta's release of the shackles evinces Plaintiff's practical inability to flee or to be a danger in her condition.

Second, as a matter of law, with Hope in 2002, the Supreme Court clearly held that shackling in a prison setting can violate the Eighth Amendment. As to concerns of flight, Defendants' experts agree that Plaintiff's pregnancy condition was obvious and their opinions on security concerns also cannot trump the law as reflected by Nelson, Women Prisons of D.C., and Brawley.[10] Leach's opinion that the Defendants were not "deliberately indifferent," (Docket Entry No. 80 at 3) (quotations in the original), is inadmissible as the use of distinct legal phrase that is beyond his competence. Berry v. City of Detroit, 25 F.3d 1342, 1353-54 (6th Cir. 1994) (disallowing an expert to testify to the term "deliberately indifferent"). Defendants' experts' statements about Defendants' good faith does not control the constitutional question for these local governmental entities. Littlejohn v. Rose, 768 F.2d 765, 772 (6th Cir. 1985) ("despite the good

[10] Even if qualified immunity were available here, in extraordinary cases, as here, decisions of non Sixth Circuit courts were held to establish the existence of a clearly established constitutional right. Daugherty v. Campbell, 935 F.2d 780, 785-87 (6th Cir. 1991) (citing Bell, the First, Fifth and Eighth Circuits to hold cavity searches of prison visitors to be a clearly established Fourth Amendment violation).

faith intentions of the officers through which it acts, a local government entity cannot assert a good faith immunity defense in any circumstances") (citing Owens).

Third, there is not any proof cited nor discerned from the Court's review of the record, that a jail medical official approved the handcuffing of the Plaintiff or would assess Plaintiff's need for a breast pump. If true, these facts also cannot supplant constitutional principles or the clear medical testimony of the necessity of the breast pump reflected by the opinions of the MGH staff, Dr. Torrente and Dr. DeBona. The medical credentials of the unidentified MGH medical official to make this essential decision is not identified. In any event, with MGH's staff's provision of the breast pump, under Boretti the DCSO officers lacked the discretion to refuse the breast pump. Finally, in evaluating the Defendants' experts' opinions the Court is mindful of the Supreme Court's admonition:

> Respondents and the District Court erred in assuming that opinions of experts as to desirable prison conditions suffice to establish contemporary standards of decency. As we noted in *Bell v. Wolfish*, 441 U.S., at 543-544, n. 27, 99 S.Ct. 1861, 1876, n. 27, 60 L.Ed.2d 447, such opinions may be helpful and relevant with respect to some questions, but "they simply do not establish the constitutional minima; rather, they establish goals recommended by the organization in question." See U.S. Dept. of Justice, Federal Standards for Prisons and Jails 1 (1980). Indeed, generalized opinions of experts cannot weigh as heavily in determining contemporary standards of decency as "the public attitude toward a given sanction." *Gregg v. Georgia*, 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976) (joint opinion).

Rhodes, 452 U.S. at 348 n. 13 (1981).

Another element of the Eighth Amendment analysis is whether the conduct at issue "violates contemporary standards of decency to expose anyone unwillingly to such a risk." Helling, 509 U.S. at 36). The Supreme Court and the Nelson court cite national health organizations in deciding constitutional claims. See e.g. Ferguson v. City of Charleston, 532 U.S. 67, 78-79 (2001) (citing American Medical Association materials on effects of urine testing of

pregnant women who were arrested for drug use); Nelson, 583 F.3d at 530 (citing website of the American Medical Association and other articles).

Here, Plaintiff cites a resolution of the American Medical Association ("AMA") that:

> a local jail shall use the least restrictive restraints necessary when the facility has actual or constructive knowledge that an inmate is in the 2nd or 3rd trimester of pregnancy. **No restraints of any kind shall be used on an inmate who is in labor, delivering her baby or recuperating from the delivery unless there are compelling grounds to believe that the inmate presents: (i) An immediate and serious threat of harm to herself, staff or others; or (ii) A substantial flight risk and cannot be reasonably contained by other means."**

(available at http://www.ama-assn.org/ama1/pub/upload/mm/38/a10-resolutions.pdf.) at 432 (emphasis added).

