IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| JUANA VILLEGAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:09-0219 |
| | ) | |
| THE METROPOLITAN GOVERNMENT | ) | Judge Haynes |
| OF DAVIDSON COUNTY/NASHVILLE -- | ) | |
| DAVIDSON COUNTY SHERIFF'S | ) | JURY DEMAND |
| OFFICE, et al., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF
VILLEGAS' MOTION IN LIMINE NO. 4
(Prohibiting Metro from Re-Arguing Liability
and Instructing the Jury Regarding Liability)**

In a forty-two (42) page memorandum opinion, this Court ruled on cross-motions for summary judgment and in so doing held that Metropolitan Government of Davidson County—Davidson County Sheriff's Office ("Metro" or "DCSO") violated Juana Villegas' Fourteenth Amendment rights based on its "shackling of her during Plaintiffs active final stages of labor and subsequent postpartum recovery and denial of breast pump." (Mem. Op. [DE 119] at 42.) Consistent with the Court's order and the purpose of summary judgment to narrow the issues for trial, the Court should prohibit Metro from making any argument or introducing any evidence denying its liability for violating Ms. Villegas' constitutional rights. Liability has already been determined and any attempt by Metro to reargue or dispute liability would improperly influence the jury and waste time.

Indeed, at the opening of the proof, Ms. Villegas would request that the Court instruct the jury that it has found liability in favor of Ms. Villegas on her Fourteenth Amendment claims related to her shackling and denial of a breast pump. In so doing, Ms. Villegas would ask that a

foundation be laid out by the Court so that the jury may properly fulfill its duty to decide damages within the context of this Court's finding of liability. Accordingly, it is requested that the Court read to the jury the following undisputed facts set forth in its memorandum opinion along with the legal foundation for the Court's finding of liability:

- "On July 3, 2008, Tim Coleman, a Berry Hill, Tennessee police office arrested Plaintiff, Juana Villegas, who was nine months pregnant, for driving without a valid license." (Mem. Op. [DE 119] at 3)

- "DCSO accepts and houses individuals arrested by local law enforcement agencies without inquiry into whether the arrest was proper." (Mem. Op. [DE 119] at 3)

- "From July 3rd until July 5th 2008, Plaintiff was held in the Davidson County jail. Because July 4th was a holiday, Davidson County courts did not meet that day. On the evening of July 5th , Plaintiff was confined at the Correctional Development Center, a female correctional facility on Harding Place in Nashville." (Mem. Op. [DE 119] at 3)

- "On July 5th, Plaintiff informed Richard Ramsey, a male jail guard that her "water," i.e., amniotic fluid "broke" and "that she was having labor pains." (Mem. Op. [DE 119] at 4)

- "Plaintiff told the officer who was at her cell to distribute food "my baby is coming." DCSO's jail incident report reflects that Plaintiffs water actually broke at 9:00 p.m. In any event, jail guards transported Plaintiff to the jail infirmary where a nurse confirmed that Plaintiffs water had broken and summoned an ambulance." (Mem. Op. [DE 119] at 4)

- "Plaintiff was placed on a stretcher and transported to Metro General Hospital ("MGH") with her wrists restrained in front of her body and her legs restrained together. Lt. Kristina Quintal, a jail supervisor sent two male officers to transport Plaintiff. In route to the hospital, Matthew Barshaw, a DCSO officer asked Lt. Quintal if Plaintiff needed to be shackled because "what's going through my head now is what if all of a sudden the baby started -- took more time to unrestrain these restraints in the back of the ambulance." Plaintiff testified that she was in pain, from contractions during this time." (Mem. Op. [DE 119] at 5)

- "When Plaintiff arrived in her hospital room at MGH, she remained shackled until her transfer to the hospital bed from the ambulance stretcher." (Mem. Op. [DE 119] at 5)

- "Nurses requested a jail officer to remove Plaintiffs handcuffs to change Plaintiff into a hospital gown. Plaintiff was unshackled and Barshaw and Farragher, a fellow male officer, remained in Plaintiff's room, but turned their backs to Plaintiff, as the nurses and a doctor requested. A doctor requested that the officers turn their backs while she examined Plaintiff's lower extremities. Once in her hospital gown, officers Farragher

and/or Bradshaw again restrained Plaintiff's hands and legs while she was in the hospital bed." (Mem. Op. [DE 119] at 5)

