IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| JUANA VILLEGAS, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | ) |
| | )   Case No. 3:09-cv-219 |
| METROPOLITAN | )   Judge Haynes |
| GOVERNMENT OF DAVIDSON | ) |
| COUNTY/NASHVILLE, *et al.*, | ) |
| | ) |
|     Defendants. | ) |

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF'S MOTION FOR U VISA CERTIFICATION**

Comes now the Plaintiff Juana Villegas, by and through her undersigned attorney, and would show the following underlying legal authority supporting her motion that the Court exercise its discretion in providing a certification for her "U Visa" application.

**I. Background and Legislative Authority**

Congress created the U nonimmigrant classification in the Battered Immigrant Women Protection Act of 2000 (BIWPA). *See* Victims of Trafficking and Violence Protection Act of 2000, div. B, Violence Against Women Act of 2000, tit. V, Battered Immigrant Women Protection Act of 2000, Pub. L. 106-386, sec. 1513, 114 Stat. 1464, 1533-37 (2000), *amended by* Violence Against Women and Department of Justice Reauthorization Act of 2005 (VAWA 2005), tit. VIII, Pub. L. 109-162, 119 Stat. 2960 (2006), *amended by* Violence Against Women and Department of Justice Reauthorization Act-- Technical Corrections, Pub. L. 109-271, 120 Stat. 750 (2006). Alien victims may not have legal status and, therefore, may be reluctant to help in the investigation or prosecution of criminal activity for fear of removal from the United States. In passing this legislation, Congress intended to strengthen the ability of

1

law enforcement agencies to investigate and prosecute cases of domestic violence, sexual assault, trafficking of aliens and other crimes while offering protection to victims of such crimes. See BIWPA, sec. 1513(a)(2)(A). Congress also sought to encourage law enforcement officials to better serve immigrant crime victims. *Id.*

The U nonimmigrant classification was established under section 1513(b) of the BIWPA. To be eligible for U visa relief, an alien (1) must have "suffered substantial physical or mental abuse as a result of having been a victim of criminal activity" described by the Act; (2) must "possess information" concerning the qualifying criminal activity; and (3) must have "been helpful, is being helpful, or is likely to be helpful" in the investigation of prosecution of the qualifying criminal act. See 8 U.S.C. § 1101(a)(15)(U)(i).

## II. Authority of Federal Judge to Issue U Visa Certification in Civil Litigation

The U visa program's implementing regulations contemplate U-visa certifying agents as including a "<u>Federal</u>, State, or local law enforcement agency, prosecutor, <u>judge</u>, or other authority, that has responsibility for the investigation or prosecution of a qualifying crime or criminal activity." 8 CFR § 214.14(a)(2). Recognizing that judges technically "neither investigate crimes nor prosecute perpetrators," USCIS suggests that "the term 'investigation or prosecution' should be interpreted broadly." 72 FR 53020. This guidance comports with the U.S. Supreme Court's construction of the term "prosecution":

> What is a suit? We understand it to be the prosecution, or pursuit, or some claim, demand, or request. In law language, it is the prosecution of some demand in a Court of justice…. To commence a suit, is to demand something by the institution of process in a Court of justice; and to prosecute the suit, according to the common acceptation of language, to continue that demand.

*Cohens v. Virginia*, 19 U.S. 264 at 407-8 (U.S. 1821); *see also United States v. Dinneen*, 455 F. Supp. 20 at 25 (W.D. La. 1977) (" 'Prosecution' may be defined as 'the following up or carrying on of an action

or suit already commenced until the remedy is attained'.") (quoting *Lupton v. Chase Natl. Bank*, 89 F. Supp. 393 at 397 (D. Neb. 1950)) *rev'd in irrelevant part by* 577 F.2d 919 (5th Cir. 1978); *Black's Law Dictionary* 1221 (6th ed. 1990) (the term prosecution "is also used respecting civil litigation, and includes every step in action, from its commencement to its final determination."). The prosecution of the Plaintiff's instant case has implicated numerous qualifying criminal laws (both state and federal), and should properly be regarded as "prosecution" for the purposes of U visa certification. 8 U.S.C. § 1101(a)(15)(U); 8 CFR § 214.14(a)(2).

