IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

JUANA VILLEGAS,             )
                                   )
        Plaintiff,           )
                                   )
v.                                 )        No. 3:09-0219
                                   )        JUDGE HAYNES
THE METROPOLITAN GOVERNMENT    )
OF DAVIDSON COUNTY/NASHVILLE –    )
DAVIDSON COUNTY SHERIFF'S         )
OFFICE, et al.,                       )
                                   )
        Defendant.         )

## MEMORANDUM

Plaintiff, Juana Villegas, filed this action under 42 U.S.C. §§ 1981 and 1983, against the

Defendants: Metropolitan Government of Nashville Davidson County, Tennessee ("Metro");

Nashville Davidson County Sheriff's Office; Jane Napolitano, in her official capacity as Secretary

of Department of Homeland Security ("the Secretary"); and John Doe #1, John Doe # 2, John Doe

# 3 and John Doe # 4. Plaintiff's specific claims arise from Defendants' shackling of her during the

final stages of her pregnancy while in the Metro Defendants' custody. Plaintiff's claims are: that the

Metro Defendants violated her due process rights under the Fourteenth Amendment for their

deliberate indifference to Plaintiff's serious medical needs, that the Defendants' violated her First

Amendment right to familial association, and that the Defendants violated her Fourth Amendment

right of personal privacy and to be free from unreasonable seizures. Plaintiff also asserts claim that

the Metro Sheriff's office breached its contract with Immigration and Customs Enforcement ("ICE")

on Metro's detention of immigrants. Plaintiff also asserted state law claims.

In earlier proceedings, the Secretary, who was sued only in her official capacity, moved to dismiss contending that the immigration detainer issued against the Plaintiff was authorized by federal law. Plaintiff filed a response and the Secretary filed a reply. After review, the Court concluded that Plaintiff had not pled an actionable claim against the Secretary and dismissed the Secretary without reaching the federal immigration regulation issues. Given that the DSCO , the responsible agency, was not a person under Section 1983 and Metro was a named party, the Court dismissed DSCO.. The remaining parties proceeded with discovery.

After the conclusion of discovery, the Defendant moved for summary judgment and Plaintiff moved for partial summary judgment on her federal and state constitutional claims. (Docket Entry Nos. 77 and 84). In its motion for summary judgment, Defendant Metro contended, in sum: (1) that handcuffing and shackling Plaintiff during her active labor and post-partum recovery were penologically justified; (2) that Plaintiff cannot show any objective harm by reason of Defendants' acts or omissions, nor that the Defendants acted in reckless disregard of any risk to Plaintiff by their handcuffing and shackling her; and (3) that Defendants' policies restricting Plaintiff's right to personal privacy and access to her child, as well as visits or telephone contacts with family members, were also based upon penological justifications. Thus, without actionable federal claims, Defendants also sought dismissal of Plaintiff's state law claims without prejudice.

In her motion, Plaintiff asserted, in essence, that Defendants' shackling of her during her active labor, shortly before actual delivery and during her post-partum recovery, as well as Defendants' agents' disregard of a physician's "no restraint" directive and prescription for a breast pump, violated Plaintiff's Fourteenth Amendment right to be free from deliberate indifference to her

2

serious medical condition. In addition, Plaintiff contends that Defendants also exhibited recklessness during her hospital stay and interfered with her rights to personal privacy and familial association.

The Court concluded that the Plaintiff's motion for partial summary judgment should be granted on her Fourteenth Amendment claim for the Defendants' shackling of her during Plaintiff's active final stages of labor and subsequent postpartum recovery as well as the Defendant's denial of breast pump prescribed for Plaintiff by the physicians. The Court dismissed Plaintiff's breach of contract claim without prejudice for lack of subject matter jurisdiction. As a matter of comity, the Court declined to entertain Plaintiff's state law claims that were also dismissed without prejudice. See Vandiver v. Hardin County Bd. of Educ., 925 F.2d 927, 935 (6th Cir. 1991). To this extent, the Defendants' motion for summary judgment was granted in part and denied in part. The action proceeded to trial on Plaintiff's due process claim and after a two day trial, the jury awarded Plaintiff $200,000.

Before the Court is Plaintiff's motion for her attorneys' fees, costs, and expenses under 42 U.S.C. § 1988 (Docket Entry No 207). Plaintiff relies upon the Court's award of partial summary judgment and the jury's award of $200,000 on her Fourteenth Amendment claims. In sum, Plaintiff contends that this litigation spanned three years and her counsel, attorneys at Sherrard & Roe and Elliott Ozment, co-counsel, conducted the initial investigation of the shackling of Plaintiff during the final stages of her pregnancy pursuant to Defendant's policy; engaged in written and oral discovery; secured experts and and expert testimony; filed a successful motion for partial summary judgment; and obtained a favorable jury verdict of $200,000. Plaintiff notes that this is a "high-profile case" and Metro repeatedly rejected Plaintiff's counsel's "multiple attempts" to settle this action on

3

reasonable terms and thereby reduce Plaintiff's legal fees. In addition, Plaintiff asserts that the Defendant Metro elected "a litigation-at-all costs strategy" and took "intransigent positions" that caused the hours and amount of fees sought in this motion. Plaintiff's motion, however, does not seek compensation for all of her counsel's time expended in this action. Plaintiff also submitted the affidavits of three highly regarded and experienced counsel in this District who opine that Plaintiff's counsel's requested total hours and hourly rates are reasonable. Plaintiff leaves to the Court whether an enhancement of the fee award, as authorized by the law, is appropriate for their work on this controversial action. The latter request is supported by one of the declarations filed in support. (Docket Entry No. 214-4, Barrett Declaration at ¶ 15).

In response, Metro contends, in essence: (1) that Plaintiff's fee request should be reduced for Plaintiff's failure to prevail on all of her claims; (2) that Plaintiff's unsuccessful claims are distinct from her successful claims so as to warrant a 50% reduction of the pretrial fees; (3) that Plaintiff's fee request seeks recovery for the undocumented work of a litigation consultant and Elliott Ozment, Plaintiff's co-counsel; (4) that a further reduction of 25% is necessary for the substantial difference between the relief sought just before trial and the jury's award; (5) that Plaintiff's action is not an "undesirable" action for her counsel because Plaintiff had wide support among the public for this action; and (6) that an enhancement of any fee award is limited to "rare circumstances" that are not present here. Initially, Metro argued for elimination of Ozment's undocumented fees for trial work apparently on the undecided U-visa claim and for a reduction of the remaining attorneys' trial fees by 25% for a total award of $357,035.06. (Docket Entry No. 226, Metro's Memorandum in Opposition

at 18). At another point, Metro contended that Plaintiff's fee request should be reduced to $303,525.06. Id at 18.