In addition, on June 12, 2007, the American College of Obstetricians and Gynecologists reported its findings on the interface of institutional concerns and safety of pregnant women in custody:

> **The practice of shackling an incarcerated woman in labor may not only compromise her health care but is demeaning and unnecessary**. Most women in correctional facilities are incarcerated for non-violent crimes and are accompanied by guards when they are cared for in medical facilities. Testimonials from incarcerated women who went through labor with shackles confirm the emotional distress and physical pain caused by the restraints. Women describe the inability to move to allay the pains of labor, the bruising caused by chain belts across the abdomen, and the deeply felt loss of dignity.
>
> The safety of hospital personnel is paramount and for this reason, adequate correctional staff must be available to monitor incarcerated women in labor, both during transport to and from the correctional facility and during the hospital stay. However, the safety of personnel has not been compromised in the years since laws preventing shackling have been instituted in California and Illinois. The safety track record demonstrates the feasibility of preserving the dignity and providing compassionate care of incarcerated laboring women.

(available at www.acog.org/departments/underserved/20070612SaarLTR.pdf) (emphasis added).

Since 2000, twenty one states as well as federal law enforcement and prison agencies have concluded that shackling of a pregnant woman shortly before delivery and post-partum recovery does not promote any penological interest. *See* Elizabeth Alexander, "The Ben J. Altheimer Symposium: Prisoners: Rights: The Rights of the Convicted and Forgotten Article: Unshackling Shawanna: The Battle Over Chaining Women Prisoners During Labor and Delivery," 32 U. Ark. Little Rock L. Rev. 435 (2010) (citing written policies adopted by the Federal Bureau of Prisons, the United States Marshal Service, States and the District of Columbia).[11]

Rule 33 of the United Nations Minimum Standard for the Treatment of Prisoners provides that shackles should not be used on inmates except as a precaution against escape, on medical grounds at the direction of a medical officer, or to prevent an inmate from injury to self or others or from damaging property. www2.ohchr.org/English/law/treatmentprisoners.htm. Amnesty International deems the use of restraints on pregnant prisoners a "cruel, inhuman and degrading form of treatment in violation of both the UN Convention Against Torture and the International Covenant on Civil and Political Rights." www.amnesty/usa.org/violence-against-when/abuse-of-women-in-custody/fact-sheet-shackling-of-pregnant-prisoners/page.do?id=1108308 (Amnesty USA, Abuse of Women in Custody: Sexual

[11] Defendants incorrectly assert that these changes in the States occurred in 2009, after Plaintiff's experiences. Alexander's article reflects these changes in the States of Illinois (2000), California (2006), Vermont (2006), and Arkansas (2003). 32 Ark Little Rock L. Rev. at 436-37, nns. 9, 13, 17, 21 and 35, but the Federal Bureau of Prisons change was in September 2008. Of course, Nelson ruled this right to be free of such restraints as clearly established as of September, 2003. 583 F.3d at 531.

Misconduct and Shackling of Pregnant Women," Amnesty International (2006).[12] The United States is a signatory of the UN Convention Against Torture, and has ratified the International Covenant on Civil and Political Rights. Id. Where a convention has been ratified by the United States, rights thereunder may be enforceable. See Breard v. Greene, 523 U.S. 371, 376 (1998), Medellin v. Texas, 552 U.S. 491, 504-08 (2008) and Mora v. New York, 524 F.3d 183,186 n. 3 (2d Cir. 2008) and authorities cited therein. This Court does not decide the enforceability issue, but with Plaintiff, a citizen of another country and a federal detention program, the United States's ratification of international conventions and standards are persuasive of the contemporary standards on shackling pregnant women.

Thus, in addition to the cited judicial decisions, this Court further concludes that these medical publications, convention rules, social studies and standards also establish that the shackling of a pregnant detainee in the final stages of labor shortly before birth and during the post-partum recovery, violates the Eighth Amendment's standard of contemporary decency.