- "Plaintiff asserts that she repeatedly asked the guards to remove the restraints." (Mem. Op. [DE 119] at 6)

- "Brandi Moore, a corporal in DCSO's transportation division, relieved Officers Faragher and Barshaw very shortly after Plaintiff's arrival at MGH. (Mem. Op. [DE 119] at 6)

- "Moore removed the handcuffs from Plaintiff, but restrained one of Plaintiff's legs to the hospital bed. According to Moore, she overheard MGH medical staff talking to a doctor about a "No Restraint Order," but the doctor did not respond. A nurse, however, commented that the officers "shouldn't put leg irons on her" and Moore described the nurse as "rude." A nurse described to jail officers the high risk of blood clots after giving birth, if the shackles were not removed. According to Plaintiff's hospital records, at 11:20 p.m. on July 5, 2008, Dr. Kesha Robertson signed a physician's order stating: "Please remove shackles" and this Order was placed in Plaintiff's hospital file. Moore did not see a "No Restraint Order" but the next day Officer Flatt told her of the "No Restraint Order." (Mem. Op. [DE 119] at 6-7).

- "David Peralta, another DCSO officer, relieved Moore at 11:00 p.m. on July 5th and Moore told Peralta to be prepared for a "no restraint order." Shortly after 11:00 p.m., Peralta removed Plaintiff's restraints. Plaintiff gave birth to her child at approximately 1:00 a.m. on July 6, 2008. Plaintiff remained unrestrained during Peralta's shift, but Peralta shackled Plaintiff just minutes before his shift change at 7:00 a.m., because of DCSO policy. Peralta restrained one of Plaintiff's ankles to the bed after Plaintiff opted for the ankle restraint in lieu of a wrist restraint." (Mem. Op. [DE 119] at 7)

- "When Moore returned on July 6th, Officer Flatt informed her that a No Restraint Order was in effect, but Sergeant Harrison, her supervisor ordered Moore to "put restraints" on Plaintiff." (Mem. Op. [DE 119] at 7)

- "During her post-partum recovery, one of Plaintiff's legs was shackled to her hospital bed. Yet, whenever Plaintiff went to the restroom or walked or bathed during her post-partum recovery, both of Plaintiff's legs were restrained." (Mem. Op. [DE 119] at 7.

- "At the time of Plaintiff's discharge from MGH, citing safety concerns, DCSO officials did not allow Plaintiff to be transported to the DCSO jail leave with a breast pump that the hospital staff provided. Defendants do not consider a breast pump to be a critical medical device under its jail policy. Without the breast pump, Plaintiff described her pain from the engorgement or swelling of her breasts. Plaintiff testified that she cries repeatedly weekly from this shackling experience surrounding the birth of her child." (Mem. Op. [DE 119] at 8)

- "Both parties submitted expert medical proof on the risks, effects and injuries attributable to Defendants' shackling of Plaintiff in transport to the hospital, during Plaintiff's stay at

the hospital and Defendants' denial of the breast pump provided by MGH staff."  (Mem. Op. [DE 119] at 8)

- "Plaintiff's claim for denial of medical care arises from Defendants' shackling during her active pre-birth labor (when her "water broke") and during her post-partum recovery and is predicated on the Due Process Clause of the Fourteenth Amendment because Plaintiff was a detainee, not a convicted prisoner."  (Mem. Op. [DE 119] at 27-28)

- "The critical part of Plaintiff's claim is Defendants' shackling of her during her final stages of her labor after her amniotic fluid or water broke.  Government officials cannot restrain residents except "when and to the extent professional judgment deems this necessary to assure such safety. . . ."  Youngberg, 457 U.S. at 324 (mental patients).  Later, in Hope v. Pelzer, 536 U.S. 737, 738 (2002), the Supreme Court held that a prison official who handcuffed a convicted inmate to a prison hitching post for seven hours in dire conditions and without any clear emergency situation and in a manner "that created a risk of particular discomfort and humiliation" and in doing so "acted with deliberate indifference to the inmate's health and safety" violated the inmate's Eighth Amendment to be free of cruel and unusual punishment."  (Mem. Op. [DE 119] at 31)