On April 15, 2008, the U.S. District Court for the Eastern District of Louisiana issued the first reported decision construing the new U visa provisions in *Garcia v. Audubon Communities Management*, 2008 U.S. Dist. LEXIS 31221 (E.D. La. April 15, 2008). The federal judge in that case concluded that a judge presiding over civil litigation has jurisdiction to <u>exercise discretion</u>, upon motion, to certify I-918 U visa applications presented by immigrant victims of qualifying crimes, and the Court then certified the U visa applications in a civil trafficking case of six undocumented immigrant workers <u>who showed prima facie</u> that they had been victims of involuntary servitude (one of the "qualifying criminal activities" for a U visa).[1] The Court cast aside the argument used by Defendants, who cast blame for any such crimes on subcontractors who were not parties to the litigation at the time of the certification. *Garcia*, therefore, can be cited for the proposition that the perpetrator(s), as in the instant case, need not be a party to the litigation yielding certification of U status applications. The Court also found that "on-going criminal investigation may not be necessary to certify a U-visa application because

---

[1] Since the *Garcia* decision, courts in the Fifth and Eleventh Circuits have held that they lack jurisdiction over lawsuits seeking to <u>compel</u> the exercise of discretion to certify a U visa application to certify a U visa application. *Bejarano v. Homeland Security Department*, 2008 U.S. App. LEXIS 23595 (11th Cir. Nov. 14, 2008); *Orazco v. Chertoff*, 2008 U.S. Dist. LEXIS 98800 (S.C. Tx. Dec. 8, 2008); *Ordonez Orosco v. Napolitano*, 598 F.3d 222 at 225-227 (5th Cir. 2010). These cases, however, are not inconsistent with *Garcia's* approval of judicial certification sought on motion asking the court to exercise <u>its own discretion</u>.

the regulations contemplate the future helpfulness of the applicant(s)." The Court cited the following from 72 FR 53019:

> USCIS interprets 'helpful' to mean assisting law enforcement authorities in the investigation or prosecution of the qualifying criminal activity of which he or she is a victim ... The requirement was written with several verb tenses, recognizing that an alien may apply for U nonimmigrant status at different stages of the investigation or prosecution. By allowing an individual to petition for U nonimmigrant status upon a showing that he or she **may be helpful at some point in the future,** USCIS believes that Congress intended for individuals to be eligible for U nonimmigrant status at the very early stages of an investigation. This suggests an ongoing responsibility to cooperate with the certifying official while in U nonimmigrant status.

The Court went on to state:

> Indeed, part of the regulations in the CFR state, "U nonimmigrant status certification means Form I-918, Supplement B, 'U Nonimmigrant Status Certification,' which confirms that the petitioner has been helpful, is being helpful, **or is likely to be helpful** in the investigation or prosecution of the qualifying criminal activity of which he or she is a victim." 8 C.F.R. § 214.14(a)(12).... The Court concludes that the Plaintiffs are entitled to U-Visa certification because they have provided sufficient evidence to show that they "may be helpful at some point in the future" to an investigation regarding qualifying criminal activity.

It should be noted that Plaintiff is not moving this Court to issue a U visa. "USCIS has sole jurisdiction over all petitions for U nonimmigrant status." 8 CFR § 214.14(c)(1). Judicial certification notwithstanding, USCIS retains the ultimate authority to determine visa eligibility:

> While USCIS will give a properly executed certification on Form I-918, Supplement B, significant weight, USCIS will not consider such certification to be conclusory evidence that the petitioner has met the eligibility requirements. USCIS believes that it is in the best position to determine whether a petitioner meets the eligibility requirements as established and defined in this rule. In addition to Form I-918, Supplement B, this interim rule permits the petitioner to provide any additional evidence that is relevant and credible to help demonstrate that the petitioner meets each of the eligibility requirements.

4

72 FR 53014 at 53024. USCIS will make the determination of Plaintiff's qualifying harms and visa eligibility.[2] Plaintiff's motion only requests that this Court certify the past helpfulness of the Plaintiff in prosecuting this civil action and the future likelihood of helpfulness in any future criminal investigation or prosecution. 8 USC § 1101(a)(15)(U)(i). This certification is but one element of the evaluation that USCIS will undertake in its adjudication of Plaintiff's application for U visa relief.

### III. Plaintiff Has Been the Victim of Illegal Acts that Comprise "Qualifying Criminal Activity"

Evidence already before this Court makes a strong showing that criminal activity has occurred relative to the deprivation of Plaintiff's rights.