·

## A. Analysis of the Motion

Plaintiff's counsel, Sherrard & Roe and co-counsel Ozment expended more than 1,650 hours during the three years of this action. Sherrard & Roe is a highly regarded firm that traditionally represents business entities. William L. Harbison, a graduate of Harvard Law School, is a Fellow of the American Bar Association, former President of the Nashville Bar Association and is on many respected "best lawyers" lists. The other two principal attorneys from Sherrard & Roe are Phil Cramer and John Farringer, members of Order of the Coif at Vanderbilt Law School, and editors of Vanderbilt Law Review. Phil Cramer served as a law clerk for a federal judge.

The attorneys at Sherrard & Roe submitted detailed descriptions of their contemporaneously recorded entries of their work on this action.[1] ( Docket Entry No. 214). Sherrard & Roe also submitted tables allocating the time spent for each major phase of the litigation:157.4 hours were spent on precomplaint investigation and the filing of the complaint; 155.9 hours were spent during the written discovery period; 452.15 hours were spent throughout deposition discovery and expert disclosures; 201.75 hours were expended on summary judgment briefing and responses; and 686.07 hours were expended on trial

---

[1] Portions of these detailed descriptions, the Court granted Plaintiff's motion for in camera inspection based upon the work product privilege. Metro's counsel was provided redacted copies of those materials. After a conference with counsel for the parties, Metro agreed, based upon Plaintiff's counsel's description of the redacted materials, that further inspection was unnecessary for its objections on the reasonableness of the time expended.

5

preparation and trial. Id.. Harbison states: "Based on my experience as an attorney and my knowledge of typical fees and hourly rates in Nashville, I believe that the total attorneys' fees incurred during Sherrard & Roe's three-year representation of Ms. Villegas are reasonable." ( Docket Entry No. 214-1, Harbison Declaration at ¶ 7). See also Docket Entry No. 214-2, Cramer Declaration at ¶ 12. ("Having reviewed the itemized time records, I believe that the services performed and expenses incurred in this matter were reasonable and necessary.").

From a review of the record, Plaintiff presented testimony of three medical experts, and the Defendant's proof involved the testimony of a medical expert and three correctional experts. Trial exhibits included medical records of Plaintiff's delivery, court and jail records of Plaintiff's arrest and detention, testimony of Defendant's employees and proof on Plaintiff's immigration status, the Defendant's contract with the Secretary and the policies of the City of Berry Hill, the employer of the arresting officer. There were several substantial dispositive motions, including the parties' cross motions for summary judgment and the United States's motion to dismiss as well as motions in limine. Extensive briefing was undertaken by counsel for the parties. The jury trial of this action required the amount of time requested by Sherrard & Roe.

To control costs, Sherrard & Roe utilized skilled lawyers-in-training for substantive work in the investigation and research. Ryan Holt, a new associate at Sherrard & Roe and Tory Hodges Lewis, a then rising third year law student at Vanderbilt University Law School and law clerk with Sherrard & Roe, worked during the summer of 2008 and throughout her first semester of her third year. Ms. Lewis also served an externship under the auspices of law school for which she received course credit for her research and drafting pre-complaint

6

documents in this action. Ms. Lewis worked on numerous research memoranda, along with drafting the complaint. (Docket Entry No. 214-2, Cramer Declaration at ¶ 7). This fee petition does not seek any reimbursement for the substantial time spent by Lewis on this action during her fall semester of 2008 when she performed much of the work.

Sherrard & Roe also pursued a litigation strategy to reduce the hours associated with a trial and to control the growing number of attorney-hours expended on this action. One part of Sherrard & Roe's litigation strategy was moving for partial summary judgment on Plaintiff's "deliberate indifference" claims. Sherrard & Roe recognized that the material facts were undisputed. Upon prevailing, the time otherwise required for a trial was reduced to a two-day trial on damages. Second, Sherrard & Roe filed motions in limine, to reduce the scope of the trial proof and to eliminate time-consuming in-court evidentiary disputes.

As to the amount of Plaintiff's fee request, Sherrard & Roe explains that Metro "refused to engage in good faith settlement talks" and that refusal is directly responsible for the total number of hours and substantial increase in the fees of Sherrard & Roe. Early in this action, Plaintiff made a "very reasonable settlement offer" that Metro rejected. On May 2011, Plaintiff again offered to settle for damages that were less than the jury's award and for legal fees that were less than the amount in this fee petition. Metro never responded to that offer. (Docket Entry No. 214-2, Cramer Declaration at ¶ 19). After the verdict, Sherrard & Roe again offered to settle with a discount on the fees sought in this petition in exchange for a settlement. Metro did not reply to that offer.

Plaintiff's fee petition is supported by the affidavits of George Barrett, Robert J. Walker, and H. Lee Barfield, prominent attorneys in this District and the Nation. According

to George Barrett, a legendary civil rights attorney in historic actions in this district and elsewhere , "[i]t is my professional opinion that the hours expended in this case were both reasonable and necessary. I base this opinion on several factors including, but not limited to, the complexity and nuance of the issues involved, the complexity of the legal issues raised, the time frame in which this action proceeded, and the vigorous defense mounted by Defendant." (Docket Entry No. 214-4, Barrett Declaration at ¶ 11).

Robert J. Walker, a fellow of the American Trial Lawyers, another distinguished member of the bar, and former President of the Nashville Bar Association, also asserts that "I believe the total number of hours expended was reasonable. Indeed, the hours each attorney expended and the division of labor in each major phase of the litigation was reasonable and quite efficient."(Docket Entry No. 214-5, Walker Declaration at ¶ 6).

H. Lee Barfield II, another esteemed member of the bar of this Court and former President of the Nashville Bar Association who is also listed among the Best Lawyers in America, states: "I have reviewed the work performed in this case by Sherrard & Roe and Mr. Elliott Ozment and believe that it all was reasonably necessary in order to pursue the claims on behalf of Ms. Villegas. In other words, the total number of hours they expended was reasonable, and the hours they expended in each major phase of the litigation were reasonable." (Docket Entry No. 214-6, Barfield Declaration at ¶ 6).