As to Plaintiff's First Amendment claim for the Defendants' denial of her right to visit or contact her husband, in Overton v. Bazzetta, 539 U.S. 126 (2003), the Supreme Court stated that:

> We have said that the Constitution protects "certain kinds of highly personal relationships". . . [a]nd outside the prison context, there is some discussion in our cases of a right to maintain certain familial relationships, including association among members of an immediate family and association between grandchildren and grandparents.

Id. at 131 (citations omitted). In a detention setting, courts have permitted the denial of contact visits with pretrial detainees, Inmates of Allegheny City Jail v. Pierce, 612 F.2d 754 (3d Cir. 1979), including for INS detainees. Hooper v. Clark, et al, No. CO6-5282 RBL/KLS 2007 WL 562345

---

[12] See Graham v. Florida, 130 S.Ct. 2011, 2033, 2034 (2010) (citing law review articles and Amnesty International materials in deciding an Eighth Amendment claim).

(W.D. Wash. Feb. 16, 2007). As a factual matter, there was no constitutional violation of depriving Plaintiff from her child as Plaintiff testified that her child was with her "the whole time" and that the nurse took the baby to enable Plaintiff to rest. In any event, Plaintiff's detention was under a Section 287(g) program, and INS Detention Standards regarding visitation reveal the following:

> Facilities holding INS detainees shall permit authorized persons to visit detainees, within security and operational constraints. To maintain detainee morale and family relationships, INS encourages visits from family and friends. Facilities shall allow detainees to meet privately with their current or prospective legal representatives and legal assistants, and also with their consular officials.

INS Detention Standard (September 20, 2000) available at ww.ice.gov/doclib/dro/detention-standards/pdf/visit.pdf. Here, any violation of this administrative provision does not support a constitutional violation.

As to any Section 1981 claim, Plaintiff, at best, is a third party beneficiary to the contract between INS and DCSO. In such instances, there is not any Section 1981 claim, rather only a breach of contract claim. See Smith v. Corrections Corp. of America, 19 Fed. Appx. 318, 320-21 (6th Cir. 2001) and authorities cited therein. Accordingly, any breach of contract claim premised on this federal contract is within the exclusive jurisdiction of the Court of Claims under 28 U.S.C. § 1491(a). See also Matthews v. United States, 810 F.2d 109, 111 (6th Cir. 1987).

As to the Plaintiff's Fourth Amendment claim, the Sixth Circuit has held that forced exposure to the other sex's viewing of a naked inmate is actionable. Kent v. Johnson, 821 F.2d 1220, 1224-25 (6th Cir. 1987) (male inmate's naked exposure to female guards actionable). Here, the male officers did not view Plaintiff when she changed into a hospital gown and followed the doctor's instruction to turn away from Plaintiff. These circumstances are not desirable, but are not unconstitutional absent Plaintiff's actual forced exposure to the male officers. Brannum v. Overton County School Bd., 516 F.3d 489, 495-96 (6th Cir. 2008); Mills v. City of Barbourville, 389 F.3d

568, 579-80 (6th Cir. 2004).

For these collective reasons, the Court concludes that the Plaintiff's motion for partial summary judgment should be granted on her Fourteenth Amendment claim for the Defendants' shackling of her during Plaintiff's active final stages of labor and subsequent postpartum recovery and denial of breast pump, but should otherwise be denied except for Plaintiff's breach of contract claim that should be dismissed without prejudice for lack of subject matter jurisdiction. As a matter of comity, the Court declines to entertain Plaintiff's state constitutional claims that are also dismissed without prejudice. See Vandiver v. Hardin County Bd. of Educ., 925 F.2d 927, 935 (6th Cir. 1991). To this extent, the Defendants' motion for summary judgment should also be granted in part and denied in part.

An appropriate Order is filed herewith.

**ENTERED** this the 27th day of ~~April~~ May, 2011.

WILLIAM J. HAYNES, JR.
United States District Judge