- "As to use of restraints in shackling of a pregnant detainee in labor, in Nelson v. Correctional Medical Services, 583 F.3d 522 (8th Cir. 2009) (en banc) the Eighth Circuit summarized the constitutional history of holdings that since 1994 such restraints were unconstitutional as deliberate indifference to a serious medical condition:

    > **[I]n the District of Columbia … [i]n 1994 that court held that "[w]hile a woman is in labor … shackling is inhumane" and violates her constitutional rights.**  Women Prisoners of D.C. Dep't of Corr. v. District of Columbia, 877 F.Supp. 637, 668-69 (D.D.C. 1994), modified in part on other grounds, 899 F.Supp. 659 (D.D.C. 1995).  The court held defendant prison officials liable, explaining that a prison official who shackles a woman in labor acts with "deliberate indifference … since the risk of injury to women prisoners is obvious."  Id. at 669.  **The court found it significant that one prison official had shackled a pregnant inmate even though he himself later stated "that he would not shackle a third trimester woman," from which the court concluded "that he recognize[d] the risk."**  Id.  Turensky's similar admission could also be found to show that she applied the leg restraints on Nelson despite recognizing the risks involved in shackling her during labor.  These constitutional holdings in Women Prisoners were never appealed and they remained in effect at the time Nelson went into labor.  See Women Prisoners of D.C. Dep't of Corr. v. District of Columbia, 93 F.3d 910 (D.C. Cir. 1996).

    >                             *     *     *

    > **Existing constitutional protections, as developed by the Supreme Court and the lower federal courts and evidenced in ADC regulations,**

> would have made it sufficiently clear to a reasonable officer in September 2003 that an inmate in the final stages of labor cannot be shackled absent clear evidence that she is a security or flight risk. Indeed, "[t]he obvious cruelty inherent in this practice should have provided [Turensky] with some notice that [her] alleged conduct violated [Nelson's] constitutional protection against cruel and unusual punishment. [Nelson] was treated in a way antithetical to human dignity … and under circumstances that were both degrading and dangerous."

Id. at 532-34 (quoting Hope, 536 U.S. at 745 with emphasis added). Accord Coleman v. Rahija, 114 F.3d 778 (8th Cir. 1997) and Brawley v. State of Washington, 712 F.Supp.2d 1208 (W.D. Wash. 2010)." (Mem. Op. [DE 119] at 31-32)

- "In Nelson, the Eighth Circuit concluded that the officer "should have been aware of the risks involved with labor and childbirth because they are obvious" and that "a factfinder could infer [that the officer] 'recognized that the shackles interfered with [the detainee's] medical care, could be an obstacle in the event of a medical emergency, and **caused unnecessary suffering at a time when Nelson would have likely been physically unable to flee,'**" "because of the pain she was undergoing and the powerful contractions she was experiencing as her body worked to give birth." Thus, the Eighth Circuit deemed the risks involved in shackling a woman in labor near childbirth to be "obvious" and to "have entered the collective consciousness" of society so that the officer must have been aware of the medical risks." (Mem. Op. [DE 119] at 32)

- "The Eighth Circuit also found, "there does not even appear to have been a competing penological interest in shackling her," given that the inmate had not been any problem. The Eighth Circuit also concluded that "[a] reasonable factfinder could determine from the record in this case that [the officer] … was no facing an emergency situation but nevertheless 'subjected [Nelson] to a substantial risk of physical harm, to the unnecessary pain caused by the [shackles] and the restricted position of confinement … [and] created a risk of particular discomfort and humiliation.'" The Eighth Circuit deemed the right to be free of such restraints to be "clearly established" as of "September 2003." (Mem. Op. [DE 119] at 33)

- "In Brawley, a pregnant inmate "was shackled to the hospital bed on April 15, 2007 and April 16, 2007" and that Court found that:

    > **Common sense**, and the DOC's own policy, **tells us that it is not good practice to shackle women to a hospital bed while they are in labor.**
    >
    > \*   \*   \*
    >
    > There is evidence in the record that Plaintiff endured unnecessary pain due to being chained to her bed. … **Dr. Easterling testified that "[t]he ability to move and change positions is integral to a woman trying to**

> **cope with pain, and so [Plaintiff's] ability to deal with pain by changing positions is severely impaired."**
>
> \* \* \*
>
> Dr. Easterling testified that it is important for women who are in labor to be able to move around to avoid venocaval occlusion, <u>hypertension</u>, and fetal compromise. Defendants offer no evidence to counter this opinion.
>
> \* \* \*
>
> **There is no evidence that she posed a flight risk. The evidence shows that on April 15, 2007, when Officers Glasco and Joy took her to the hospital, at a minimum, she was a pregnant woman at or near full term, and was running a fever, was in pain, and was moving slowly.**
>
> \* \* \*
>
> **. . . [S]he had a serious medical need and was exposed to an unnecessary risk of harm."**

(Mem. Op. [DE 119] at 33-34

- "Here, Plaintiff had no prior criminal history or prior arrest or flight risk and had not been engaged in any conduct to pose a danger to the community or to anyone. While Plaintiff was in labor or post-partum recovery, the medical testimony of Dr. Sandra Torrente and the commendable conduct of Officer Peralta clearly establish the Plaintiff was neither a risk of flight nor a danger to anyone." (Mem. Op. [DE 119] at 34)

- "The Court applies [the holdings and rationales of these previous cases] and the undisputed facts to conclude that Defendants' shackling of Plaintiff during the final stages of her active labor and her post-partum recovery, violated the Due Process Clause of the Fourteenth Amendment, given Plaintiff's serious medical condition and the Defendants' indifference to that condition by shackling her during these time periods." (Mem. Opp. [DE 119] at 34-35)

- "The medical proof demonstrates that such shackling was not medically necessary and caused unnecessary physical and mental suffering." (Mem. Op. [DE 119] at 35)

- "In addition, [citation omitted], the Court concludes that Defendants' denial of the breast pump that the MGH provided for Plaintiff's medical care also constitutes deliberate indifference under the Eighth and Fourteenth Amendments as the denial and interference with care prescribed by a health care provider." (Mem. Op. [DE 119] at 35)

- "The Court concludes that the Defendants' shackling of Plaintiff in the final stages of her pregnancy and post-partum recovery as well as the denial of the prescribed breast pump, constitute punishment under the Due Process Clause that is also prohibited [citation omitted]." (Mem. Op. [DE 119] at 35)

- "There is not any proof cited nor discerned from the Court's review of the record, that a jail medical official approved the handcuffing of the Plaintiff or would assess Plaintiff's need for a breast pump. If true, these facts also cannot supplant constitutional principles or the clear medical testimony of the necessity of the breast pump reflected by the opinions of the MGH staff, Dr. Torrente and Dr. DeBona. The medical credentials of the unidentified MGH medical official to make this essential decision is not identified. In any event, with MGH's staff's provision of the breast pump, under [caselaw] the DCSO officers lacked the discretion to refuse the breast pump." (Mem. Op. [DE 119] at 37)

- "Another element of the Eighth Amendment analysis is whether the conduct at issue "violates contemporary standards of decency to expose anyone unwillingly to such a risk." [citation omitted] The Supreme Court and [other courts] cite national health organizations [such as the American Medical Association] in deciding constitutional claims. [citation omitted]." (Mem. Op. [DE 119] at 37-38)

- "Here, Plaintiff cites a resolution of the American Medical Association ("AMA") that:

  > a local jail shall use the least restrictive restraints necessary when the facility has actual or constructive knowledge that an inmate is in the 2nd or 3rd trimester of pregnancy. **No restraints of any kind shall be used on an inmate who is in labor, delivering her baby or recuperating from the delivery unless there are compelling grounds to believe that the inmate presents: (i) An immediate and serious threat of harm to herself, staff or others; or (ii) A substantial flight risk and cannot be reasonably contained by other means."**

  (available at http://www.ama-assn.org/ama1/pub/upload/mm/38/a10-resolutions.pdf.) at 432 (emphasis added)." (Mem. Op. [DE 119] at 38)