First, there has been a prima facie showing of deprivation of rights under color of law. It is a federal crime to, "under color of any law, statute, ordinance, regulation or custom," willfully subject any person to deprivation of any rights secured or protected by the Constitution or laws of the United States. 18 U.S.C. § 242. *See United States v. Bunke*, 412 Fed. Appx. 760, 761 (6th Cir. 2011) (prison guard convicted for use of excessive force under 18 U.S.C. § 242); *United States v. Sellers*, 906 F.2d 597 (11th Cir. 1990) (investigators in Sheriff's department allowed co-defendant to beat suspect to obtain confession); *United States v. DiSantis*, 565 F.3d 354 (7th Cir. 2009) (police officer convicted of depriving suspect's right to be free from unreasonable search and seizure); *United States v. Cote*, 544 F.3d 88 (2d Cir. 2008) (prison guard convicted of excessive force); *United States v. LaVallee*, 439 F.3d 670 (10th Cir. 2006). Under color of law, it is similarly a crime to willfully subject a person to different punishments or pains on account of the person being an alien or by reason of his color or race. *Id.*

In this case, the court held that the shackling of Plaintiff during the final stages of pregnancy during labor and during post-partum recovery violated the Due Process Clause of the Fourteenth Amendment. [Doc. Entry No. 119-1 at 34-35]. Additionally, the Court held that the denial of the breast

---

[2] Ultimately, eligibility for U visa interim relief must be made on "case-by-case determinations, using [these] factors as guidelines…. Through these factors USCIS will be able to evaluate the kind and degree of harm suffered by the individual

pump provided for Plaintiff's medical care constituted deliberate indifference under the Eighth and Fourteenth Amendments as the denial interfered with care prescribed by a health care provider. [DE No. 119-1 at 35]. These violations were willful. They occurred as a direct result of two governmental policies, which this Court has held are unlawful. First, the DCSO automatically classified all detainees who were subject to investigation by the 287(g) program as "medium security" inmates. It did so despite the marked dearth of empirical support that undocumented immigrants as a group are more dangerous than other inmates. [DE No. 119-1 at 34 n.8]. Second, the automatic classification of Ms. Villegas as a medium security inmate (and indeed, any security classification) triggered DCSO's shackling policy. The operation of these two policies in tandem caused the unlawful deprivation of Plaintiff's rights under color of law.

Second, there has been a prima facie showing of a conspiracy to injure or oppress Plaintiff in the free exercise of her rights under the Constitution. It is a federal crime for two or more persons to "conspire to injure, oppress, threaten, or intimidate" any person in the free exercise or enjoyment of any right or privilege secured by the Constitution or laws of the United States. 18 U.S.C. § 241. *See United States v. Lanham*, 617 F.3d 873, 878-79 (6th Cir. 2010) (prison guards convicted of conspiring to deprive inmate of rights for placing him in a general population jail cell notorious for sexually predatory conduct, where he was immediately raped); *United States v. Gilpatrick*, 548 F.3d 479, 480-81 (6th Cir. 2008) (prison administrator convicted of conspiracy to deprive an inmate of rights by arranging a beating at the hands of dangerous inmates). In this case, DCSO deputies and administrators acted in concert, pursuant to policy approved at the highest levels, to subject Ms. Villegas to shackling and to deny her a breast pump. This conspiracy violated her Fourteenth Amendment right to due process and her Eighth Amendment right to be free of cruel and unusual punishment.

---

applicant, based upon the individual applicant's experience." 72 FR 53018.

Aside from these general considerations, Plaintiff further contends that she has made a *prima facie* showing that she has been the victim of certain other crimes that qualify her for U visa certification. 8 U.S.C. 1101(a)(15)(U)(i)(IV) requires that a U visa applicant be the victim of "qualifying criminal activity" that either violated the laws of the United States or occurred in the United States. Qualifying criminal activity is defined as criminal activity that is "in violation of Federal, State, or local criminal law." *See* INA sec. 101(a)(15)(U)(iii), 8 U.S.C. 1101(a)(15)(U)(iii).