Significantly, the 1,653.27 hours understate the total number of hours that Sherrard & Roe firm members and staff actually expended on this action. Sherrard & Roe excluded work performed by members and staff of Sherrard & Roe attorneys. Sherrard & Roe excluded all hours that are not directly relate to the judgment and jury damages award and

8

exclude the work of its attorneys who spent less than five total hours working on this action. (Docket Entry No. 214-2, Cramer Declaration at ¶ 10).

The time spent by Sherrard & Roe's paralegals and law clerks was 33.6 hours; law clerks expended 182.07 hours, see Exhibit 1 to Decl. of Phillip F. Cramer. Sherrard & Roe billed them at the same rates at which it bills and collects from fee-paying clients: $147.50 for paralegals, and $125 for law clerks. According to Robert J. Walker, a distinguished lawyer and former President of the Nashville Bar Association, "I have also reviewed the hourly rates charged for paralegals and law clerks . . . and believe their rates to be commensurate with those rates charged in the Nashville legal community among law firms." (Docket Entry No. 214-5, Walker Declaration at ¶ 7)(Docket Entry No. 214-6, Barfield Declaration at ¶ 8).

Eighty point eight of the 1,653.27 hours are from Elliott Ozment, who served as co-counsel, but is not a member of Sherrard & Roe. (Docket Entry No. 214-2, Cramer Declaration, Exhibit 1 thereto). Sherrard & Roe and Ozment have contemporaneously filed a declaration of Mr. Ozment and an affidavit of Sean Lewis supporting the reasonableness of Mr. Ozment's fees. (Docket Entry No. 214). Sean Lewis, who has been practicing law in Tennessee for over ten years, has submitted an affidavit supporting the reasonableness of the rate and hours of Mr. Ozment.(Docket Entry No. 214-7, Lewis Declaration). Ozment submitted his separate bill of costs for $2.338.20. (Docket Entry No. 211).

Sherrard & Roe also seeks reimbursement for $82,394.51 in costs and expenses Sherrard & Roe seeks recovery of expert fees, including for Bradshaw Litigation consultant, whose website describes its work as "a national consulting firm that offers a variety of

services in preparation of mediation, arbitration, or trial." http://bradshawlitigation.com/.

Metro cites the lack of information about Bradshaw Litigation's actual work in this action

to assess the reasonableness of his fees. In Metro's view, Dr. Bradshaw's fees are more akin

to attorney fees than expert fees and thus, Dr. Bradshaw's fees of $15,343.00 should be

denied for lack of "contemporaneous time records" and "other materials". (Docket Entry No

231-1, Plaintiff's Memorandum at 9-10). Metro also cited Plaintiff's limited documentation

for Dr. Jill DeBona's fees of $51,350.00, but Metro does not challenge Dr. DeBona's fees.

Metro is not challenging the other undocumented expert fees, except for Dr. Bradshaw, (Doc.

214-2 at 2) and objects to any expert fees beyond $53,510.00. (Docket Entry No. 226 at 18).

This amount, however, excludes tens of thousands of dollars for costs on Lexis and

Westlaw expenses, videoconferencing fees, medical-records request fees, and telephone

expenses all of which the firm donated as part of its representation of Ms. Villegas. Sherrard

& Roe submitted its bill of costs, excluding expert-witness fees. (Docket Entry No. 214-2,

Cramer Declaration, Exhibit 2 thereto). Sherrard & Roe also excluded the time to prepare its

fee petition[2] that is compensable under the applicable law.

### 1. Hourly Rates

Over the three-year duration of this action, the six attorneys from Sherrard & Roe

charged the following hourly rates: (1) William L. Harbison, senior partner, $535 per hour

(105.9 hours expended); (2) Phillip F. Cramer, partner, $360 per hour (667.2 hours

---

[2]Included is time spent by Mr. Elliott Ozment in connection with the motion filed for the
U-Visa certification. No additional time from Sherrard & Roe been included in connection with the
U-Visa certification motion.

10

expended); (3) John L. Farringer IV, senior associate and then partner, $315 per hour (501.9 hours expended); (4) Lisa K. Helton, senior associate, $255 per hour, (16.5 hours expended); (5) Grant Dickson, junior associate, $220 per hour (7.1 hours expended); and (6) Gabe Roberts, junior associate, $200 per hour (58.2 hours expended). (Docket Entry No. 214-2, Cramer Declaration, Exhibit 1 thereto). Elliott Ozment, co-counsel, bills at an hourly rate of $400 per hour (80.8 hours expended). Each attorney's hourly rate in this action is the attorney's rate currently billed and collected from fee-paying clients. (Docket Entry No. 214-1, Harbison Declaration at ¶ 7; Docket Entry No. 214-3, Ozment Declaration at ¶ 7).

For its fee request, Sherrard & Roe seeks a "blended hourly rate" to reflect the weighted average of each attorney's hourly rate multiplied by that attorney's proportion of the total hours spent on the case. With the rates of paralegals and law clerks, the average hourly rate is approximately $320 per hour. This average hourly rate for Ozment, is $351.05 per hour. (Docket Entry No. 214).

George Barrett, Robert Walker and Lee Barfield agree that all of the hourly rates for Sherrard & Roe attorneys are well within the market rates in Nashville for similarly qualified and experienced attorneys for similar services. "It is my professional opinion that these hourly billing rates are imminently reasonable. I base this opinion on several factors, including my familiarity with the rates typically charged by lawyers of similar stature and experience for similar services in this locality and the stellar reputation of Mr. Harbison and his firm in this community." (Docket Entry No. 214-4, Barrett Declaration at ¶ 13). "Based upon each attorney's level of experience, skill and expertise, as well as the nature of the matter in dispute and the excellent results obtained, I consider the rates charged by each to

11

be quite reasonable and within a range of rates in this market for similar work by similarly skilled attorneys. In fact, some Nashville attorneys charge higher hourly rates, particularly for matters that are highly publicized and of public importance."(Docket Entry No. 214-5, Walker Declaration at ¶ 7). Barfield and another well-established attorney, Sean Lewis, agree that Elliott Ozment's hourly rate is reasonable. (Docket Entry No. 214-6, Barfield Declaration at ¶ 7 and Docket Entry No. 214-7, Lewis Declaration at ¶ 5).