- "In addition, on June 12, 2007, the American College of Obstetricians and Gynecologists reported its findings on the interface of institutional concerns and safety of pregnant women in custody:

  > **The practice of shackling an incarcerated woman in labor may not only compromise her health care but is demeaning and unnecessary.** Most women in correctional facilities are incarcerated for non-violent crimes and are accompanied by guards when they are cared for in medical facilities. Testimonials from incarcerated women who went through labor with shackles confirm the emotional distress and physical pain caused by the restraints. Women describe the inability to move to allay the pains of labor, the bruising caused by chain belts across the abdomen, and the deeply felt loss of dignity.
  >
  > The safety of hospital personnel is paramount and for this reason, adequate correctional staff must be available to monitor incarcerated women in labor, both during transport to and from the correctional facility and during the hospital stay. However, the safety of personnel has not

> been compromised in the years since laws preventing shackling have been instituted in California and Illinois. The safety track record demonstrates the feasibility of preserving the dignity and providing compassionate care of incarcerated laboring women.

(available at www.acog.org/departments/underserved/20070612SaarLTR.pdf) (emphasis added)." (Mem. Op. [DE 119] at 38-39)

- "Since 2000, twenty one states as well as federal law enforcement and prison agencies have concluded that shackling of a pregnant woman shortly before delivery and post-partum recovery does not promote any penological interest." (Mem. Op. [DE 119] at 39)

- "Rule 33 of the United Nations Minimum Standard for the Treatment of Prisoners provides that shackles should not be used on inmates except as a precaution against escape, on medical grounds at the direction of a medical officer, or to prevent an inmate from injury to self or others or from damaging property. www2.ohchr.org/English/law/treatmentprisoners.htm. Amnesty International deems the use of restraints on pregnant prisoners a "cruel, inhuman and degrading form of treatment in violation of both the UN Convention Against Torture and the International Covenant on Civil and Political Rights." [citation omitted]. The United States is a signatory of the UN Convention Against Torture, and has ratified the International Covenant on Civil and Political Rights." (Mem. Op. [DE 119] at 39-40)

- "Thus, in addition to the cited judicial decisions, this Court further concludes that these medical publications, convention rules, social studies and standards also establish that the shackling of a pregnant detainee in the final stages of labor shortly before birth and during the post-partum recovery, violates the Eighth Amendment's standard of contemporary decency." (Mem. Op. [DE 119] at 40)

- "For these collective reasons, the Court concludes that the Plaintiff's motion for partial summary judgment should be granted on her Fourteenth Amendment claim for the Defendants' shackling of her during Plaintiff's active final stages of labor and subsequent postpartum recovery and denial of breast pump." (Mem. Op. [DE 119] at 42)

By providing the jury with this foundation, not only will the jury be able to place their role in context of the procedural history of the case to date, but it should also streamline the proceedings so that they may be focused on the issue of damages. Metro should be precluded from denying or rearguing any of the Court's prior factual findings and conclusions of law.

Respectfully Submitted,

*/s/ John L. Farringer IV*
William L. Harbison (No. 7012)
Phillip F. Cramer (No. 20697)
John L. Farringer IV (No. 22783)
SHERRARD & ROE, PLC
424 Church Street, Suite 2000
Nashville, TN 37219
(615) 742-4200
bharbison@sherrardroe.com
pcramer@sherrardroe.com
jfarringer@sherrardroe.com

Elliott Ozment (No. 4331)
IMMIGRATION LAW OFFICES OF
ELLIOT OZMENT
1214 Murfreesboro Pike
Nashville, TN 37217
(615) 321-8888
elliott@ozmentlaw.com

*Attorneys for Juana Villegas*

**CERTIFICATE OF SERVICE**

Service of the foregoing was accomplished through the Court's Electronic Filing System on this 27th day of July, 2011, upon the following:

Kevin Klein
Allison Bussell
Metropolitan Department of Law
108 Metropolitan Courthouse
P.O. Box 196300
Nashville, TN 37219
Kevin.Klein@nashville.gov
Allison.Bussell@nashville.gov

*/s/ John L. Farringer IV*