USCIS gives the following helpful commentary about "qualifying criminal activity" in 72 FR at 53018:

> The statutory list of qualifying criminal activity in section 101(a)(15)(U)(iii) of the INA, 8 U.S.C. 1101(a)(15)(U)(iii), is not a list of specific statutory violations, but instead a list of general categories of criminal activity. It is also a non-exclusive list. Any similar activity to the activities listed may be a qualifying criminal activity. This interim rule adopts the statutory list of criminal activity and further defines what constitutes "any similar activity." *See* 8 CFR 214.14(a)(9). The rule provides that for a criminal activity to be deemed similar to one specified on the statutory list, the similarities must be substantial. USCIS bases this definition on the fact that the statutory list of criminal activity is not composed of specific statutory violations. Instead, the criminal activity listed is stated in broad terms. The rule's definition of "any similar activity" takes into account the wide variety of state criminal statutes in which criminal activity may be named differently than criminal activity found on the statutory list, while the nature and elements of both criminal activities are comparable. In addition, qualifying criminal activity may occur during the commission of non-qualifying criminal activity. For varying reasons, the perpetrator may not be charged or prosecuted for the qualifying criminal activity, but instead, for the non-qualifying criminal activity. For example, in the course of investigating Federal embezzlement and fraud charges, the investigators discover that the perpetrator is also abusing his wife and children, but because there are no applicable Federal domestic violence laws, he is charged only with non-qualifying Federal embezzlement and fraud crimes.

The qualifying general categories of criminal activity are set out in 8 USC § 1101(a)(15)(U)(iii) (portions pertinent to this case are underlined):

> (iii) the criminal activity referred to in this clause is that involving one or more of the following <u>or any similar activity</u> in violation of <u>Federal, State, or local criminal law</u>: rape; <u>torture</u>; trafficking; incest; domestic violence; sexual assault; abusive sexual contact; prostitution; sexual exploitation; female genital mutilation; being held hostage; peonage; involuntary servitude; slave trade;

>   kidnapping; abduction; <u>unlawful criminal restraint</u>; <u>false imprisonment</u>;
>   blackmail; extortion; manslaughter; murder; <u>felonious assault</u>; witness
>   tampering; obstruction of justice; perjury; or <u>attempt, conspiracy, or solicitation
>   to commit any of the above mentioned crimes</u>.

The term "any similar activity" accounts for a wide variety of state and federal criminal laws which may be named differently than the enumerated criminal activity in the statute but are comparable in nature and elements to the enumerated criminal activity.

The discussion below addresses the specific federal and state criminal statutes for which Plaintiff contends she has made at least a *prima facie* showing of violation in the instant case. Plaintiff contends that all are within the ambit of the categories of criminal activity enumerated above as applied to the facts of this case. The qualifying criminal activities which were done, attempted to be done, or conspired to be done, are as follows:

### A. Unlawful Criminal Restraint

8 U.S.C. § 1101(a)(U)(15)(iii) specifies "unlawful criminal restraint" as a qualifying crime warranting a U-visa grant. Most states' criminal codes include the necessary elements of criminal restraint in false imprisonment and kidnapping. The states that make criminal restraint an independent offense define it as restraint of another unlawfully "in circumstances exposing the other to risk of serious bodily injury." N.J. Stat. Ann. 2C:13-2a. Criminal liability under Tennessee's kidnapping statute encompasses all the elements of "unlawful criminal restraint," as explained below.

#### 1. False Imprisonment

In Tennessee, a person commits the crime of false imprisonment when she knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty. Tenn Code Ann. § 39-13-302. *See United States v. Grimes*, 348 Fed. Appx. 138, 141 (6th Cir. 2009); *State v. Richardson*, 251 S.W.3d 438, 441-42 (Tenn. 2008); *State v. Berry*, 141 S.W.3d 549, 567 (Tenn. 2004). In this case, deputies confined Ms. Villegas by shackling her legs together while in an ambulance and then to the

8

hospital bed while she was in labor. This substantially interfered with her liberty by depriving her of a full range of movement while she was in the most vulnerable of states. It caused her to fear for her health and that of her child, and it violated her clearly established constitutional rights.

### 2. Kidnapping

In Tennessee, a person commits the crime of kidnapping when she knowingly confines another unlawfully so as to interfere substantially with the other's liberty under circumstances which expose the victim to "substantial risk of bodily injury." Tenn. Code Ann. § 39-13-303; *Grimes*, 348 Fed. Appx. at 141 (quoting *Richardson*, 251 S.W.3d at 441-42 (citing § 39-13-303 and § 39-13-302)). This Court concluded DCSO's actions subjected Plaintiff and her child to a substantial risk of bodily injury. DE No. 119-1 at 34-35. In fact, Ms. Villegas suffered bodily injury when DCSO denied her access to a breast pump. *Id*. at 35. "The medical proof demonstrates that such shackling was not medically necessary and caused unnecessary physical and mental suffering." *Id.*