Plaintiff also cites a 2008 publication of the National Law Journal that studied law firm billing rates that included the range of hourly rates for partners and associates at two well-known Nashville law firms: Bass, Berry & Sims and Baker, Donelson, Bearman, Caldwell & Berkowitz. "A Nationwide Sampling of Law Firm Billing Rates," The Nat'l L. J., Vol. 31, No. 15 (Dec. 8, 2008). In terms of 2011 dollars[3], the range for partners at Bass Berry was approximately $252 to $604 per hour; the range for associates was about $189 to $326 per hour. In terms of 2011 dollars, the range for partners at Baker Donelson was approximately $241 to $550 per hour; the range for associates was about $126 to $346 per hour.

Thus, the Court finds that Sherrard & Roe attorney's and Ozment's weighted hourly rates fall reasonably within the range for similar attorneys in this community. (Docket Entry No. 213, Plaintiff's Memorandum at 15).

## 2. Controversial Action

---

[3] See "Consumer Price Index Inflation Calculator," U.S. Bureau of Labor Statistics, http://www.bls.gov/data/inflation_calculator.htm.

As discussed infra, the Court may award an enhancement of Plaintiff's fee award for services rendered in a controversial action. Plaintiff is a Mexican and undocumented immigrant and her action was highly controversial and engendered some unpopular sentiments in this District. Sherrard & Roe cite online "comments" that readers left on the websites of local news publications as a window into the unpopularity of this action.

> This woman is a parasite . . . .

> Let me get this straight….The woman was here illegally, driving without a license, most likely uninsured, and breaking the law, but she is rewarded with a $200,000 judgment? As far as I am concerned, her rights ended whenever she broke the laws of our land by entering and living her illegally. The 'do-gooders' who continue to enable this kind of behavior are a big part of the reason this country is in the current financial mess it's in right now.

> ACORN! They instigated this whole thing, that I am sure! When they registered her to vote they probably planted the seed to sue the sheriff! If the Founding Fathers could come back today, they would kick that lawyer who represented her in the nuts!

> Are you kidding me? Sure, 90% for these despicable attorneys and the rest for this illegal alien who (1) violated US law, (2) drove without a license, (3) exploited the generosity of the American people, and the list goes on.

(Docket Entry No. 214-2, Cramer Declaration at ¶ 18). One comment expressly called for a boycott of Sherrard & Roe: "I propose as a form of protest to by American Citizens to not ever do business with her attorney. Make it so hard for him to earn a living; he has to leave Middle, TN!" Id.

In earlier proceedings, Sherrard & Roe cited additional evidence of the unpopularity and hostility in the community about the Plaintiff. (Docket Entry No.122, Plaintiff's Motion in limine).

13

Illustrating the highly polarizing nature of this issue, just one Tennessean article in August of last year garnered 160 comments on the newspaper's website. Chris Echegaray, *Nashville Mom Shackled While in Labor Faces Deportation, Again,* TENNESSEAN, Aug. 4, 2010. The vast majority of comments ignored the legal claims surrounding the case and instead focused on the divisive issue of immigration, producing a series of remarks clouded by deep-seeded hateful and sometimes dehumanizing anti-immigrant sentiment. A short, yet impactful, sample of comments should ensure this Court of the highly prejudicial and distracting impact of allowing the Defendants to mention Ms. Villegas' immigration status. The readers commented,

"Again, she is NOT the first female criminal inmate to be 'cuffed to the bed during childbirth. She's just one who, like those of her ilk, refused to take responsibility for her OWN part in her situation and played the 'race' card and the 'poor mistreated criminal trespasser' card to get attention and a few dollars. Deport her."

She's a criminal who has NO respect for the people or laws of this country. She is nothing to be respected."; "They (Hispanics) are the MAJORITY of the criminal illegal trespassers. They brought this on themselves by shirking and disrespecting the laws of this country.";

"Send them and their children back. It's cheaper on taxpayers."; "Nashville Mom?????? This is a Mexican woman! She is here illegally."; "These people have no right to be represented in our court systems. If they don't like it here leave. It is sort of like going to a friends house uninvited at dinner time then going to all of your other friends and complaining about the food."

"Get her and the other 12 million the hell out of our country. Illegal means illegal".

The article elicited some even more extreme responses, illustrating the dangerous, and in  fact, unjust effect this issue could have on what should be a straightforward damages determination. For example,

"I BELIEVE PUBLIC FLOGGINGS WOULD BE USEFUL IN THE CASE OF ILLEGAL ALIEN CRIMINALS. I would love to see them FLOGGED and deported.";

"How about an honest headline? Previously deported scumbag of an illegal alien gives birth to another anchor while in custody.";

14

"Illegal immigrants have ruined Nashville and TN! Helping an illegal immigrant is a crime." "Get her back to Mexico with her spawn."

Id. at 7-8.

George Barrett, who has over fifty years of experience litigating civil rights actions in Nashville, describes the "excellent legal representation" provided to Plaintiff in the "very contentious public climate." (Docket Entry No. 214-6, Barrett Declaration at ¶¶ 5, 6). Barrett further states: "It is my further opinion; given the controversy surrounding this case, viewed by many as extremely unpopular; and the economic circumstances of the Plaintiff coupled with the excellent results achieved by Plaintiffs' counsel deserve a multiplier of their fees of no less than two (2) times the fee." Id. at ¶ 15.

In an article for the journal *Political Behavior*, Efren Perez, a Vanderbilt University political scientist, reported his research and concluded that most Americans, despite their best intentions, harbor a negative bias against Latino immigrants. Efren Perez, *Explicit Evidence on the Import of Implicit Attitudes: The IAT and Immigration Policy Judgments* (2011). In a news release from Vanderbilt University, Perez stated, "I found that when the issue of immigration is broached, whether legal or illegal, many individuals automatically think of Latino immigrants. These attitudes, which lurk in one's subconscious, can influence people's judgments and behavior." Press Release, Vanderbilt University (July 1, 2010), *available at* http://news.vanderbilt.edu/2010/07/implicit-bias-against-latinos/. (Docket Entry No. 122 at 5).