### B. Felonious Assault

Under U.S. law, an assault is aggravated if it (a) involves more than minimal planning, or (b) if the victim sustained bodily injury. 18 USC Appx. § 2A2.2. In Tennessee, a person commits the felony of aggravated assault (Tenn. Code Ann. § 39-13-102(a) if he is convicted of an assault (defined in Tenn. Code Ann. § 39-13-101 as "intentionally, knowingly, or recklessly causes bodily injury to another") which results in ordinary or serious bodily injury to the victim. *State v. Gillon*, 15 S.W.3d 492 (Tenn Crim. App. 1999); *State v. Bell*, 69 S.W.3d 171 (Tenn. 2002). This Court has held that that the conduct of DCSO officers was willful: Refusing to remove the shackles was a willful refusal to follow doctor's orders. The risk to human life (*see State v. Jones*, 883 S.W.2d 597, 1994 Tenn. LEXIS 259 (Tenn. 1994); *State v. Crowe*, 914 S.W.2d 933, 1995 Tenn. Crim. App. LEXIS 623 (Tenn. Crim. App. 1995), *appeal denied*, -- S.W.2d --, 1996 Tenn. LEXIS 43 (Tenn. Jan. 8, 1996)) was also high since expert

testimony showed that placing a pregnant woman in leg irons or shackles increases her risk of developing a life-threatening blood clot, and the risk is greatest post-partum. (DE 94-4 at pp. 1-2, Declaration of Dr. Sandra Torrente). Dr. Torrente also reported that Ms. Villegas was subjected to unnecessary pain and suffering by shackling her after her water broke.

### C. Torture or Similar Acts

Another of the twenty-six (26) enumerated categories of crimes warranting a U visa is torture or similar activity. This Court has already made certain findings of fact and conclusions of law in DE No. 119-1 which raise at several points the possibility that Plaintiff was the victim of torture (or "similar activity"), which if so, would serve as a qualifying criminal activity for a U visa.

This Court alludes with approval in DE No. 119-1 to two international organizations whose covenants relative to torture and mistreatment have been violated:

> Rule 33 of the United Nations Minimum Standard for the Treatment of Prisoners provides that shackles should not be used on inmates except as a precaution against escape, on medical grounds at the direction of a medical officer, or to prevent an inmate from injury to self or others or from damaging property. . . . *Amnesty International deems the use of restraints on pregnant prisoners a "cruel, inhuman and degrading form of treatment in violation of both the UN Convention Against Torture* and the International Covenant on Civil and Political Rights. . . . The United States is a signatory of the UN Convention Against Torture, and has ratified the International Covenant on Civil and Political Rights.

DE No. 119-1 at pp. 39-40.

While not specifically stating that "the use of restraints on pregnant prisoners" constitutes "torture", Amnesty International indicates that such activity constitutes a "cruel, inhuman and degrading form of treatment" which violates the UN Convention Against Torture, thus constituting "similar activity" to criminal torture proscribed by 8 USC § 1101(a)(15)(U)(iii).

Since CAT was not self-executing, but the United States was nevertheless under an obligation to enact laws to proscribe violations of CAT within its territory, Congress passed the 1994 Torture Act,

10
Case 3:09-cv-00219 Document 199 Filed 08/26/11 Page 10 of 18 PageID #: 3746

codified at 18 USC § 2340(1). The Torture Act defines the criminal act of torture as an "act committed by a person acting under color of law specifically intended to inflict severe physical and mental pain or suffering (other than pain or suffering incidental to lawful sanctions upon another person within his custody or physical control." 18 USC § 2340(2) defines "severe mental pain or suffering" as the "prolonged mental harm caused by or resulting from – (A) the intentional infliction or threatened infliction of severe physical pain or suffering; . . . [or] (D) the threat that another person will imminently be subjected to death, severe physical pain or suffering, or the administration or application . . . of procedures calculated to disrupt profoundly the senses of personality."

With reference to the regulations implementing CAT, the Board of Immigration Appeals summarized a five-part test for determining whether an act rises to the level of torture in *Matter of J-E-*, 23 I&N Dec. 291 at 297 (BIA 2002):

> For an act to constitute torture it must be: (1) an act causing severe physical or mental pain or suffering; (2) intentionally inflicted; (3) for a proscribed purpose; (4) by or at the instigation of or with the consent or acquiescence of a public official who has custody or physical control of the victim; and (5) not arising from lawful sanctions.