15

Metro responds that "[t]he mere fact that illegal immigration is a controversial subject does not justify enhancement of the lodestar every time an illegal immigrant wins a civil rights lawsuit." (Docket Entry No. 226, Defendant's Opposition at 13). Metro also quotes Plaintiff's successful motion in limine about the public support for Plaintiff:

> The irrelevance of such information [about the threat of deportation] is further enhanced by the current unlikelihood that Ms. Villegas will be deported but instead will receive deferred action, as she has informally received for the past three years. Among the avenues available to Ms. Villegas to remain in this country are deferred action, private bill, cancellation of removal, U Visa, and humanitarian parole. Given the national and international support for Ms. Villegas, it is unlikely she will ever be deported and any suggestion otherwise— including any suggestion that she has brought this case because of her immigration status—would be misleading and unfairly prejudicial.

(Docket Entry No.122 at 5).

Metro conducted its Google search and found "support for Juana Villegas," in two articles citing Nashville lawyers who supported Plaintiff. (Docket Entry No. 226 at 11). Id. at Exhibit 1, Nashville City Paper, August 14, 2011 ("Damages trial for immigrant shackled during childbirth starts this week,") and Exhibit 2, Nashville City Paper, August 15, 2008 ("Woman who gave birth in sheriff's custody innocent on one charge," ) (attached as Exhibit 2). In a third Nashville City Paper dated March 6, 2009, Metro quotes the article, stating a "Woman who made headlines giving birth while shackled to bed in Sheriff's custody files second suit,". Id at Exhibit 3 at 1. Metro cites another article: "In the most recent lawsuit Villegas has also added a cadre lawyers from well-known Nashville firm Sherrard & Roe. They are Bill Harbison, Phil Cramer and

16

John Farringer."Id. at 2. To the Court, these articles are fact based, not supportive of one side.

To be sure, Metro quotes another article that Metro deems favorable to Plaintiff and misstating the facts of the case. Id. at Exhibit 1 ("When Davidson County Sheriff's Office deputies shackled Juana Villegas, then a 33-year-old mother of three, to the hospital bed — releasing her just long enough to give birth before replacing the irons on her wrists — they violated her civil rights.") Metro cites a crowded courtroom with few empty seats and asserts, without citing any empirical basis, that "the overwhelming majority of those spectators openly supported the Plaintiff" Id. at 11.

Finally Metro cites from Sherrard & Roe's firm website, http://sherrardroe.com/services.php, revealing that the firm's practice listings are "overwhelmingly dominated by legal issues specific to business entities." Id. at 12. According to Metro, "[c]ommon sense dictates that Sherrard & Roe typically is not pulling clients from the pool of individuals who submit racist and irrational comments to newspapers like those quoted in Plaintiff's filings." Id.

The Court concludes that Plaintiff's proof of the Perez study, the opinion of highly experienced civil rights counsel, and the prior articles cited in the Tennessean and other publications, is far more persuasive than the few fact based articles cited by Metro. In these circumstances, the Court concludes that in representing Plaintiff in this highly controversial action, Sherrard & Roe and Ozment had more than plausible concerns about their representation of Plaintiff that could have a negative economic impact on the firm's practice.

17

## B. Conclusions of Law

Congress authorized the award of reasonable attorneys' fees and expenses to prevailing parties in civil rights actions under section 1983. 42 U.S.C. § 1988(b). "The purpose of § 1988 is to ensure 'effective access to the judicial process' for persons with civil rights grievances." Hensley v. Eckerhart, 461 U.S. 424, 429 (1983); see also Perdue v. Kenny A. ex rel. Winn, 130 S. Ct. 1662, 1676 (2010) ("Section 1988 serves an important public purpose by making it possible for persons without means to bring suit to vindicate their rights.")"'[C]ounsel for prevailing parties should be paid, as is traditional with attorneys compensated by a fee-paying client, **for all time reasonably expended on a matter.**'" City of Riverside v. Rivera, 477 U.S. 561, 575 (1986) (internal quotation marks omitted and emphasis in original).

"[T]o qualify as a prevailing party, a civil rights plaintiff must obtain at least some relief on the merits of his claim." Farrar v. Hobby, 506 U.S. 103, 111 (1992). The statutory presumption is that absent "special circumstances" that would render such an award "unjust," a prevailing party under 42 U.S.C. § 1988 "must" be awarded attorneys' fees and expenses. Indep. Fed. of Flight Attendants v. Zipes, 491 U.S. 754, 761 (1989) (holding that "in absence of special circumstances a district court not merely 'may' but must award fees to the prevailing plaintiff") (emphasis in original); Hensley v. Eckerhart, 461 U.S. 424, 429 (1983) ("[A] prevailing plaintiff should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust.") (internal quotation marks omitted). Given the award of partial summary judgment and the jury

18

award of $200,000, the Court concludes that Plaintiff is a "prevailing party" who is entitled to her attorney's reasonable fees and expenses under § 1988.

A reasonable attorney fee under § 1988 is "one that grants the successful civil rights plaintiff a 'fully compensatory fee,' comparable to what 'is traditional with attorneys compensated by a fee-paying client.' " Missouri v. Jenkins by Agyei, 491 U.S. 274, 286 (1989) (internal citations omitted). "It is central to the awarding of attorney's fees under § 1988 that the district court judge, in his or her good judgment, make the assessment of what is a reasonable fee under the circumstances of the case." Blanchard v. Bergeron, 489 U.S. 87, 96 (1989).

A fee award is reasonable if sufficient "to attract competent counsel," but it is not designed to produce a windfall to the attorney for a prevailing party. Hadix v. Johnson, 65 F.3d 532, 535 (6ᵗʰ Cir. 1995) (citing Blum v. Stenson, 465 U.S. 886, 897 (1984)). The Supreme Court recently reiterated that "a 'reasonable fee' is a fee that is sufficient to induce a capable attorney to undertake the representation of a meritorious civil rights case," but Section 1988 is not designed "to provide 'a form of economic relief to improve the financial lot of attorneys.'" Perdue, 130 S. Ct. at 1672-73. Under Section 1988, attorney fees are **not** to be awarded  in proportion to the amount of damages recovered. City of Riverside v. Rivera, 477 U.S. 561, 580-81 (1986).