Plaintiff contends that this case meets all five criteria comprising torture. The actions of shackling and denying a breast pump (a) caused both severe physical and mental pain and suffering; (b) was intentionally inflicted as already found; (c) did not arise from lawful sanctions (8 CFR § 208.18(a)(3) states that lawful sanctions cannot include sanctions that defeat the object and purpose of the CAT); (d) was with the instigation of or with the acquiescence of a public official (i.e., the Sheriff) who imposed the rules requiring such conduct, and (e) was for a proscribed purpose, which the BIA determined to include "any discriminatory purpose" in *Matter of J-E-*.

The interpretation of the "intent element" in torture has been extensively discussed. The latest and most authoritative discussion comes from the Justice Department Dec. 30, 2004 Memo on U.S.

Torture Policy for Deputy Attorney General James B. Comey ("2004 Memo"). The 2004 Memo explained that:

> In the August 2002 Memorandum, this Office concluded that the specific intent element of the statute required that infliction of severe pain or suffering be the defendant's "precise objective" and that it was not enough that the defendant act with knowledge that such pain "was reasonably likely to result from his actions" (or even that that result "is certain to occur"). *Id*. at 3-4. **We do not reiterate that test here.**

*Id*. at n.27. The 2004 Memo continued:

> [C]ases such as *United States v. Neiswender*, 590 F.2d 1269 (4th Cir. 1979), suggest that to prove specific intent it is enough that the defendant simply have "knowledge or notice" that his act "would have likely resulted in" the proscribed outcome. *Id*. at 1273. "Notice," the court held, "is provided by the reasonable foreseeability of the natural and probable consequences of one's acts." *Id*.
>
> We do not believe it is useful to try to define the precise meaning of "specific intent" in section 2340. In light of the President's directive that the United States not engage in torture, it would not be appropriate to rely on parsing the specific intent element of the statute to approve as lawful conduct that might otherwise amount to torture. Some observations, however, are appropriate. **It is clear that the specific intent element of section 2340 would be met if a defendant performed an act and "consciously desire[d]" that act to inflict severe physical or mental pain or suffering. 1 LaFave, *Substantive Criminal Law* § 5.2(a), at 341. Conversely, if an individual acted in good faith, and only after reasonable investigation establishing that his conduct would not inflict severe physical or mental pain or suffering, it appears unlikely that he would have the specific intent necessary to violate sections 2340-2340A. Such an individual could be said neither consciously to desire the proscribed result,** *see, e.g., Bailey*, **444 U.S. at 405, nor to have "knowledge or notice" that his act "would likely have resulted in" the proscribed outcome,** *Neiswender*, **590 F.2d at 1273.**

*Id*. at 16-17. Thus, the 2004 Memo both affirmatively stated that the specific intent element is *not* tied to a purpose or 'precise objective' to inflict severe pain and suffering, and suggested that knowledge of 'reasonably likely' results could come within the definition of specific intent.

The "intent" element in the case at hand is discussed extensively and repeatedly in the Court's DE No. 119-1, and this Court makes it clear that shackling Plaintiff while in labor and denying her a breast pump was not mere recklessness or negligence. Much more was involved.

First, in noting that the prison guards intentionally disregarded a physician's "No Restraint Order", this Court cited the standard set by the U.S. Supreme Court in *Estelle v. Gamble* in determining that Defendant violated Plaintiff's rights to adequate medical care under the Eighth Amendment to the U.S. Constitution:

> *Deliberate indifference* to serious medical needs of prisoners constitutes the *"unnecessary and wanton infliction of pain"* proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs *or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed.*

429 U.S. 97 at 104-05 (emphasis added). DE No. 119-1, p. 29.

The Court further noted that under *Boretti v. Wiscomb*, 930 F.2d 1150 at 1156 (6th Cir. 1991), "complying with a doctor's prescription or treatment plan is a ministerial function, not a discretionary one." DE No. 119-1, p. 30. This Court also cited the Eighth Circuit's summary of the constitutional history relative to the use of restraints in shackling of a pregnant detainee in labor as reported in *Nelson v. Correctional Medical Services*, 583 F.3d 522 (8th Cir. 2009) (en banc):

> **In the District of Columbia … [i]n 1994 that court held that "[w]hile a woman is in labor … shackling is inhumane" and violates her constitutional rights.**
> 
> \* \* \*
> 
> **Existing constitutional protections, as developed by the Supreme Court and the lower federal courts and evidenced in ADC regulations, would have made it sufficiently clear to a reasonable officer in September, 2003 that an inmate in the final stages of labor cannot be shackled absent clear evidence that she is a security or flight risk. Indeed, "[t]he obvious cruelty inherent in this practice should have provided [Turensky] with some notice that [her] alleged conduct violated [Nelson's] constitutional protection against cruel and unusual punishment. [Nelson] was treated in a way antithetical to human dignity … and under circumstances that were both degrading and dangerous.**

DE No. 119-1, p. 32.