In awarding fees, Courts employ the "lodestar" method that multiplies a reasonable hourly rate by the reasonable number to hours expended, Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, 478 U.S. 546, 564 (1986), but the calculation excludes "unreasonable and excessive hours or when unique circumstances

19

justify adjustments to hourly rates." <u>United States ex rel. Taxpayers Against Fraud v.</u>

<u>General Electric Co.</u>, 41 F.3d 1032, 1048 (6th Cir. 1994). The lodestar method considers

an attorney's experience and special knowledge. <u>See</u> <u>Pierce v. Underwood</u>, 487 U.S.

552, 581 (1988). As to hourly rates, a reasonable rate is based upon the rates prevailing in

the community for similar services by lawyers of reasonably comparable skill, experience

and reputation. <u>Blum</u>, 465 U.S. at 895 n.11. Yet, "the fee applicant bears the burden of

establishing entitlement to an award and documenting the appropriate hours expended

and hourly rates." <u>Hensley</u>, 461 U.S. at 437. Plaintiff bears the initial burden "of

establishing entitlement to an award and documenting the appropriate hours expended

and hourly rates." <u>Hensley v. Eckerhart</u>, 461 U.S. 424, 437 (1983). "[T]he party opposing

the fee award then has the burden to challenge ... the reasonableness of the requested

fee." <u>Rode v. Dellarciprete</u>, 892 F.2d 1177, 1183 (3d. Cir. 1990).

### 1. The Distinctive Claims Analysis

Before the lodestar calculations, the Court first analyzes Metro's contention that

Plaintiff's attorney fees should be reduced because Plaintiff prevailed on only two of her

several claims, namely on her Fourteenth Amendment claims for her being shackled

during the final stages of her pregnancy and the denial of the breast pump prescribed by

the attending physicians. In addition, Metro contends that any attempt to recover fees for

Plaintiff's undecided motion for U-visa certification should be denied. Metro contends

that as a matter of law, Plaintiff's fee request should be reduced "by the expenditures of

time attributable to these unsuccessful claims". (Docket Entry No. 226 at 4).

20

Under the applicable law, the issue is "[f]irst, did the plaintiff fail to prevail on claims **that were unrelated to the claims on which he succeeded**? Second, did the plaintiff achieve a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award?" <u>Hensley</u>, 461 U.S. at 434 (emphasis added). "Where the plaintiff has **failed to prevail on a claim that is distinct in all respects from his successful claims**, the hours spent on the unsuccessful claim should be excluded in considering the amount of a reasonable fee." <u>Id.</u> at 440.(emphasis added). In sum,

> The fee award, of course, should not reimburse the plaintiff for **work performed on claims that bore no relation to the grant of relief**: Such work "cannot be deemed to have been expended in pursuit of the ultimate result achieved." **But the presence of these unsuccessful claims does not immunize a defendant against paying for the attorney's fees that the plaintiff reasonably incurred in remedying a breach of his civil rights**.

<u>Fox v. Vice</u>, 131 S. Ct. 2205, 2214 (2011) (emphasis added). This "results-obtained" analysis is "the most critical factor." on the reasonableness of a fee award. <u>Hensley</u>, 461 U.S. at 436. In a word, "the district court should award only that amount of fees that is reasonable in relation to the results obtained." <u>Id</u> at 424.

Here, Plaintiff's First Amendment claims involved the Defendant Metro's officials' denial of her requests to contact her husband or for a Metro to contact him or to visit her. The Court denied relief on these claims, but also deems these claims to be directly related to the circumstances of her unjustified detention[4] and shackling during her final stages of her pregnancy. Pretrial discovery is not limited to facts about a claim, but

---

[4] In its earlier ruling, the Court noted that Plaintiff, who was charged with a minor traffic offense, was detained under an immigration program designed for serious offenders. (Docket Entry No. 119-1 Memorandum at 34 n. 8).

extends to any facts that may lead to discovery of admissible proof. Moreover, any discovery would reasonably inquire about all aspects of Plaintiff's treatment. The jury considered all of the proof about the circumstances of Plaintiff's hospital stay, including the lack of visitation. There was testimony that Plaintiff was alone during this time and such a fact could be considered by the jury on Plaintiff's emotional damages. The jury awarded damages for Plaintiff's physical and emotional suffering of which denial of family and privacy are closely related. The briefing on Plaintiff's claims for denial of right of privacy and association consisted of two pages in Plaintiff's brief on motion for summary judgment. (Docket Entry No. 85 at 22-24). The Court's analysis of these claims was two pages. (Docket Entry No.119-1, Memorandum at 40-41).

In any event, the Court concludes Plaintiff's First and Fourth Amendment claims are factually indistinct claims. Thus, time related thereto was "reasonably incurred in remedying a breach of [Plaintiff's] civil rights," because all of these claims necessarily involve the facts inextricably intertwined to Plaintiff's successful claim. Fox, 131 S. Ct. at 2214. Finally, time expended on the First and Fourth Amendment claims are more than setoff by the number of hours that Sherrard & Roe excluded from its fee request.

As to the breach of contract claim, the Court found only a lack of subject matter jurisdiction over this claim. The Court observes that this contract claim had merit as the Court noted that given Plaintiff's arrest on a minor traffic citation, Plaintiff's offense did not qualify for her detention under Metro's 287 (g) contract with the United States that applies to serious offenders. (Docket Entry No. 119-1, Memorandum at 34 n. 8).

22

The only exception to the Court's finding on the distinctive claims analysis is the total hours expended by Ozment on Plaintiff's motion for U-visa certification. (Docket Entry No. 198). Although the relief sought in this motion for U-visa certification is tied to Plaintiff's treatment, there are significant different legal and factual aspects in the issues in this U-Visa motion. As to the U-visa motion, for the reasons stated in the separate Memorandum filed herewith, the Court concludes that Plaintiff's U-visa motion should be granted in part. Thus, the Court concludes one third of Ozment's time sought for work on Plaintiff's U-visa motion will be excluded.

### 2. The Hours Expended

As noted earlier, to calculate the "lodestar" award, the Court multiplies the number of hours reasonably expended on the litigation by a reasonable hourly rate. Blum, 465 U.S. at 888. A strong presumption exists that the lodestar represents a reasonable fee. Blanchard v. Bergeron, 489 U.S. 87, 95 (1989). Notably, reasonable attorneys' fees should compensate the work of paralegals and law clerks, in addition to the work of attorneys. Missouri v. Jenkins by Agyei, 491 U.S. 274, 285-86 (1989).