Second, this Court at DE No. 119-1, pp. 10-12, took extensive note of the testimony of Dr. Torrente (at DE No. 94-4) about the life-threatening risks of Defendants' conduct toward not only the Plaintiff, but also Plaintiff's baby (which is also a separate element of torture):

**37. The shackling of a woman who is in her third trimester and whose water has broken is extremely dangerous because of, among other things, a potential for the umbilical cord prolapse.** Umbilical cord prolapse occurs when the baby's head is not engaged (not in the pelvis) and the umbilical cord moves below the baby's head. In this position, the cord can kink and cause a lack of blood to the baby. The baby becomes hypoxic, which can cause brain injury.

. . .

**47. Medical personnel need constant unrestricted access to a woman in labor. There are a number of complications that can occur during labor which necessitate the ability of healthcare providers to provide immediate medical assistance. The process of freeing a woman from restraints can inhibit this process. For example, when a woman is in labor and the baby develops a non-reassuring fetal heart tracing, the patient needs to be able to move to her left lateral decubitus position to increase blood flow to the baby.**

. . .

**18. Placing a pregnant woman in leg irons or shackles increases her risk of developing a potentially life-threatening blood clot. This risk is increased and present throughout a woman's entire pregnancy; however, it is at the greatest risk post-partum. . . . Women who are pregnant have three major physiologic changes that increase their fall risk. First her center of gravity changes to above her legs, second the enlarging abdomen, and third the relaxation of the pelvic joints leads to unsteadiness in her gait. Restraints — especially leg restraints — would increase her fall risk which can lead to injury of both the woman and the unborn child.**

**19. A woman who has given birth should not be restrained in any manner for her entire hospital stay. It is vitally important that a woman have full range of movement of her limbs and remain ambulatory to prevent blood clots and general discomfort.. . .**

. . .

**21. The use of shackles on a woman during labor and post-partum is extremely unsanitary and unacceptable.** (Emphasis in Original).

Third, this Court held that Defendants' denial of the breast pump that Metro General Hospital furnished to Plaintiff constituted under *Boretti* and *Byrd* "*deliberate indifference under the Eighth and Fourteenth Amendments as the denial and interference with care prescribed by a health care provider*." DE No. 119-1, p. 35.

Combining (a) the concept that shackling during labor constitutes torture which is in contravention of the UN Convention Against Torture, with (b) the concept that the shackling of the Plaintiff here was a deliberate act of inhumanity, with (c) the concept that "the medical proof demonstrates that such shackling . . . caused unnecessary physical and mental suffering" (DE No. 119-1,

14

p. 35), with (d) the concept that this Plaintiff endured severe physical suffering for days when the pain associated with shackling is combined with the pain resulting from denial of a breast pump, with (e) the concept that this Plaintiff suffers to this day from nightmares associated with her treatment by Defendant, and with (f) the concept that shackling Plaintiff during childbirth presented a severe danger to her baby, Plaintiff contends that the conduct at issue here rose to the criminal level of "torture" as defined.

**IV. Plaintiff Suffered Substantial Physical and Mental Abuse as a Result of Defendant's Actions**

To be eligible for U visa relief, an alien must have "suffered substantial physical or mental abuse as a result of having been a victim of criminal activity" enumerated by the Act. 8 USC § 1101(a)(15)(U)(iii)(1). To determine whether suffered abuse is substantial, a number of factors may be considered, including:

> The nature of the injury inflicted or suffered; the severity of the perpetrator's conduct; the severity of the harm suffered; the duration of the infliction of the harm; and the extent to which there is permanent or serious harm to the appearance, health, or physical or mental soundness of the victim…. A series of acts taken together may be considered substantial physical or mental abuse even where no single act alone rises to that level.