As to the hours expended, "to calculate the reasonable hours expended, the prevailing party's fee application must be supported by contemporaneous time records, affidavits, and other materials." McDonald v. Pension Plan of the NYSA-ILA Pension Trust Fund, 450 F.3d 91, 96 (2d Cir. 2006). "Counsel for the prevailing party should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary. . . . Hours that are not properly billed to one's client also are

23

not properly billed to one's adversary pursuant to statutory authority." <u>Hensley</u> 461 U.S. at 434. (internal quotation marks omitted) (emphasis in original).

Sherrard & Roe complied with these directives, as evidenced by the detailed tables reflecting the categories of their work. This was a three-year dispute from the initial investigation to a jury trial. A review of the summary tables and the docket entries in this action reflect that Sherrard & Roe actively pursued this action on Plaintiff's behalf. (Docket Entry No. 214-2, Cramer Declaration, Exhibit 1 thereto). George Barrett, Lee Barfield, and Robert Walker who have been engaged in civil litigation in Nashville for a combined 134 years, opine that the hours expended by Sherrard & Roe in this action are reasonable. Sherrard & Roe's exclusion of compensable time adds further credence to the reasonableness of their fee request. The Court concludes the hours expended by Sherrard & Roe,1,653.27 hours, are reasonable.Given the complexity of the U-visa motion, the Court deems the time expended by Ozment is also reasonable.

Several federal courts have found hours exceeding those requested here to be reasonable in cases where the representation spanned several years. See, e.g., <u>Cummings Incorp. v. BP Prods. N. Am., Inc.,</u> No. 3:06-0890 (M.D. Tenn. Docket Entry no. 297 March 3, 2010) (Trauger, J.) (approving of 4,568 hours as reasonable for purpose of fee petition after a three-year complex business dispute culminating in a jury trial); see also <u>Faigman v. AT&T Mobility LLC,</u> No. C06-04622 MHP, 2011 WL 672648, at *4 (N.D. Cal. 2011) (approving of 3,527 hours as reasonable after a four-year class action dispute); <u>Pruett v. Harris County Bail Bond Bd.,</u> 593 F. Supp. 2d 944, 948 (S.D. Tex. 2008) (approving of 1,317 hours in multiple-year civil rights case).

As stated earlier, these hours do not include all time expended by Sherrard & Roe on Plaintiff's action. Significantly, "time spent in preparing, presenting, and trying attorney fee applications is compensable as part of the reasonable fee." Gonter v. Hunt Valve Co., Inc., 510 F.3d 610, 620-21 (6th Cir. 2007) (Merritt, J.) (internal quotation marks omitted); accord United States ex rel. Lefan v. Gen. Elec. Co., 397 F. App'x 144, 150 (6th Cir. 2010); see also Coulter v. State of Tenn., 805 F.2d 146, 151 (6th Cir. 1986) ("The cases from this and other circuits uniformly hold that a lawyer should receive a fee for preparing and successfully litigating the attorney fee case after the original case is over."). Yet, as with other exclusions of its time, Sherrard & Roe elected to forego its right to seek additional fees for the time in preparing its fee petition.

### 3. The Hourly Rates

The second lodestar prong is whether counsel's hourly rates are reasonable. Hensley, 461 U.S. at 433. Whether an hourly rate is reasonable should be considered with reference to "the prevailing market rates in the relevant community." Blum v. Stenson, 465 U.S. 886, 895 (1984). "A reasonable attorney's fee under § 1988 is one calculated on the basis of rates and practices prevailing in the relevant market, i.e., 'in line with those [rates] prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation . . . .' " Missouri v. Jenkins by Agyei, 491 U.S. 274, 286 (1989).

The best indicator of the "market" hourly rate for an attorney is that attorney's actual, established hourly rate at which he or she bills and collects from paying clients. See Northcross v. Board of Ed. of Memphis City Schools, 611 F.2d 624, 638 (6th Cir.

1979) ("In most communities, the marketplace has set a value for the services of attorneys, and the hourly rate charged by an attorney for his or her services will normally reflect the training, background, experience and skill of the individual attorney."). Where civil rights litigation spans several years, the appropriate rate is each attorney's current hourly rate at the time of the fee petition, rather than the attorneys' historic hourly rates because rates increased over time. Jenkins, 491 U.S. at 283-84 ( "compensation received several years after the services were rendered . . . is not equivalent to the same dollar amount received reasonably promptly as the legal services are performed"). Thus, "an appropriate adjustment for delay in payment—whether by the application of current rather than historic hourly rates or otherwise—is within the contemplation of [section 1988]". Id. See also Barnes v. City of Cincinnati, 401 F.3d 729, 745 (6th Cir. 2005).

William Harbison's rate of $535 per hour reflects his numerous honors as the President of the Nashville Bar Association, a Fellow of the American Bar Association, and peer regard as among the "best lawyers." Phil Cramer and John Farringer, whose current hourly rates are $360 and $315, respectively, were members of the Order of the Coif at Vanderbilt Law School, editors of the Vanderbilt Law Review, and served as law clerks for federal judges.

Based upon these facts and the affidavits of three distinguished and experienced attorneys and the national survey, the Court concludes that hourly rates for each of Plaintiff's counsel, are reasonable rates in the Nashville legal community "for similar services by lawyers of reasonably comparable skill, experience, and reputation." Jenkins, 491 U.S. at 286.

26

Applying the 1,653.27 hours expended by Sherrard & Roe by its weighted or blended average of $322.02 per hour, including work performed both by attorneys and by paralegals and law clerks, the Court calculates the total "lodestar" fee to be $532,391.25, which is presumptively reasonable. Blanchard, 489 U.S. at 95. For Ozment who expended 80.8 hours on the U-visa motion, a one third reduction is necessary for the distinct unsuccessful claims yielding 53.8 compensable hours at an hourly rate of $351.00 for an attorney's fee award of $18,883.

### 4. The Enhancement Analysis

In exceptional circumstances, the Court can increase the lodestar award. Perdue, 130 S. Ct. at 1673. Such enhancements are based upon the "Johnson factors," listed in the Fifth Circuit's discussion in Johnson v. Ga. Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974). The Sixth Circuit adopted these factors. Reed v. Rhodes, 179 F.3d 453, 471 (6th Cir. 1999) (holding that "[the lodestar] amount can then be adjusted based on the Johnson factors").[5] In Perdue, the Supreme Court emphasized that ""an enhancement may not be awarded based on a factor that is subsumed in the lodestar calculation." and neither "the novelty and complexity of a case" nor "the quality of an attorney's performance" can justify an enhancement. 130 S. Ct. at 1673.