8 CFR § 214.14(b). Ultimately, eligibility for U visa interim relief must be made on "case-by-case determinations, using [these] factors as guidelines…. Through these factors, USCIS will be able to evaluate the kind and degree of harm suffered by the individual applicant, based upon the individual applicant's experience." 72 FR 53018.

The Plaintiff suffered substantial physical and mental abuse as a result of (a) her shackling during labor, and (b) denial of a breast pump upon her departure from the hospital. Expert reports and testimony, including that of Dr. Jill DeBona, provide extensive documentation of the physical and mental abuse suffered by Plaintiff as a result of the actions of Defendant's agents in this matter. The

jury heard the evidence and returned a verdict for $200,000, finding that Plaintiff was damaged and injured as a result of the specified conduct.

### V. Plaintiff Possesses Information About Defendant Agents' Involvement in Criminal Activity

To receive U visa relief, an alien must "possess information" concerning the alleged criminal activity. See 8 USC § 1101(a)(15)(U)(i)(II); see also 8 CFR § 214.14(b)(2) (the petitioner must have "knowledge of the details" and "possess specific facts" sufficient to show that the petitioner "has, is, or is likely" to assist the prosecution of the crimes.) As set forth in the Plaintiff's deposition and her testimony at trial, the Plaintiff has intimate and detailed knowledge of the activities at issue.

### VI. Plaintiff "Has Been Helpful, Is Being Helpful, or Is Likely to be Helpful" in the Investigation or Prosecution of Defendant Agents' Crimes

The final requirement for U visa relief is that the petitioner "has been helpful, is being helpful, or is likely to be helpful" to the law enforcement agency or judge investigating or prosecuting the crime. 8 USC § 1101(a)(15)(U)(i).

Here, the Plaintiff filed the instant lawsuit alleging that Defendant and its agents engaged in activity amounting to the criminal acts enumerated above. Plaintiff's bringing the instant lawsuit itself — a private prosecution of this illegal activity — is manifestly being "helpful" to the Court's investigation of the unlawful activity.

Moreover, Plaintiff has brought these charges of criminal activity before the U.S. Department of Justice Civil Rights Division ("DOJ/CRD"), the FBI, the U.S. Attorney for the Middle District of Tennessee, and the District Attorney General of the 20th Judicial District of the State of Tennessee (Davidson County). See Exhibit B to Motion to Certify. The DOJ/CRD (with the U.S. Attorney's office) and the FBI have the principle responsibility for investigating and prosecuting federal criminal offenses involving excessive force and other constitutional violations by persons acting as law enforcement

officials or public officials. The District Attorney has the principle responsibility for the prosecution of state offenses in Davidson County.

## Conclusion

One of the most puzzling aspects of this case is Defendant's insistence that it has done nothing wrong. The stubborn refusal of Defendant to concede that its shocking and inhumane conduct in this case was wrong in any way betrays a seared conscience that is severely troubling to any thoughtful citizen of an enlightened society. This Court's certification of a U visa for adjudication by USCIS would not only constitute equitable relief for the Plaintiff fully justified by the facts of this case, but may also jar Defendant into realizing the gravity and depraved nature of Defendant's actions.

For these reasons, Plaintiff urges the Court to grant the relief requested in her Motion for U Visa Certification.

Respectfully Submitted,

*/s/ Elliott Ozment*
Elliott Ozment (No. 4331)
IMMIGRATION LAW OFFICES OF
ELLIOT OZMENT
1214 Murfreesboro Pike
Nashville, TN 37217
(615) 321-8888
elliott@ozmentlaw.com

William L. Harbison (No. 7012)
Phillip F. Cramer (No. 20697)
John L. Farringer IV (No. 22783)
SHERRARD & ROE, PLC
424 Church Street, Suite 2000
Nashville, TN 37219
(615) 742-4200
bharbison@sherrardroe.com
pcramer@sherrardroe.com
jfarringer@sherrardroe.com

*Attorneys for Juana Villegas*

**CERTIFICATE OF SERVICE**

Service of the foregoing was accomplished through the Court's Electronic Filing System
on this 26th day of August, 2011, upon all those to receive notice in the Court's ECF system, including
the United States and the following:

Kevin Klein
Allison Bussell
Metropolitan Department of Law
108 Metropolitan Courthouse
P.O. Box 196300
Nashville, TN 37219
Kevin.Klein@nashville.gov
Allison.Bussell@nashville.gov

*/s/ Elliott Ozment*