_____

[5]The Johnson factors are: "(1) the time and labor required by a given case; (2) the novelty and difficulty of the questions presented; (3) the skill needed to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases." Reed, 179 F.3d at 471 n.3.

Significant here is that counsel represented an unpopular client with controversial claims that alone is sufficient for a fee enhancement. Johnson, 488 F.2d at 719. "Civil rights attorneys face hardships in their communities because of their desire to help the civil rights litigant. Oftentimes [an attorney's] decision to help eradicate discrimination is not pleasantly received by the community or his contemporaries. This can have an economic impact on his practice which can be considered by the Court." Id. (internal citations omitted). The Sixth Circuit approved a fee enhancement of seventy-five percent (75%) for attorneys in a "highly controversial" case. See Barnes v. City of Cincinnati, 401 F.3d 729, 746-47 (6th Cir. 2005) (transsexual public employee claim of discrimination). Of course, each controversy is decided on its particular facts.

Here, based upon Plaintiff's status as an undocumented immigrant from Mexico, the Perez study, the observations and perceptions of an experienced civil rights attorney in this district and comments posted on local media website, including a proposed boycott of Plaintiff's counsel, the Court finds that these counsel who represented Plaintiff did so in a "highly controversial" action.

Other courts recognize the prejudicial effect of evidence of immigration status in litigation. See, e.g., Galaviz-Zamora v. Brady Farms, Inc., 230 F.R.D. 499, 502 (W. D. Mich. 2005) ( discovery of immigration status would cause prejudice and far outweigh the minimal legitimate value on credibility); Romero v. Boyd Bros. Transp. Co., Inc., 1994 WL 287434, at *2 (W.D. Va. June 14, 1994) (excluding evidence of plaintiff's immigration status because its probative value was far outweighed by the potential of prejudice before a jury and, "the threat that a jury would consider [the plaintiff's] alienage

in deciding upon the liability or assessing damages, contrary to clear public policy.");

Sanchez v. Echo, Inc., 2008 WL 2951339, at *1 (E.D. Pa. 2008) (evidence related to a person's immigration status had the potential of being highly prejudicial and could lead the jury to think that a plaintiff is undeserving of any compensation).

For these collective reasons, the Court concludes that a fee enhancement is warranted. Barnes upheld a 75% enhancement of any attorney fee award in an action far less controversial than this action. Moreover, Plaintiff's counsel undertook every reasonable measures to limit the costs of this controversial action, and had to endure Metro's intransigence that was unsupported by the relevant facts and law.[6] Thus, given the Barnes enhancement rate, the Court deems a fee enhancement of an additional twenty five percent for this far more controversial action appropriate. This results in a one hundred percent (100%) enhancement to Plaintiff's attorney fee award to reflect the high unpopularity of this action and the economic risks to Plaintiff's counsel in representing Plaintiff.

### 5. Fees and Expenses

"Unless a federal statute, these rules, or a court order provides otherwise, costs—other than attorney's fees—should be allowed to the prevailing party." Fed. R.

---

[6] As examples, Metro relied upon the opinions of a Vanderbilt University Medical School professor on the lack of risk to Plaintiff. In the Court's view, this opinion on the constitutional question could not trump the decisions of two circuits on strikingly similar facts as well as the opinions of the American Medical Association and the American College of Obstetricians and Gynecologists and United States treaties. (Docket Entry No. 119-1, Memorandum at 31-40).Metro also relied on correctional experts on the penological justifications for Metro's treatment of Plaintiff when such justifications, as a matter of law, apply to convicted prisoners, not a pretrial detainee charged with a minor traffic offense and without any criminal history or violence. Id. at 28 n. 6

Civ. P. 54(d)(1). Section 1988 does not provide otherwise; to the contrary, it expressly permits the prevailing party to recover reasonable attorneys' fees "as part of the costs." 42 U.S.C. § 1988(b); see also 28 U.S.C. § 1920 (providing a list of statutorily reimbursable costs). Moreover, "[i]n awarding an attorney's fee under [§ 1988(b)] . . . , the court, in its discretion, may include expert fees as part of the attorney's fee." 42 U.S.C. § 1988(c).

In addition to attorneys' fees, Sherrard & Roe seeks reimbursement of its costs and expenses in the amount of $82,394.51. (Docket Entry No. 214). These costs are disaggregated both in the Bill of Costs and in a helpful costs-and-expenses table. See Exhibit 2 to Decl. of Phillip F. Cramer. Of that grand total, the subtotal for costs and expenses not relating to expert witnesses is $12,941.51. (Docket Entry No. 210). All of these non-expert expenditures fall within the scope of 28 U.S.C. § 1920. All have already been paid in their entirety. (Docket Entry No. 214-2, Cramer Declaration at ¶ 17). And all were reasonable and necessary. (Docket Entry No. 214-1, Harbison Declaration at ¶ 8). In fact, this total excludes costs incurred for Westlaw and Lexis, reference materials and books, administrative costs, videoconferencing fees, exemplar shackles, medical-records request fees, donated expert time, and telephone expenses—which would have added tens of thousands of dollars to the total, and which Sherrard & Roe has decided to donate as part of its representation of Ms. Villegas.

The portion of costs and expenses relating to experts is $69,453.00. (Docket Entry No. 214-2, Cramer Declaration, Exhibit 2 thereto). Section 1988(c) authorizes the Court to reimburse of expert-witness fees. Expert witnesses were integral to Plaintiff prevailing

30

on the merits of her claim and damages. Several experts donated all or some of their time for their work in this action.

Ozment is awarded his costs set out in his separate statement seeking $2,338.20 in costs.(Docket Entry No. 211),

For these collective reasons, the Court concludes that Plaintiff's motion for attorneys' fees and costs should be granted to award Sherrard & Row $1,064,782.50, and costs and expenses of $82,394.51. Elliott Ozment should be awarded $37,766 in attorney fees and $2,338.20 in costs.

An appropriate Order is filed herewith.

Entered thsi the _20th_ day of September, 2012.

William J. Haynes, Jr.
Chief Judge
United States District Court

31